UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel 44 Wall Street 6th Floor New York, NY 10005** *Plaintiff*, v. **GLOBAL NAPS, INC.,** *Defendant* | 08 –CIV-3829 (Judge Rakoff) **NOTICE OF MOTION** |

Joel Davidow (JD-4500)
KILE GOEKJIAN REED & MCMANUS, PLLC
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

William J. Rooney, Jr. (WR-8317)
Jeffrey C. Melick (JM-1686)
89 Access Road, Suite B
Norwood, MA 02062
(781) 551-9956

*Counsel for Defendant*

**PLEASE TAKE NOTICE** that undersigned counsel for Defendant Global NAPs, Inc. shall move this Court, before the Honorable Jed S. Rakoff, at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007, at 5:00 p.m., September 10, 2008,

(1) for summary judgment in favor of Defendant and against Plaintiff MetTel, and an order dismissing all counts of the Amended Complaint with prejudice;

(2) alternatively, with respect to Count I of the Amended Complaint, for summary judgment and an order dismissing the count with prejudice to the extent it asserts claims accruing more than two years prior to April 23, 2006, and staying the remainder of its claims on the basis of the doctrine of primary jurisdiction.

The basis for this motion is set forth in the accompanying memorandum in support.

Respectfully submitted,

Joel Davidow (JD-4500)
KILE GOEKJIAN REED & MCMANUS, PLLC
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel**<br>**44 Wall Street**<br>**6th Floor**<br>**New York, NY 10005**<br><br>***Plaintiff,***<br><br>-vs-<br><br>**GLOBAL NAPS, INC.,**<br><br>***Defendant*** | **08 - CIV - 3829 (Judge Rakoff)**<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR DISMISSAL UNDER DOCTRINE OF PRIMARY JURISDICTION** |

Joel Davidow (JD-4500)
Kile Goekjian Reed & McManus, PLLC
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

William J. Rooney, Jr. (WR-8317)
Jeffrey C. Melick (JM-1686)
89 Access Road, Suite B
Norwood, MA 02062
(781) 551-9956

*Counsel for Defendant*

## AUTHORITIES

### Cases

*Abraham & Straus v. Teller*, 37 Misc.2d 797, 799-800, 236 N.Y.S.2d 435, 438 (N.Y.City Civ.Ct.1962)....16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-252 (1986)....6

*Alliance Communications Cooperative, Inc. v. Global Crossing Telecommunications, Inc.*, 2007 WL 1964271 (D.S.D. July 2, 2007)....15

*Davis & Cox v. Summa*, 751 F.2d 1507, 1516 (9th Cir. 1995)....15

*Evans v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000)....15, 16

*Freedom Ring Commc'ns, LLC v. AT & T Corp.*, 229 F.Supp.2d 67, 69-70 (D.N.H.2002)....16

*Frontier Tel. of Rochester, Inc. v. USA Datanet Corp.*, No. 05-CV-6056 (CJS), 2005 WL 2240356 (W.D.N.Y. August 2, 2005)....13

*Hofeldt v. Mehling*, 658 N.W.2d 783, 788 (S.D.2003)....15

*Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001)....6

*In re Transcom*, No. 05-31929-HDH-11 (Bkrptcy. N. D. Tex., Apr 28, 2005)....10, 12

*Marcus v. AT & T Corp.*, 138 F.3d 46, 60-62 (2d Cir.1998)....15

*MCI WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc.*, No. Civ. A 04-1479, 2005 WL 2145499, at *5 (E.D.Va. Aug.31, 2005), *aff'd*, 204 Fed. Appx. 271 (4th Cir.2006)....15

*Meadowbrook-Richman, Inc. v. Associated Fin. Corp.*, 325 F.Supp.2d 204 (S.D.N.Y. 2004)....16

*National Comm. Assn., Inc. v. American Tel & Tel. Co.*, 46 F. 3d 220, 222 (2d Cir. 1995)....12

*Paetec Comm., Inc. v. Cellco Partnership*, No. 17-821(MLC), 2007 WL 2300775 (D. N.J. Aug. 7, 2007)....13

*Parsons v. Batchelor*, 233 A.D. 517, 518, 253 N.Y.S. 728, 728-730 (N.Y.A.D. 1 Dept.1931)....16

*Reconstruction Finance Corp. v. Commercial Union of America Corp.*, 123 F.Supp. 748. 756 (D.C.N.Y. 1954)....................16

*Southwestern Bell, L.P. v. Vartec Telecom, Inc.*, No. 4:04-CV-1303, 2005 WL 2033416 (E.D.Mo. August 23, 2005)....................13

*Sprint Spectrum v. AT&T*, 168 F.Supp.2d 1095 (W.D. Mo.2001)....................13

*The Southern New England Telephone Co. v. Global NAPs, Inc.*, Civ. Action. No. 3:04-CV-2075 (JCH) 2005 WL 2789323 (D. Conn. 2005)....................13

*Union Tel. Co. v. Qwest Corp.*, No. 02-CV-209-D, 2004 WL 4960780, at *15 (D.Wyo. May 11, 2004)....................15, 16

*Verizon New York, Inc., v. Global NAPs, Inc.*, 463 F.Supp.2d 330 (SDNY 2006)....................15

*Wilson v. Gotham Instrument Co.*, 198 Misc. 1009, 1010, 101 N.Y.S.2d 699, 700-01 (N.Y. Sup.1950)....................16

**Rules**

FRCP 56....................6, 18

28 U.S.C. §1367....................15

47 C.F.R. §67.702(a)....................5

47 C.F.R. §69.5(b)....................7, 8

47 U.S.C. §153(43) and (46)....................8

47 U.S.C. §157....................14

47 U.S.C. § 201....................4

47 U.S.C. § 230(b)(2)....................14

47 U.S.C. § 253....................14

47 U.S.C. §415....................11

**Commission/Other Holdings**

*In the Matter of Intercarrier Compensation for ISP-Bound Traffic*, CC Docket No 99-68, F.C.C. 01-131(Apr. 27, 2001)....................17

*In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges*, FCC WC Docket No. 02-361.......7

*In the Matter of Time Warner Cable Request for Declaratory Ruling that Competitive Local Exchange Carriers May Obtain Interconnection Under Section 251 of the Communications Act of 1934, as Amended, to Provide Wholesale Telecommunications Services to VoIP Providers*, WC Docket No. 06-55, DA 07-709, Memorandum Opinion and Order, ¶17 (March 1, 2007).......8

*In re IP-Enabled Services*, 19 F.C.C.R. 4869, 2004 WL 439260 (2004) (Notice of Proposed Rulemaking).......13

*In re Time Warner Cable*, 22 F.C.C.R. 3513 (2007), 2007 WL 623570 (F.C.C.), at ¶17.......14

Level 3 Draft Arbitration Order http://docs.cpuc.ca.gov/Published/Rulings/42478.htm.......9, 10

[Calif] *Order Instituting Investigation re Voice over Internet Protocol*, No. 1.04-02-07...9

*Petition of MCImetro Access Transmissoin Services, LLC and MCI WorldCom Communications, Inc. for Arbitration of Interconnection Terms and Conditions and Related Arrangements with Wisconsin Bell, Inc., d/b/a Wisconsin Pursuant to 47 U.S.C. §252(b)*, PSC Ref. No. 54417, Arbitration Award of May 15, 2006.......9

PSC Case No. 07-C-0059, *Complaint of TVC Albany, Inc. d/b/a Tech Valley Communications Against Global NAPs, Inc. for Failure to Pay Intrastate Access Charges*, Order dated Mar. 20, 2008.......8, 11, 12

*Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, WC Docket No. 03-211, 19 F.C.C.R. 22404, 2004 WL 2601194 (2004) ("FCC Vonage Order"), *affirmed Minnesota P.U.C. v. FCC*, 483 F.3d 570 (8th Cir. 2007).......12, 13

## I. INTRODUCTION

This case arises out of two major developments in American telecommunications that have engendered much legal uncertainty. The first is that antitrust actions and related legislation fostered competition in telephony and created interconnection duties, but raised difficult problems concerning how to set intercarrier compensation. The second unsettling development has been the rapid growth of internet communications, which are capable of being cheaper and more flexible than the public switched telephone network (PSTN). When computer users speak directly to each other by means of internet transmission, there are no telephone charges to be paid. However, in regard to people using computers and internet transmission to speak to their friends on the PSTN, legal and policy debate has ensued concerning whether such traffic should be characterized and treated as normal telecommunications or as enhanced/information traffic that is not subject to the same switched access fees that regular long distance carriers pay to each other.

Plaintiff ("MetTel") has dial tone telephone customers. When other long distance companies send calls to it, it completes those calls and bills them under interstate and intrastate tariffs it has established. When it started to receive calls from the computer voice telephone companies whose traffic Defendant ("Global") forwards, it attempted to impose its regular interstate and intrastate tariff charges. MetTel persisted in its billing attempts even after Global explained that its traffic was "enhanced", i.e., changed in form and content both by it and by its customers and, as explained below, thus exempt under FCC rules from MetTel's tariffs. Global forwards "Voice over Internet Protocol" (VoIP) calls that many courts and agencies have held to be exempt from the high access charges imposed on regular long distance calls.

Further, the FCC has decided that internet telephone service, because it is usually "nomadic" (a customer can take a converter wherever she goes), is interstate traffic and thus not subject to intrastate tariffs at all. That conclusion has been reinforced in a federal circuit court and in decisions of state commissions.

Further, as we informed MetTel in urging it to withdraw its complaint, the New York Public Service Commission ("PSC"), in a case virtually identical to this (*i.e.*, a small telephone company attempting to impose switched access tariff charges on Global's traffic) completely rejected the attempt, other than using its regulatory authority to encourage negotiation of some interim rate.

When federal or even state courts have been faced with cases like MetTel's, they have consistently refused to adjudicate them until the FCC clarifies the status of VoIP or until state public utility commissions forge some other solution.

MetTel attempts to escape these federal preemption and state regulation hurdles by adding supposedly common law counts entitled "unjust enrichment" and "account stated." But it is well settled that, due to the "filed rate doctrine," an unjust enrichment case cannot be entertained in court to compensate a common carrier whose tariff does not apply. Governing law is equally clear that where, as here, the underlying claim is flawed, or the recipient of bills responds unequivocally that it has legal or other grounds for not paying them, an account stated cause of action will not lie.

Count V of the complaint, added by amendment, only masquerades as a triable claim against Global. Having been informed that Global is also immune from VoIP charges because it is a mere intermediary, MetTel threatens to use discovery in this case as a stepping stone to a suit

against Global's VoIP customer/suppliers. Such intention is obviously not a sustainable cause of action against Global nor a proper use of a complaint and accompanying discovery.

In accordance with Local Civ. R. 56.1, a concise statement of undisputed material facts is attached with this memorandum to our notice of motion, as are the supporting declarations of James R. J. Scheltema, Global's Vice President for Regulatory Affairs and Brad Massuret, Global's Vice President for Sales and Marketing, attached hereto as Exhibits 1 and 2 respectively. Both exhibits are submitted under seal in accordance with the Court's Protective Order entered in this case July 30, 2008 with confidential customer list.

There being no facts that will save MetTel's claims, Defendant Global NAPs, Inc. ("Global") is entitled to dismissal for the reasons stated below. Alternatively, Count I should be limited to two years, and that portion of it stayed or dismissed on primary jurisdiction grounds, while Counts II, III, IV and V are dismissed with prejudice.

## II. FACTUAL BACKGROUND

We accept as a given MetTel's description of its own business as stated in the Amended Complaint, and we add four significant facts. First, MetTel has never had a contract with Global (Scheltema Decl. ¶5); it relies entirely upon its tariffs as grounds for its claims. Second, Global sends no traffic directly to MetTel (Scheltema Decl. ¶10), but only to Verizon, an "incumbent local exchange carrier" or "ILEC," which forwards it to MetTel. Third, MetTel's tariffs never mention VoIP by name, nor have any provisions for traffic that touches the internet. Fourth, it seems that MetTel has never knowingly asserted such tariff claims against any other VoIP provider, much less been successful in doing so. *See,* Met Tel's Answers to Interrogatories 4 and 5, received July 29, 2008, attached as Exhibit 3.

Taking MetTel at its word (see Complaint ¶14), it owns or controls local telephone lines over which it provides telecommunication services to paying subscribers. To obtain switching capacity to some of its local customers, MetTel leases capacity on switches owned or controlled by an ILEC. Under the Telecommunications Act of 1996, 47 U.S.C. 201 *et seq.* (the "Act"), ILECs are generally required to permit MetTel and other "competitive local exchange carriers," or "CLECs," to interconnect with them, subject to terms and conditions set forth in interconnection agreements, known as "ICAs," negotiated under section 252 of the Act and approved by the PSC. Global is not involved in MetTel's arrangements, whatever they may be, with any ILEC.

As set forth in our Rule 56.1 Statement and in the accompanying declarations, Global plays only one role and provides only one type of traffic that travels over MetTel's lines to MetTel customers. Global's role is that of an intermediate carrier. Scheltema Decl. ¶9. It originates none of the traffic it forwards to MetTel. Global transports the traffic that eventually reaches MetTel on behalf of its ESP customers. It currently receives the traffic from only four companies, although another company forwarded traffic during at least a portion of the time period covered by the Amended Complaint. (See CONFIDENTIAL sections of the Masuret and Scheltema Declarations). Global's contracts with four of those five companies have been produced to MetTel, and are attached herewith as CONFIDENTIAL Exhibits 4, 5, 6 and 7. Each warrants that the traffic being sent to Global is IP and enhanced traffic. Global's three major suppliers have provided Global with letters describing their businesses and interconnection activities with Global. Those letters, plus the additional one were substantially the same as letters submitted to the New York PSC, which formed a key part of the bases for the PSC Staff

determination that the traffic at issue was exempt from the application of access charges. They are included with Exhibits 4, 5, and 6.

Global's customers are not VoIP providers in themselves, in that they do not react with the general public, but rather are aggregators of VoIP calls. A VoIP provider, such as Vonage or Packet8, routes its subscriber's calls to a VoIP aggregator, such as Global's customers who, in turn, enhance the signals and route the calls through Global's facilities.

Such traffic is routed to Global, and transformed by Global to an internet protocol called Asynchronous Transfer Mode ("ATM"), unless already in ATM. Due to the operations of Global and its traffic suppliers, such traffic, it is "enhanced" as defined in FCC Regulations at 47 CFR §67.702(a). All traffic is transported over Global's network in ATM. At the Global switch proximate to its exchange with the incumbent carriers, the ATM formatted communication is then reassembled and converted to Time Division Multiplexing ("TDM") for ILECs such as Verizon, which subsequently delivers it to dial-tone users or to MetTel. Thus, the traffic Global sends to MetTel has been "enhanced" at least twice before it reaches Verizon or MetTel, once by Global's customers and once when relayed by Global. Global, like its customers, is therefore an "enhanced service provider" ("ESP").

In New York, the communications in dispute in this case are usually sent by Global to Verizon's network, whereupon Verizon delivers them to its dial tone customers or forwards some of them to MetTel for termination to MetTel's end-users. Due to the hardware provided by Vonage or other VoIP providers who recruit the end-user customers, those communications are largely, if not exclusively, "nomadic" VoIP, since calls may, for example, be placed via a laptop computer from anywhere there is Internet access, *e.g.*, a Starbucks store. In regard to nomadic VoIP traffic, the number assigned to the calling party may have no geographical relevance to his

physical location. It is equally likely for the calling party to have a number with a 212 area code whether he is placing the call from San Francisco or Miami – and in neither instance is the calling party's number geographically connected to Manhattan. This makes traditional measures of associating the called and calling party's number to determine distance impossible. Indeed, as explained in detail below, this "impossibility exception" was one driving force in the FCC and federal court decisions to declare such traffic to be jurisdictionally interstate and to retain exclusive jurisdiction over all IP-enabled calls.

## III.    APPLICABLE STANDARDS UNDER RULE 56.

Rule 56 of the Federal Rules of Civil Procedure states that a party is entitled to summary judgment where

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact....

A "genuine issue" exists where the evidence before the court is of such a nature that a rational fact-finder could not find in favor of the non-moving party after drawing all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-252 (1986). Any genuine issue must also pertain to some "material fact." This materiality distinction creates a demarcation between irrelevant or unnecessary facts and those facts that might affect the outcome of the case. *Id. See also Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001).

## IV.    THE STANDARDS FOR SUMMARY JUDGMENT ARE MET

An essential element of MetTel's first claims is that its state or federal tariffs apply to Global, an intermediate transmitter of VoIP traffic. Because this assertion is contradicted by all state and federal cases on VoIP regulation, this element cannot be established. The operative

facts, as set forth in the accompanying statement under Rule 56 can not be seriously disputed. Neither party disputes the transmission or receipt of traffic by the parties during the relevant time. Likewise, the validity of Plaintiff's tariffs is not disputed. The only dispute has to do with whether Plaintiff's tariffs can legally apply to Defendant and its VoIP traffic. The law is that enhanced VoIP service is either an information service or is so different from standard long distance that a new pricing regime will have to be forged by the FCC for it.

**A. Counts I and II Should Be Dismissed Because Such Claims Are Precluded By Applicable Federal Law.**

The traffic Global transfers to MetTel for termination is subject to neither interstate or intrastate tariffs, for different reasons. We discuss the controlling precedents below. Numerous state agencies, and at least one federal court, have so ruled. We are aware of no controlling case law or other authority to the contrary.

**Count I: Breach of Federal Tariff.**

In Count I of its Amended Complaint, MetTel alleges that the "interstate access charges set forth in "F.C.C. Tariff No. 3" are applicable to traffic relayed from Global to MetTel's New York customers, and that Global has used switched access subject to that tariff since on or about February, 2001. Count I is untenable for several reasons.

First, Global is an intermediate CLEC, not an interexchange carrier or end-user service provider. Such intermediaries may not be billed switched access fees unless an applicable tariff so provides. Order of Apr. 21, 2004, *In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges*, FCC WC Docket No. 02-361, note 92 at 15, citing 47 CFR §69.5(b).

Second, even if Global were not an intermediate carrier, it would not be subject to MetTel's access charges, because the traffic it forwards is "enhanced" and is "VoIP", which is

presently immune from switched access tariff charges, due to the federal regulatory situation, recognized by state commissions in New York and elsewhere as having preemptive effect. At present, it cannot be said that VoIP traffic is "telecommunications," and handling it is thus not "telecommunications service" at all within the meaning of 47 U.S.C. §153(43)[1] and (46), respectively. Accordingly, access charges cannot apply under FCC rules, including 47 CFR §69.5(b), which limits the applicability of access charges to "telecommunications services."

The PSC has recently ruled that VoIP traffic cannot be subjected to tariff charges, pending the conclusion of FCC proceedings to determine whether the "ESP Exemption" applies, whether such traffic constitutes "information services" rather than "telecommunications services," and whether rates or any type of charges ultimately approved may be applied, and, if so, retroactively or only prospectively. PSC Case No. 07-C-0059, *Complaint of TVC Albany, Inc. d/b/a Tech Valley Communications Against Global NAPs, Inc. for Failure to Pay Intrastate Access Charges,* Order dated Mar. 20, 2008 (hereinafter *"TVC,"* copy attached as Exhibit 8). The FCC has not yet determined whether interstate switched access tariff charges should apply to VoIP traffic, and instead has indicated that interconnecting carriers will have to negotiate rates for terminating such traffic.[2] (Of course, Global does not interconnect with Met Tel.) It should be noted that the TVC factual finding and legal conclusions were bottomed on letters from two of our four customers. This motion is supported by letters from three of our customers. See

---

1 "The term 'telecommunications' means the transmission, between or among points specified by the user, of information of the user's choosing, *without change in the form or content of the information* as sent or received." (Emphasis added.) Thus, changes in form or content of the traffic involved place it outside the definition of "telecommunications service," giving rise to what is generally referred to as the "exemption" for "enhanced services," or the "ESP Exemption."

2 *In the Matter of Time Warner Cable Request for Declaratory Ruling that Competitive Local Exchange Carriers May Obtain Interconnection Under Section 251 of the Communications Act of 1934, as Amended, to Provide Wholesale Telecommunications Services to VoIP Providers*, WC Docket No. 06-55, DA 07-709, Memorandum Opinion and Order, ¶17 (March 1, 2007).

Exhibits 4, 5 and 6. Also, we attach as Exhibit 9 the transcript of testimony of the independent expert who described Transcom's enhancement methods and their effects.

A similar statement of the law is found in a 2006 decision of the Wisconsin Public Service Commission ("WPSC"). *Petition of MCImetro Access Transmissoin Services, LLC and MCI WorldCom Communications, Inc. for Arbitration of Interconnection Terms and Conditions and Related Arrangements with Wisconsin Bell, Inc., d/b/a Wisconsin Pursuant to 47 U.S.C. §252(b)*, PSC Ref. No. 54417, Arbitration Award of May 15, 2006. That case is of special interest because the winning party was Verizon Business Services (formerly MCI), and MetTel generally receives Global's traffic through Verizon. The question before the WPSC was whether AT&T's local affiliate could impose switched access charges on the VoIP service that Verizon/MCI was transmitting, a question answered in the negative. The WPSC panel found that "IP-PSTN traffic is a type of information service," *Id.* at 25, and therefore went on to conclude "that the ESP exemption applies to the IP-PSTN traffic at issue in this arbitration. MCI is not responsible for paying access charges for IP-PSTN traffic it delivers to AT&T." *Id.* at 32.

Another clear statement of current regulatory law and policy regarding VoIP comes from a ruling of a California Public Utilities Commission ("CPUC") ALJ in a case between SBC and Level 3 Communications, one of Global's competitors (copy attached as Exhibit 10):

> Contrary to SBC's position, IP-enabled services traffic is not currently subject to access charges. As the Commission notes in its order instituting its investigation into the regulatory framework to apply to Voice over Internet Protocol (VoIP), VoIP providers do not contribute to the payment of access charges under the current regulatory access charge scheme. [citing *Order Instituting Investigation re Voice over Internet Protocol*, 1.04-02-07, p. 7]. This observation echoes the FCC's acknowledgement that currently IP telephony "is exempt from the access charges that traditional long-distance carriers must pay" ... It may be that the

> FCC will ultimately determine that IP-enabled services traffic will be subject to access charges due to its similarity to interexchange traffic. However, it is inappropriate for this Commission to make that determination here in the face of both commissions' statements that access charges do not currently apply, the FCC's very recent assertion of exclusive economic jurisdiction over certain IP-enabled services, the FCC's steadfast and emphatic refusal to prejudice the applicability of access charges to IP-enabled services traffic, and the FCC's pending determination on the issue in the *IP-Enabled Services NPRM*.

That ruling also accepted Level 3's request that the PUC should cause the parties to add a sentence in their ICA specifying that "intraLATA toll traffic does not include IP-enabled services traffic." *Id.* at 7-8.

Finally, in a highly relevant federal case (one in a succession of four related rulings), *In re Transcom*, No. 05-31929-HDH-11 (Bkrptcy. N. D. Tex., Apr 28, 2005) (attached hereto as Exhibit 11), a bankruptcy court analyzed in detail the applicability of interstate access charges to Transcom's VoIP traffic, and found them inapplicable as a matter of fact and law. In that case, SBC sued under an ICA for terminating traffic from Transcom – a Global customer, and, like Global, a VoIP transmitter. Transcom defended on the ground that, since it was solely a VoIP provider, it was not subject to access charges until the FCC clarified the law as to whether VoIP is an "information service" or a "telecommunication service." After an evidentiary hearing and expert testimony, the judge concluded that Transcom was clearly a VoIP provider, and agreed with Transcom that VoIP is an information service that is not now, and should not be, subject to access charges:

> Based on the evidence and testimony presented at the hearing, the Court finds, for purposes of the §365 motion before it, that the Debtor's [Transcom's] system fits squarely within the definitions of "enhanced service" and "information service," as defined above. Moreover, the Court finds that [Transcom's] system falls outside of the definition of "telecommunications service" because [Transcom's] system routinely makes non-trivial changes to user-supplied information (content) during the entirety of every communication. Such changes fall outside the scope of the operations of traditional telecommunications networks, and are not necessary for the ordinary management, control or operation of a telecommunications system or the management of a telecommunications service. As such, [Transcom's] service is not a "telecommunications service" subject to access charges....

*Id.* at 11. The direct relevance of the Transcom court's findings of fact to Global's traffic at issue in this case is that Global is forwarding Transcom's traffic. This is amplified in the Transcom letter and the declarations.

Finally, a two-year statute of limitations applies to federal tariff claims by virtue of 47 U.S.C. §415. Irrespective of this Court's ruling on dismissal of Count I in its entirety, summary judgment is at least required as to all claims accruing before April 23, 2006.

**Count II: Breach of Intrastate Tariff**

Count II, based on treating Global's traffic as intrastate, is equally untenable. The PSC and other state agencies and courts have definitively ruled that nomadic VoIP traffic such as that originating with Global's suppliers must be treated as interstate traffic because it is primarily if not exclusively interstate. State tariffs are inapplicable to interstate traffic. *TVC* is fatal to Plaintiff's state tariff count, since the PSC accepted Global's proof there, buttressed by its staff's conclusions, that Global is, in fact, an intermediate carrier of nomadic VoIP, and is thus providing an interstate service not subject to intrastate tariffs. In rejecting TVC's intrastate charges, the PSC stated:

> Because nomadic VoIP is interstate in nature, and because its rates are exclusively under the FCC's jurisdiction, we are similarly precluded from imposing the TVC intrastate access tariff. Under the FCC's decisions, nomadic VoIP is treated as interstate subject to exclusive federal rate jurisdiction. *Applying the TVC intrastate access tariff to an interstate service would be inappropriate and conflict with valid federal laws and policies.*

*TVC* at 15 (emphasis added); *see*, *Minnesota Public Utilities Comm. v. FCC*, 483 F.3d 570 (8th Cir. 2007) (upholding FCC's "Minnesota/Vonage Order," 19 F.C.C. 22404 (2004), preempting state regulation of "nomadic" VoIP services).[3]

3 While limiting its holding to that of the Eighth Circuit *Vonage* opinion on which it relied, the PSC also pointed out that the FCC's determination arguably applies to "…VoIP-to-VoIP, VoIP-to-

**B. Dismissal of Count I Is Also Appropriate on Primary Jurisdiction Grounds.**

Just as it is clear that MetTel's tariffs cannot apply to the VoIP traffic it receives from Global, it is equally clear that seeking to parse such issue further would plunge the court into a cutting edge issue of national telecommunications policy with which the FCC is currently occupied. For that reason, this court is, at a minimum, obliged to defer to the competent federal agency on grounds of primary jurisdiction, and dismiss or stay Count I of the complaint on those grounds.

Numerous courts have granted motions to dismiss, or similar relief, under circumstances like those of this case. As stated by the Second Circuit, four factors govern applicability of the doctrine of primary jurisdiction: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *National Comm. Assn., Inc. v. American Tel & Tel. Co.*, 46 F. 3d 220, 222 (2d Cir. 1995). Applying this test, numerous courts in this circuit and elsewhere have dismissed or stayed claims for access charges on account of VoIP or IP-enhanced traffic.

In *The Southern New England Telephone Co. v. Global NAPs, Inc.*, Civ. Action. No. 3:04-CV-2075 (JCH) 2005 WL 2789323 (D. Conn. Oct. 26, 2005), the court considered Global's motion to dismiss an ILEC's tariff claims on primary jurisdiction grounds. The ILEC opposed the motion on the basis that its complaint was not based solely, or even principally, on VoIP.

---

landline and landline-to-VoIP calls (interconnected VoIP calls) because the VoIP part of the call is not confined to the geographic location associated with the customer's billing address or assigned telephone number." *Id.* at 11.

Ruling on Global's motion under Rule 12(b)(6), the court denied it as to traffic that was neither VoIP nor IP-enhanced calls; as to such calls, however, the court stayed the plaintiff's claims "...to the extent they assert[ed] causes of action regarding traffic that involves IP at some point in its transmission." *Id.* at *6.[4] To similar effect are cases on which the Connecticut District Court relied primarily, *Frontier Tel. of Rochester, Inc. v. USA Datanet Corp.*, 386 F.Supp.2d 144, 2005 WL 2240356 (W.D.N.Y. 2005)(staying ILEC's claim against VoIP provider for access charges), and *Southwestern Bell, L.P. v. Vartec Telecom, Inc.*, No. 4:04-CV-1303, 2005 WL 2033416 (E.D.Mo. August 23, 2005) (staying claims for transmission of interexchange IP-enabled traffic). *See also, Sprint Spectrum v. AT&T*, 168 F.Supp.2d 1095 (W.D. Mo.2001); *Paetec Comm., Inc. v. Cellco Partnership*, No. 17-821(MLC), 2007 WL 2300775 (D. N.J. Aug. 7, 2007)(Deferring to the primary jurisdiction of the FCC and state commissions).

While the FCC has not yet specified the compensation rates for terminating VoIP traffic, it has clearly and repeatedly stated both its intention to do so and that piecemeal resolution of this issue at the state level has been preempted. Memorandum Opinion and Order, *Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, WC Docket No. 03-211, 19 F.C.C.R. 22404, 2004 WL 2601194 (2004) ("FCC Vonage Order"), *affirmed Minnesota P.U.C. v. FCC*, 483 F.3d 570 (8th Cir. 2007). Furthermore, the FCC is currently considering the appropriate access charge treatment for IP-enabled services and VoIP. While it has not yet determined what the current law requires with respect to such charges, it has stated repeatedly that it is prepared to intercede, and it has taken steps toward resolving such issues. *See, In re IP-Enabled Services*, 19 F.C.C.R. 4869, 2004 WL

---

4 In *SNET*, the court did not discuss its procedural choice of staying the plaintiff's claims until after FCC action regarding VoIP, as opposed to dismissing them without prejudice. It would make little practical difference in the case at bar.

439260 (2004) (Notice of Proposed Rulemaking). On March 1, 2007, the FCC stated: "We do not, however, prejudge the Commission's determination of what compensation is appropriate, or any other issues pending in the Intercarrier Compensation docket." *In re Time Warner Cable*, 22 F.C.C.R. 3513 (2007), 2007 WL 623570 (F.C.C.), at ¶17.

Further difficulties with district court adjudication of VoIP issues become apparent when the full import of the FCC Vonage Order is considered. The FCC did not rely on its "impossibility doctrine" (*i.e.*, the impossibility of distinguishing interstate from intrastate VoIP traffic requires that it all be treated as interstate) as the sole basis for federal preemption, but also stressed additional grounds, such as Congress's expressed preference for developing a national VoIP framework (citing section 230 of the TCA[5]) and section 706[6] ("...precluding multiple disparate attempts to impose economic regulations" on VoIP services that would thwart its development by allowing each state commission to take a different approach. The FCC also noted that it could also have relied on Section 253,[7] which provided preemptive authority over state regulations that "prohibit or have the effect of prohibiting the ability of an entity to provide any interstate or intrastate telecommunications service." *Id.* at paras 34, 36-37, and n.69.[8]

**C. <u>Count III: Unjust Enrichment</u>**

MetTel's claim for "unjust enrichment" is of course a state law claim, jurisdiction over which, under 28 U.S.C. §1367, must be premised on a valid federal cause of action. Here, there

---

5 47 U.S.C. § 230(b)(2).

6 47 U.S.C. §157 note (containing Section 706 of the Act).

7 47 U.S.C. § 253.

8 In *Verizon New York, Inc. v. Globa NAPs, Inc.l*, 463 F.Supp.2d 330 (SDNY 2006), Verizon sued to recover facility charges arising from its ICA with Global. Rejecting a primary jurisdiction motion regarding those charges, Judge Vitaliano considered the VoIP issues under an ICA.

is not even a colorable federal claim, and the "pendent" claim of Count III must therefore fall as well. Further, Plaintiff ignores consistent rejection of the theory set out in this count.

In a case on all fours with the this one, *Alliance Communications Cooperative, Inc. v. Global Crossing Telecommunications, Inc.*, 2007 WL 1964271 (D.S.D. July 2, 2007), the court dismissed an unjust enrichment count for VoIP traffic that passed over lines of a traffic carrier, holding that, under the "filed rate doctrine" a carrier's approved federal tariff is considered to be the law, and therefore the conclusive and exclusive enumeration of all rights and liabilities as between carriers and their customers. *Id.*, citing *Evans v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000). The court states that:

> Here, plaintiffs allege that Global Crossing was unjustly enriched when it received originating and terminating access services without paying for them. If plaintiffs are successful on their unjust enrichment claim, the court would order Global Crossing to pay plaintiffs the value of the benefit that Global Crossing received. *See Hofeldt v. Mehling,* 658 N.W.2d 783, 788 (S.D.2003). The amount corresponding to value of the benefit received will likely be different than the amount Global Crossing would have to pay for the service pursuant to plaintiffs' tariffs. The court thus concludes that plaintiffs' unjust enrichment claim is barred by the filed rate doctrine. This conclusion is supported by several other courts that have held that the filed rate doctrine bars claims for unjust enrichment. *See, e.g., Marcus v. AT & T Corp.,* 138 F.3d 46, 60-62 (2d Cir.1998); *MCI WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc.,* No. Civ. A 04-1479, 2005 WL 2145499, at *5 (E.D.Va. Aug.31, 2005), *aff'd,* 204 Fed. Appx. 271 (4th Cir.2006); *Union Tel. Co. v. Qwest Corp.,* No. 02-CV-209-D, 2004 WL 4960780, at *15 (D.Wyo. May 11, 2004); *Freedom Ring Commc'ns, LLC v. AT & T Corp.,* 229 F.Supp.2d 67, 69-70 (D.N.H.2002).

*See Id.* At 7.

### D. Count IV: Account Stated

It is hornbook law that an action for account stated is negated by a finding that there is no underlying contract claim. *Davis & Cox v. Summa,* 751 F.2d 1507, 1516 (9th Cir. 1995)(because accounts stated are "intended to preserve and protect legitimate demands but not to create obligations independent of prior indebtedness, the rendering of an account does not create a

liability where no liability existed before the rendering")(internal citations omitted). In New York as elsewhere, a cause of action for account stated cannot create a legal obligation where none existed before. *Reconstruction Finance Corp. v. Commercial Union of America Corp.*, 123 F.Supp. 748. 756 (D.C.N.Y. 1954); *Parsons v. Batchelor,* 233 A.D. 517, 518, 253 N.Y.S. 728, 728-730 (N.Y.A.D. 1 Dept.1931):

> The account stated can only determine the amount of the debt where a liability exists, and will not be permitted to be made the instrument to create a liability where none existed before. Merely changing the form of the action to evade the bar of the statute creates no new liability.

*See* also, *Abraham & Straus v. Teller*, 37 Misc.2d 797, 799-800, 236 N.Y.S.2d 435, 438 (N.Y.City Civ.Ct.1962); *Wilson v. Gotham Instrument Co.*, 198 Misc. 1009, 1010, 101 N.Y.S.2d 699, 700-01 (N.Y. Sup.1950). Thus, when this Court concludes, as it must, that MetTel's federal tariff, state tariff and unjust enrichment claims are unsound, it will necessarily have to conclude that sending bills for such unsustainable claims cannot give them new life.

Second, disagreement between the parties as the "accounts" are "stated" negates any meeting of the minds or implied consent, and so destroys an account stated claim. *Meadowbrook-Richman, Inc. v. Associated Fin. Corp.*, 325 F.Supp.2d 204 (S.D.N.Y. 2004). Attached hereto as Exhibit 12 are nine protesting emails sent to MetTel from July 2004 to December 2006 by Robert J. Fox, at the time Global's Vice president for Carrier Relations. These emails each plainly and unambiguously identified Global's traffic as "information access traffic", reiterated Global's clear and timely objections to the charges set forth in MetTel's invoices, and gave MetTel notice that Global did and would contest any and all such invoices in the future based on the principles discussed in this motion. Indeed, each letter stated, in boldface, that:

> **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company to Global.**

Thus, Count IV is woefully deficient for the simple and undeniable reason that Global objected clearly and repeatedly, stating legally sufficient reasons, including the *ISP Remand Order*,[9] to the "accounts" MetTel tendered.

Misleadingly, MetTel alleges:

> Defendant acknowledged receipt of the invoices. Defendant acknowledged that it sent and received traffic to MetTel customers and never disputed any of the traffic flowing between the carriers. MetTel received no objection or protest to its statements of account regarding the fact that traffic was passed.

See Complaint ¶43.[10] It is impossible to understand how MetTel can make this allegation in light of Global's documented and repeated protests. Similarly, it is difficult to understand how MetTel can blandly allege that Global "acknowledged" the invoices it received, in blithe disregard of the protesting *substance* of those "acknowledgments."

**E. <u>Count V: Unspecified</u>**

Finally, Count V, the sole new material added on July 17, 2008, by MetTel's Amended Complaint, has no place in this case. Count V alleges merely that, should Global prevail on its defense (grounded in FCC rules) that it is an "intermediate carrier" not subject to access charges, then MetTel intends to sue unnamed other parties. In the first place, Global's defenses herein are scarcely limited to its status as an intermediate carrier. Second, to the extent this Court's

---

9 *In the Matter of Intercarrier Compensation for ISP-Bound Traffic*, CC Docket No 99-68, F.C.C. 01-131(Apr. 27, 2001)

10 In light of the uncertainty surrounding the modifiand of the last clause in the quoted ¶43, MetTel might offer the sophistic justification that it has merely alleged that Global never denied that traffic it forwarded reached MetTel subscribers. But that would not alter the fact that the technical bit of truth in its misleading assertion provides no basis whatever for an account stated cause of action. MetTel's circumlocution is an irresponsible attempt to disguise a knowingly flawed cause of action.

disposition of Global's motion depends on the nature of VoIP and its uncertain status under a hesitant but preemptive FCC régime, similar considerations will apply equally to the other intermediate VoIP carriers who constitute 100 percent of Global's customers in this jurisdiction. Third, Count V states no cause of action against Global; it is of no concern to Global or the Court what MetTel may or may not do next, after the Amended Complaint is dismissed. At most, Count V suggests an intended misuse of discovery, i.e., to use it to sue others, or an unsavory threat to sue Global's customers if Global does not settle the case to Met Tel's liking.

**CONCLUSION**

For these reasons we respectfully request that the Court grant Global's Motion for Summary Judgment under Rule 56, Fed. R. Civ. P., as to all counts of the Amended Complaint; or, alternatively, that Count I be stayed under the doctrine of primary jurisdiction pending definitive action by the FCC as to the nature of VoIP and the regulatory régime, state or federal, applicable to it.

Respectfully submitted,

Joel Davidow (JD-4500)
Kile Goekjian Reed & McManus, PLLC
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel<br>44 Wall Street<br>6th Floor<br>New York, NY 10005**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**GLOBAL NAPS, INC.,**<br><br>***Defendant*** | **08 - CIV-3829 (Judge Rakoff)**<br><br>**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE ISSUE REMAINS FOR TRIAL** |

Joel Davidow (JD-4500)
KILE GOEKJIAN REED & MCMANUS, PLLC
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

William J. Rooney, Jr. (WR-8317)
Jeffrey C. Melick (JM-1686)
89 Access Road, Suite B
Norwood, MA 02062
(781) 551-9956

*Counsel for Defendant*

Pursuant to Rule 56, Fed. R. Civ. P., and Local Civ. R. 56.1, Defendant Global NAPs, Inc. ("Global") sets forth the following statement of material facts as to which no genuine issue remains:

**As to Counts I and II of the Amended Complaint:**

1. Defendant Global is a Competitive Local Exchange Carrier ("CLEC") within the meaning of the Communications Act of 1934, as amended by the Telecommunications Act of 1996 (the "Act"), and is certificated as a telecommunications carrier in New York State. Declaration of James Scheltema, attached hereto as Exhibit 1 (hereinafter "Scheltema Decl."), ¶6.

2. Global does not provide dial-tone service to any end-user customers. Scheltema Decl. ¶7.

3. Global does not provide interexchange or toll services to end-user long distance customers. Scheltema Decl. ¶9.

4. Global provides transmission capabilities to service providers wishing to send traffic to local exchange carriers ("LECs") and is therefore an "intermediate carrier" within the meaning of the 1996 Telecommunications Act. Scheltema Decl. ¶9.

5. Global presently has only four customers: [BEGIN CONFIDENTIAL MATERIAL Transcom, CommPartners, PointOne, and IDT. Global also had a fifth customer, Nterra, during the relevant period. END CONFIDENTIAL MATERIAL] Scheltema Decl. ¶13; Masuret Decl. ¶6.

6. Each customer sends Global traffic that is Voice over Internet Protocol ("VoIP") traffic and is "enhanced" in ways that beneficially alter its form and content. Scheltema Decl. ¶10. Exhibits 4, 5, 6, and 7.

7. Global's customers all certify that they are enhanced service providers in their contracts with Global. Masuret Decl. ¶¶4, 12.

8. The traffic Global receives from all of its customers is converted by Global to a form of "Internet Protocol" called "Asynchronous Transfer Mode" ("ATM"), is thus in a format to be efficiently transmitted over Global's network, and is then converted to "Time Division Multiplexing" ("TDM"), at the ILEC's or CLEC's demand, when it reaches the local loop. Scheltema Decl. ¶10.

9. Global does not assess any "toll" (per call, per minute) charges to its customers, and thus is not a long-distance telephone company or an interexchange carrier ("IXC"). Scheltema Decl. ¶8; Masuret Decl. ¶9.

10. The traffic Global receives from its customers is usually transmitted in New York State by Global to Verizon's network for further delivery to Verizon's end-user customers or to other intermediate carriers such as Plaintiff MetTel for delivery to their end-user customers. Scheltema Decl. ¶10.

11. Global has no contractual relationship with MetTel, has never directly connected with MetTel and has never requested any services from MetTel. Scheltema Decl. ¶5.

12. In a recent proceeding before the New York Public Service Commission ("PSC"), PSC Case No. 07-C-0059, *Complaint of TVC Albany, Inc. d/b/a Tech Valley Communications Against Global NAPs, Inc. for Failure to Pay Intrastate Access Charges,* Order dated Mar. 20, 2008 (hereinafter *"TVC"*), it was determined that virtually all the traffic Global delivers for transfer or termination in New York State is VoIP, primarily "nomadic" VoIP. Scheltema Decl. ¶12; Exhibit 8.

13. In four proceedings involving Global's main customer/supplier Transcom, Transcom provided expert testimony to explain how it enhanced all its traffic to improve sound, all efficient

low-cost transmissions and enable other features, and such testimony was accepted as being factually accurate. Scheltema Decl. ¶16; Exhibits 4 and 9.

**As to Count III:**

14. The PSC has asserted broad authority to require parties to enter into private contract negotiations on the rates, charges , terms and conditions for the exchange of nomadic VoIP in New York State. Exhibit 8.

**As to Count IV:**

15. Global has objected in writing to invoices it has received from Met Tel, and has indicated that its objections are as to all such invoices. Scheltema Decl. ¶5; Exhibit 12.

**As to Count V:**

16. Global's customers for New York State and other states are all "enhanced service providers" and are required to so certify in their respective contracts with Global. Masuret Decl. ¶4.

Respectfully submitted,

Joel Davidow (JD-4500)
KILE GOEKJIAN REED & MCMANUS, PLLC
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

# EXHIBIT 1

CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel 44 Wall Street 6th Floor New York, NY 10005** *Plaintiff*, -vs- **GLOBAL NAPS, INC.,** *Defendant* | 08 –CIV-3829 (Judge Rakoff) DECLARATION OF JAMES R. J. SCHELTEMA |

I, JAMES R. J. SCHELTEMA, depose and say that the following is true to the best of my knowledge and belief:

1. I am Vice President of Regulatory Affairs for Global NAPS, Inc. ("Global"), and have been in charge of regulatory affairs there for approximately the past five years. My address is 1311 East La Rua Street, Pensacola, Florida 32501. I am a licensed member of the District of Columbia, Florida and Maryland Bars and a licensed certified public accountant in the states of Florida and Maryland. I have personal knowledge of the facts stated in this affidavit.

2. I have worked for more than a decade in the field of telecommunications regulation on behalf of MCI Telecommunications, the Maryland Public Service Commission, AT&T Communications, Rhythms Net Connections, Global NAPS, Inc, and other entities. During such time, I have also been an instructor in Accounting for the Baltimore County Community College.

CONFIDENTIAL

3.     I have a working knowledge of the Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 U.S.C. §§201 *et seq.* (the "Act").

4.     I am familiar with the Complaint in this case filed by Metropolitan Telecommunications ("MetTel"), and with the underlying facts, including those surrounding the traffic that Global delivers for termination to MetTel's customers.

5.     Global has no contract with Met Tel, no interconnection agreement with Met Tel, and, to the extent any invoices have not been previously disputed, it is Global's position that they are disputed herewith.

6.     Global is a Competitive Local Exchange Carrier ("CLEC") within the meaning of the Act and is a certificated telecommunications carrier in the State of New York.

7.     Global does not provide dial tone services to any end-user customers.

8.     Global does not charge per call or per minute, and is thus not a long distance carrier. Global also does not receive traffic from any customer using a 1+ method, and has no interconnection arrangements with long distance carriers. Thus, it is not an interexchange carrier ("IXC").

9.     Global does not provide dial tone services to end-user local customers or provide interexchange or toll services to end-user long distance customers, but rather provides transmission capabilities to service providers wishing to exchange traffic with LECs. Global is thus, by definition, an "intermediate carrier." As an intermediate carrier, Global provides wholesale interconnection services to third parties seeking to interconnect with local exchange carriers through an intermediary.

10.     Essentially, Global delivers one type of traffic for termination to MetTel's customers. This type of traffic – which is the gravamen of this lawsuit – is voice over internet protocol

CONFIDENTIAL

("VoIP") telephone service. Each customer sends Global traffic that is VoIP and is "enhanced" in ways that benefically alter its form and content. The traffic Global receives from all of its customers is converted by Global to a form of "Internet Protocol" called Asynchronous Transfer Mode" ("ATM")(a format efficiently transmitted over Global's network), and then converted again to "Time Division Multiplexing" ("TDM") at the ILEC's or CLEC's demand when the traffic reaches the local loop. The traffic Met Tel receives from Global is received from its enhanced service provider customers and is exchanged between Global to Verizon with further delivery by Verizon for termination on Met Tel's network.

11. In contrast to traditional telephony over the Public Switched Telephone Network ("PSTN"), which uses a dedicated analog transmission path between two parties, Global carries data (i.e., digitized) traffic on behalf of its customers. These data "packets" are grouped and sent using an entirely different switching system *(i.e.,* packet switching as opposed to analog switching).

12. An expert agency, charged with regulation of all telecommunications in New York State, relying at least partially on my affidavit and exhibits (customer letters), has confirmed that the traffic Global delivers for termination to LECs is nomadic VoIP traffic. The New York Public Service Commission (the "PSC found as a matter of fact that virtually all, if not all, of the traffic that Global delivers for transport and termination is nomadic VoIP traffic. PSC Case No. 07-C-0059, *Complaint of TVC Albany, Inc. d/b/a Tech Valley Communications Against Global NAPs, Inc. for Failure to Pay Intrastate Access Charges,* Order (the "TVC Order"), issued Mar. 20, 2008, at 14 (copy at Attachment A).

13. Brad Masuret, our VP for Sales and Marketing, has primary responsibility for dealing with our customers, i.e. the firms that pay us to forward the traffic. However, I personally know

CONFIDENTIAL

who the present four customers are, namely Transcom, Commpartners, PointOne (UniPoint), and IDT.

14. I am familiar with the contracted assurance they provide to us, and with the significance of those assurances.

15. I participated in obtaining letters from them further explaining what they do, and my years in the telephony industry allow me to understand how they do it.

16. The assertion of Transcom, our largest ESP customer/supplier as to the nature of the traffic it sends to us were further confirmed by the findings and ruling of a federal court. I also enclose the testimony of Transcom's expert witness in that case.. Case No. 05-31929-HDH-11, *In re Transcom Enhanced Services, LLC.* in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Order of Apr. 28, 2005)(Copy at Attachment B).

CONFIDENTIAL

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true

and correct.

Executed this 6th day of August, 2008.

JAMES R. J. SCHELTEMA

# EXHIBIT 2

CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel 44 Wall Street 6th Floor New York, NY 10005** | 08 –CIV-3829 (Judge Rakoff) |
| ***Plaintiff*,** | |
| -vs- | DECLARATION OF BRADFORD MASURET |
| **GLOBAL NAPS, INC.,** | |
| ***Defendant*** | |

**DECLARATION OF BRADFORD MASURET**

I, Brad Masuret, declare as follows:

1. I am over 18 years of age and am the Vice President of Sales and Marketing for Global NAPs, Inc. I have personal knowledge of the facts set forth, and if called upon to testify to them, could and would competently do so.

2. I have been in the telecommunications business with various firms for over fifteen years.

3. Global NAPs, Inc. is an operating affiliate of Global NAPs New York, Inc., the petitioner in the captioned proceeding.

4. I recruit and deal directly with the customers of Global NAPs New York, Inc. (referred to herein as "Global NAPs") and the traffic they transmit and we forward. None of Global NAPs' customers are traditional residential and/or business end-user customers. All of them certify to us that they are Enhanced Service Providers ("ESPs"). Global NAPs requires all customers that

BM

CONFIDENTIAL

request us to deliver traffic on their behalf to assure Global NAPs in their service contracts that they are qualified ESPs. All ESPs with which Global NAPs transacts business have contractually or otherwise assured Global NAPs that they meet the definition of being ESPs as defined by the Federal Communications Commission and are exempt from certain regulatory constraints placed on traditional voice telephony providers as a result.

5. Because an end-user requires dial-tone to originate a call, Global's customers are not traditional residential and/or business end-user customers.

6. At present, four companies pay Global to forward their traffic. Those companies are Transcom, CommPartners, PointOne (Unipoint), and IDT. Our largest customers, Transcom, CommPartners, and PointOne have provided Global with letters describing their activities. The website of the fourth, www.idt.net, describes its VoIP business. A fifth supplier during the relevant period, Ntera, is now in Chapter 7.

7. To my knowledge, the two main specialized providers of VoIP service are Vonage and Packet8. Our supplier, CommPartners, informs us that it carries Vonage traffic. I am aware from regulatory and judicial opinions that Vonage provides "nomadic" VoIP, that is it provides equipment so that its subscribers can begin a call from any location, national or international.

8. The VoIP traffic handled by Global is "nomadic." By nature, these services are portable and may, for example, be placed via a laptop computer from anywhere there is Internet access, *e.g.*, a Starbucks store.

9. In the case of VoIP traffic, the number assigned to the calling party may have no geographical relevance to his physical location. The calling party may have a number with a 212 area code whether he is placing the call from San Francisco or Miami -- and in neither instance is the calling party's number geographically correlated to Manhattan. This makes traditional

JGM

CONFIDENTIAL

measures of associating the called and calling party's number to determine distance impossible as a practical matter.

10. Section 8 of the general terms and conditions of each of those contracts states that the ESP either is or may be (depending on the individual contract and whether the ESP is sending traffic to Global to terminate) providing VoIP services.



I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6th day of August, 2008, at Quincy, Massachusetts.

Bradford Masuret

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

Manhattan Telecommunications Corp.,
d/b/a Metropolitan Telecommunications,
a/k/a MetTel
44 Wall Street, 6th Floor,
New York, NY 10005,

Plaintiff,

v.

Global Naps, Inc., and John Doe 1-5,

Defendants.
---------------------------------------------------------X

Index No.: 08 civ 3829 (JSR)

**RESPONSE TO INTERROGATORIES**

INTERROGATORY 1

Identify the tariff section and tariff rate used to compute the interstate access charge upon which MetTel's bills to GNAPs were based.

ANSWER:

Former Bell Atlantic States NY: FCC NO. 1 Access, Section 3,

Tandem Transport section 3.6 (B) (1) (page 12) $0.00003

Local Switching Section 3.6 (B) (6) (c) $0.002431

Shared End Office trunk Port (g) $ 0.001595

Section 3.6 (B) (7) query charge $0.003702 per query

Former Nynex States

Tandem Transport Per Mile per minute of use Section 3.6 (C) (1) page 15

Local Switching section 3.6 (C) (7) (b) $0.002084

Shared End Office Trunk Port (C) (9) $0.001595

Query Charge (C) (10) (a) $0.003702

INTERROGATORY 2

Identify the tariff section and tariff rate used to compute the intrastate access charge upon which MetTel's bills to GNAPs were based.

ANSWER:

See attached PDF file.

INTERROGATORY 3

Identify all carriers who have been billed by or paid metTel at either of the rates identified in your answers to Interrogatories 1 and 2 for ESP or VoIP traffic terminated from them to MetTel's subscribers.

ANSWER:

OBJECTION

MetTel has not billed or differentiated due to whether traffic was in VoIP protocol or not.

INTERROGATORY 4

Identify all carriers who have been billed by, or paid, MetTel at some other rate for ESP or VoIP traffic terminated from them to MetTel's subscribers, and in the case of each such carrier, state and the rates at which it has been billed or has paid.

ANSWER:

None

INTERROGATORY 5

Identify all persons within MetTel who helped develop the tariffs applied to GNAPs traffic or the bills sent to GNAPs, or who are knowledgeable about those two issues.

ANSWER:

OBJECTION

Sam Vogel and John Rossi developed the tariffs. They did not develop the tariffs with any specific customer or carrier in mind. CDG handles the billing. No carrier was billed differently because the carrier was handling VoIP.

INTERROGATORY 6

State the rate of compensation MetTel pays to Verizon for forwarding traffic such as that from GNAPs to MetTel.

ANSWER:

MetTel owes Verizon a switching charge for completing calls to our customers. It depends on the jurisdiction.

INTERROGATORY 7

(a) Do you have reason to believe that any traffic forwarded from GANPs to MetTel for termination to MetTel's customers is anything other than VoIP?

(b) If so, state such reason or reasons.

ANSWER:

OBJECTION: MetTel's belief as to what protocol GNAPs uses is irrelevant to any issue in this case.

(a) MetTel has no reason to know, without viewing GNAPS network, exactly what protocols GNAPs uses to transmit voice calls. GNAPs must prove that its calls are VoIP from origination to handoff to claim that its calls are calls utilizing VoIP.

(b) MetTel believes that GNAPs hands off calls to Verizon's network in Time Division Multiplexing ("TDM) format based on MetTel's belief that Verizon only receives calls in such format. Accordingly, based on that reasonable belief and without more proof MetTel has no reason to know that the calls GNAPs hands off are originated in any other protocol.

Dated: July 29, 2008

By: ______________________

David E. Aronow, Esq. (DA-2026)
**Attorney for Plaintiff MetTel**
44 Wall Street, 6th Floor
New York, New York 10005
(212) 359-1000

# EXHIBIT 4

CONFIDENTIAL

MCGUIRE, CRADDOCK & STROTHER, P.C.

500 N. AKARD, SUITE 3550
LINCOLN PLAZA
DALLAS, TEXAS 75201
www.mcslaw.com

STEVEN H. THOMAS
DIRECT: 214.954.6845
sthomas@mcslaw.com
Licensed in New York and Texas

TELEPHONE: 214.954.6800
TELECOPIER: 214.954.6868

June 19, 2008

*Via e-mail to:* **jscheltema@gnaps.com**
James R. J. Scheltema, CPA, Esq.
Global NAPs, Inc.
Vice President - Regulatory Affairs
1311 East La Rua St.
Pensacola, FL 32501

***Re: Public Service Commission actions involving Global NAPs***

Dear Mr. Scheltema:

As you know, this firm represents Transcom Enhanced Services, Inc. ("Transcom"). In our telephone conversation yesterday, you requested that we provide you with certain information that might assist you in certain Public Service Commission ("PSC") proceedings involving your company (the "GNAPs Proceedings"). We are happy to assist, subject to our concern that proper steps be taken to maintain the confidentiality of the information we provide. To that end, please note that the information provided below qualifies as trade secrets, confidential commercial information and critical infrastructure information. More specifically, dissemination of the information provided below to Transcom's competitors or to the general public would cause unfair economic or competitive damage to Transcom because it would reveal the basic structure of Transcom's network and provide insight into the type of customers Transcom serves. As such, the information provided below may be used only in the context of the GNAPs Proceedings. Moreover, the information below may be submitted to a PSC only after you have obtained protection against unauthorized use or dissemination by way of a protective order, confidentiality agreement, or other enforceable mechanism.

With that understanding, Transcom is an enhanced service provider serving the VoIP communications industry with call enhancement and termination. On four separate occasions, courts have ruled that Transcom's system qualifies under the definitions of "enhanced service" and "information service" under the telecom laws, and therefore Transcom's system is not a "telecommunications service" and Transcom is not obligated to pay access charges. On two separate occasions, courts receiving evidence regarding the operation of Transcom's system have found that the system enhances every single call that passes through it.

James R. J. Scheltema, CPA, Esq.
Global NAPs, Inc.
Vice-President - Regulatory Affairs
June 19, 2008
Page 2

CONFIDENTIAL

The vast majority of calls passing through Transcom's system do not originate on the PSTN, but rather are broadband-originated traffic. Moreover, a significant portion of calls that pass through Transcom's system originate from "nomadic" VoIP services, which means that the VoIP customer can use the service "nomadically" by connecting with a broadband internet connection anywhere in the world. Transcom's customers include some of the largest nomadic VoIP services in the country.

We hope that this letter provides you with the information you need. If you have any questions, or need any further information, please do not hesitate to contact the undersigned.

Best regards.

Sincerely yours,

MCGUIRE, CRADDOCK & STROTHER, P.C.

By: Steven H. Thomas
Steven H. Thomas
by JWC with permission

SHT/vwk



CONFIDENTIAL

# GLOBAL NAPs, INC. TELEPHONE SWITCH SERVICE AGREEMENT

Global NAPs, INC. ("GLOBAL") and Transcom Enhanced Services, LLC. ("CLIENT"), an Enhanced Service Provider hereby agree, subject to the Global General Terms and Conditions, which are incorporated herein by reference, that GLOBAL shall provide to CLIENT the following service as set out below:

1. Description of Service: GLOBAL shall provide CLIENT with service as may be more particularly described as follows:

   Local Origination Service and/ or Local Termination Service to be provided hereunder by Client's submission of such requests to Service Provider from time to time, on the Service Provider service order form(s) ("Service Order").

   Service Provider will provide Local Termination Services to any end user served within the Serviceable Rate Centers.

2. Start Date: Per Customer Order

3. Compensation:

   Compensation for these Services shall consist of Monthly recurring charges (MRC). The Monthly recurring charge (MRC) will be paid in two equal installments before the 1st and the 15th of each month. Payments will be based on the schedule attached hereto and the services ordered. In addition and if applicable, the CLIENT shall pay Global for all outgoing calls, which have a per minute cost in accordance to the rates and terms set forth in GLOBAL's tariff, or in accordance with the rates and terms set forth in the special agreement between GLOBAL and CLIENT, if any and/or if applicable. Generally, these per minute charges relate to any terminating calls, which are considered "off net" as per the attached schedule.

4. Payment

   4.1 CLIENT shall pay GLOBAL the set up fee and the first one half of the monthly trunk charge prior toprovide service. Subsequent one half of the monthly trunk charges will be billed in advance of the half of the month to which they apply. GLOBAL shall invoice CLIENT for outbound service, and these invoices shall be paid within Thirty (30) days following the date of CLIENT's invoice. CLIENT payments to GLOBAL shall be made without set off.

   4.2 Any charges not paid when due, shall be subject to late charges at one and one-half percent (1 1/2%) per month.

   4.3 GLOBAL may terminate this Agreement if any charge is not paid in full prior to due date. In such event, CLIENT shall be responsible for all unpaid charges plus all of Global costs and expenses associated with the collection of said unpaid charges (including reasonable attorneys' fees).

CONFIDENTIAL

4.4    For disputed invoices, requests for billing adjustments together with all supporting documentation must be received by GNAPS within sixty (60) days from the date of the invoice in dispute or the right to a billing adjustment will be waived. All such requests must be in writing and must clearly identify the amount in dispute and the specific items in dispute. Requests for billing adjustments that do not provide adequate information for analysis by GNAPS, as determined in GNAPS's sole discretion, will be rejected and Client will be notified of the inadequate information, with an opportunity to submit subsequent information  Global will timely respond to Client regarding the adequacy of the information provided.   In the event of a billing dispute, Customer must timely pay any undisputed amounts.

4.5    If the GNAPS network is not available to the client for more than 45 consecutive minutes in a given day, that day shall be considered "Downtime". Client Downtime caused by direct action or inaction on the part of GNAPS, and being wholly under the control of GNAPS, will be credited to the client. For the purpose of credit calculation, each day of downtime shall be assessed the dollar value of 1/30th of the discounted rate, as listed in the Order form. If Downtime occurs on more than 4 days in a period of 30 consecutive days or the product changes( NPA-NXX's deleted from footprint). Client may at its sole discretion, terminate any or all agreements with GNAPS without penalty.

5.    Certain Federal, State and Local Taxes

5.1    Any state or local excise, sales, or use taxes (excluding any taxes on income) resulting from the performance of this Agreement shall be borne by the Party upon which the obligation for payment is imposed under applicable law even if the obligation to collect and remit such taxes is placed upon the other Party. Each Party shall be responsible for filing all returns for federal, state or local sales, use, excise, governmental, or other taxes or tax-like fees imposed on or with respect to its services.

5.2    To the extent permitted by applicable law, the Party obligated to pay such taxes may contest the same in good faith and shall be entitled to the benefit of any refund, provided that such Party cannot permit any lien to exist on any assets of the other Party by reason of any such contest.

CONFIDENTIAL

WITNESS our hands and seals this _______ day of ____________________, 20____.

Global NAPs, Inc. ("GLOBAL")

By: ____________________
(Signature)

____________________
(Name)

____________________
(Title)

("CLIENT")

| | |
|---|---|
| Company | Transcom Enhanced Services, LLC. |
| Address | 1950 W. John Carpenter Freeway, Suite 500 |
| City, State Zip | Irving, TX 75063 |
| Name | Chad Frazier |
| Phone | 972-792-3700 |
| Fax | 972-889-2775 |

By: ____________________



## GENERAL TERMS AND CONDITIONS

The following General Terms and Conditions are incorporated into the agreements between Global NAPs, INC., Global NAPs Realty, INC. and/or Global NAPs Networks, Inc. (each hereinafter referred to as ("GLOBAL") and Transcom Enhanced Services, LLC. ("CLIENT").

1. Term and Termination

1.1 The initial term of this Agreement, and each Customer Order, is Six (6) Months. Thereafter, this Agreement will be automatically renewed on a month to month basis unless either party provides the other party with written notification, at least thirty (30) days prior to the expiration of the then current term of this Agreement, of its intention not to renew this Agreement. If substantially all of the assets of either Party are sold the buyer may, upon thirty (30) days written notice, terminate this contract.

1.2 Except as otherwise provided for herein, in the event that either Party commits a material breach of this Agreement, and fails to cure such breach within Thirty (30) days after written notice of such breach from the nonbreaching Party, the non-breaching Party may terminate this Agreement.

1.3 Neither Party shall be relieved of its respective obligations arising prior to the termination of this Agreement,

2. Severability

In the event that any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any respect under the laws of the jurisdiction governing the entire Agreement, such unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such unenforceable provision or provisions had never been contained herein.

3. Amendments: Waivers

3. 1 Except as otherwise provided herein, this Agreement may be amended only by written Agreement signed by authorized representatives of both Parties.

3.2 No waiver of any provisions of this Agreement and no consent to any default under this Agreement shall be effective unless the same shall be in writing and signed by or on behalf of the Party against whom such waiver or consent is claimed. No course of dealing or failure of any Party to enforce any term, right or condition of this Agreement shall be construed as a waiver of such term, right or condition.



4. Independent Contractors

Each Party shall perform its obligations hereunder as an independent contractor and not as the agent, employee or servant of the other Party, and neither Party nor any person furnished by such Party shall be deemed employees, agents or servants of the other Party or entitled to any benefits available under the plans for such other Party's employees.

5. No Exclusivity

Nothing herein shall be construed to prohibit either Party from entering into similar arrangements with any third Party, or to use its own assets and personnel for any legitimate business purpose.

6. Force Majeure

Neither Party shall be held liable for any delay or failure in performance of any part of this Agreement from any force majeure condition, including acts of God, acts of civil or military authority, government regulations, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, explosions, earthquakes, nuclear accidents, floods, strikes, power blackouts, unusually severe weather conditions, inability to secure products or services of other persons or transportation facilities, acts of Global suppliers, acts or omissions of transportation common carriers, or other causes beyond their reasonable control whether or not similar to the foregoing conditions.

7. Warranty

GLOBAL warrants that it has as of the Effective Date hereof, the right to provide the Service to CLIENT. GLOBAL makes no other warranties with respect to its provision of the Service under this Agreement, either express or implied. GLOBAL AND ITS SUPPLIERS EXPRESSLY DISCLAIM ALL IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

8. Liabilities

GLOBAL SHALL NOT BE LIABLE FOR ANY LOSS OR DAMAGE INCURRED BY REASON OF OR INCIDENTAL TO GLOBAL'S PROVISION OF SERVICE UNDER THIS AGREEMENT AND SUCH LIMITATION OF DAMAGES BY GLOBAL SHALL INCLUDE, BUT NOT BE LIMITED TO, AMOUNTS FOR DIRECT, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING LOST REVENUE OR LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY THEREOF, WHETHER SUCH DAMAGES ARISE OUT OF BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER THEORY OF LIABILITY AND WHETHER SUCH DAMAGES WERE

CONFIDENTIAL

FORESEEABLE OR NOT AT THE TIME THIS AGREEMENT WAS EXECUTED. The parties acknowledge that CLIENT is an enhanced service provider and may provide VOIP services. GLOBAL shall be under no obligation to defend or indemnify CLIENT for claims by third parties arising from the provision of VOIP services. GLOBAL makes no representation to CLIENT regarding VOIP services.

9.    Indemnification

To the extent not prohibited by law, and except as otherwise provided herein, the Parties shall indemnify, defend and hold each other and their suppliers harmless from and against any loss, cost, claim, injury or liability brought by a person not a party or an affiliate under this Agreement that relates to or arises out of their own acts or omissions or the acts or omissions of their employees. agents or contractors in the use of the Service under this Agreement, whether negligent or otherwise. The Parties shall notify each other of any claims as soon as practicable, and reasonably cooperate with each other in the defense of any claims.

10.    Governing Law

This Agreement shall be deemed to be a contract made in the State of Massachusetts, and the construction, interpretation, and performance of this Agreement shall be governed by the substantive laws of said State. Any action or proceeding brought by either Party shall be brought only in the courts of the State of Massachusetts, County of Norfolk, and each of the Parties consents to jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding. Process in any action or proceeding referred to in the preceding sentence may be served on either Party anywhere in the world.



11. Executed in Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same document.

12. Headings

The headings and numbering of sections in this Agreement are for convenience only and shall not be construed to define or limit any of the terms herein or affect the meaning or interpretation of this Agreement.

13. Entire Agreement

This Agreement, including any Attachments, constitutes the entire Agreement between the Parties and supersedes all prior oral or written Agreements, representations, statements, negotiations, understandings, proposals or undertakings with respect to the subject matter hereof.

14. Notices and Demands

All notices, demands, requests, elections, or other communications herein provided to be given or which may be given by one Party to the other Party shall be made in writing and, except as otherwise provided herein, such notices, demands, requests, elections, or other communications shall be deemed to have been duly given when received. If hand delivered, any such notice, demand, request, election or other communication shall be deemed to have been received on the business day received; if sent by registered or certified mail, return receipt requested, the date of receipt; if sent by overnight courier, the day after delivery to the courier; and if sent by electronic facsimile and followed by an original sent via overnight or first class mail, the date of confirmation of the facsimile; and in all cases shall be addressed as follows:

If to GLOBAL:

William J. Rooney, Jr.
General Counsel
Global NAPs, Inc.
Ten Merrymount Rd.
Quincy, MA 02169

If to CLIENT: At the address set forth in the Agreement.

The address to which such notices may be given by either Party may be changed by written notice given by such Party to the other Party pursuant to this Section. All notices sent hereunder, whether by mail, overnight courier, or personal delivery, shall be sent return receipt requested.



15. Third-Party Beneficiaries

This Agreement shall not provide any person not a Party to this Agreement with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement. Either Party may, however, assign this contract to an affiliate, parent or subsidiary upon Seven (7) days written notice.

16. Delegation and Assignment

16.1 Neither Party may assign, transfer, or sell its rights under this Agreement, or delegate its obligations hereunder, without the prior written consent of the other Party which written consent will not be unreasonably withheld. The Parties may, however, assign their rights or delegate their obligations to affiliated corporations, or parent or subsidiary corporations.

16.2 Subject to the above restrictions, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their permitted assigns and successors.

17. Survival

The provisions contained herein, the provisions contained in the Telephone Switch Service Agreement and the provisions contained in the Collocation Agreement, if any, between the Parties shall survive the termination of said Agreements.

18 Governmental Compliance

18.1 Each Party shall perform this Agreement in compliance with all applicable federal, state, county, and local laws, regulations, government agency orders or decisions and codes, and shall obtain permits and certificates where needed. In the event that such permits or certificates cannot be obtained, or in the event that legislative, regulatory, other legal action or changes in laws invalidate a material term(s) of this Agreement or adversely affects a Party's ability to perform a material term(s) of this Agreement, the Parties shall attempt to renegotiate a new term(s) as may be required to allow this Agreement to continue. In the event that such new term(s) cannot be renegotiated, and the ability of one or both Parties to perform this Agreement has been materially adversely affected, then, the adversely affected Party shall have the right to terminate this agreement upon Thirty (30) days notice.

18.2 All obligations under this Agreement shall be performed in compliance with those statutes, government agency orders, and regulations prohibiting discrimination against any employee or applicant for employment because of race, color, religion, sex, national origin, age, or handicap. Where required by law, certificates of compliance shall be provided.

19. Confidentiality

The Parties covenant and agree that they will not either during the term of this agreement, or at any time thereafter, disclose to anyone any confidential information



concerning each other business or affairs. Information shall be considered confidential only if it is clearly marked as confidential or designated in writing as confidential before being provided to the other Party.

WITNESS our hands and seals this ________ day of ____________________, 20___.

Global Naps, Inc. ("GLOBAL")

By: ____________________
(Signature)

____________________
(Name)

____________________

("CLIENT")

| | |
|---|---|
| Company | Transcom Enhanced Services, LLC. |
| Address | 1950 W. John Carpenter Freeway, Suite 500 |
| City, State Zip | Irving, TX 75063 |
| Name | Chad Frazier |
| Phone | 972-792-3700 |
| Fax | 972-889-2775 |

By: ____________________

CONFIDENTIAL

# Schedule A
## Service Order Form for Origination and Termination Services

Date:
Customer:
Start Date:

Circuit Type and Associated Charges
Bandwidth: DS3
Quantity: 1
Installation Charge: waived
Monthly Recurring Charge: $[redacted]
Extended Monthly Recurring Charge: $[redacted]

CLIENT Billing Information

| | |
|---|---|
| Company Name: | Transcom Enhanced Services, LLC. |
| Street Address: | 1925 W. John Carpenter Freeway |
| Suite, Room, Floor: | Suite 500 |
| City, State, Zip Code: | Irving, TX 75063 |
| Billing Contact: | Carolyn Malone |
| Billing Email: | cmalone@ transcomus.com |
| Billing Phone: | 972-792-3700 |
| Billing Fax: | 972-889-2825 |



# EXHIBIT 5

Kristopher E. Twomey
Regulatory Counsel

December 4, 2007

Via Email and DHL
Mr. Brad Masuret
Global NAPS, Inc.
10 Merrymount Road
Quincy, MA 02169

Dear Brad:

You asked me to provide additional information regarding the types of traffic CommPartners Holding Corporation ("CommPartners") affiliates send to Global NAPs for termination in the state of New York. Additionally, you asked me to identify the wholesale carrier customers sending traffic to CommPartners for eventual termination by Global NAPs.

There are two separate business units within CommPartners. One provides hosted voice over Internet protocol ("VoIP") and related IP services on a wholesale basis to network integrators, ISPs, and VoIP providers. These "partners" sell IP voice/data services primarily to small and medium-sized business customers. All traffic from this side of the company originates as IP.

The second business unit acts as a carrier's carrier for other VoIP providers. CommPartners controls a nationwide, licensed competitive local exchange carrier ("CLEC"), CommPartners, LLC, with network currently built in twelve states. CommPartners terminates its affiliate's hosted VoIP traffic and carrier's carrier traffic on the CLEC's trunks in those states. In states where CommPartners has not yet built network, or needs additional termination capacity, CommPartners acts as an intermediate carrier sending traffic to Global NAPs and other CLECs for termination. CommPartners' contracts with its carrier customers specify that only true IP-originated traffic be sent to CommPartners for termination. CommPartners' largest wholesale termination customer is Vonage. CommPartners has reason to believe that its other wholesale carrier customers offer services similar to Vonage, i.e. enhanced service provider traffic generated by end users without fixed origination points. This is the type of IP-originated traffic that CommPartners sends to Global NAPs for termination in New York.

Please let me know if I can provide any additional information.

Sincerely,

Kristopher E. Twomey
Regulatory Counsel

3291 North Buffalo Drive, Suite 150
Las Vegas, NV 89129
Phone: 702.367.8647 ext.
Fax: 702.365.8647

1079

ktwomey@commpartners.us



CONFIDENTIAL

GLOBAL NAPs, INC. TELEPHONE SWITCH SERVICE AGREEMENT

Global NAPs, INC. ("GLOBAL") and TPC Networks ("CLIENT"), an Enhanced Service Provider hereby agree, subject to the Global General Terms and Conditions, which are incorporated herein by reference, that GLOBAL shall provide to CLIENT the following service as set out below:

1. Description of Service: GLOBAL shall provide CLIENT with telephone service as may be more particularly described as follows:

   During the Term of this Agreement, CLIENT shall request Local Termination Service to be provided hereunder by submitting such requests to Service Provider from time to time, on Schedule A Service Provider Service Order Form(s) ("Service Order").

   Service Provider will provide Local Termination Services to any end user served within the Serviceable Rate Centers.

2. Start Date: Per Customer Order

3. Compensation

   Compensation for these services shall consist of separate charges. There will be Non-recurring charges (NRC) and Monthly recurring charges (MRC). The Monthly recurring charge (MRC) will be paid in equal installments based on the schedule attached hereto and the services ordered. In addition and if applicable, the CLIENT shall pay Global for all outgoing telephone calls, which have a per minute cost in accordance to the rates and terms set forth in GLOBAL's tariff, or in accordance with the rates and terms set forth in the special agreement between GLOBAL and CLIENT, if any and/or if applicable. Generally, these per minute charges relate to any terminating calls, which are considered "off net" as per the attached schedule.

4. Payment

   4.1 CLIENT shall pay GLOBAL the set up fee and the first monthly trunk charge prior to the turnup of any service or providing service. Subsequent monthly trunk charges will be billed in advance of the month to which they apply. GLOBAL shall invoice CLIENT for outbound service, and these invoices shall be paid within Thirty (30) days following the date of CLIENT's invoice. CLIENT payments to GLOBAL shall be made without set off.

   4.2 Any charges not paid when due, shall be subject to late charges at one and

Sent By: TPC Networks; 201 573 0740; Oct-28-04 8:05PM; Page 1



one-half percent (1 1/2%) per month.

4.3    GLOBAL may terminate this Agreement if any charge is not paid in full prior to due date. In such event, CLIENT shall be responsible for all unpaid charges plus all of Global costs and expenses associated with the collection of said unpaid charges (including attorneys' fees).

4.4    For disputed invoices, requests for billing adjustments together with all supporting documentation must be received by GNAPS within thirty (30) days from the date of the invoice in dispute or the right to a billing adjustment will be waived. All such requests must be in writing and must clearly identify the amount in dispute and the specific items in dispute. Requests for billing adjustments that do not provide adequate information for analysis by GNAPS, as determined in GNAPS's sole discretion, will be rejected and any outstanding amounts will be due according to the invoice which was the subject of the request. In the event of a billing dispute, Customer must timely pay any undisputed amounts.

5.    Certain Federal, State and Local Taxes

5.1    Any state or local excise, sales, or use taxes (excluding any taxes on income) resulting from the performance of this Agreement shall be borne by the Party upon which the obligation for payment is imposed under applicable law even if the obligation to collect and remit such taxes is placed upon the other Party. Each Party shall be responsible for filing all returns for federal, state or local sales, use, excise, governmental, or other taxes or tax-like fees imposed on or with respect to its services.

5.2    To the extent permitted by applicable law, the Party obligated to pay such taxes may contest the same in good faith and shall be entitled to the benefit of any refund, provided that such Party cannot permit any lien to exist on any assets of the other Party by reason of any such contest.

CONFIDENTIAL

WITNESS our hands and seals this 25 day of October 2004

Global NAPs, Inc. ("GLOBAL")

By: ______________________
(Signature)

Kevin J Burke
(Name)

President
(Title)

("CLIENT")

Company TPC Networks, INC
Address 645 Rita Drive
City, State Zip River Vale, NJ, 7675
Name Kevin Burke
Phone 201-573-0628
Fax 201-5730-740

By: ______________________



## GENERAL TERMS AND CONDITIONS

The following General Terms and Conditions are incorporated into the agreements between Global NAPs, INC., Global NAPs Realty, INC. and/or Global NAPs Networks, Inc. (each hereinafter referred to as ("GLOBAL") and TPC Networks, INC ("CLIENT").

1. Term and Termination

1.1 The initial term of this Agreement, and each Customer Order, is One (1) year. Thereafter, this Agreement will be automatically renewed for consecutive one (1) year periods unless either party provides the other party with written notification, at least sixty (60) days prior to the expiration of the then current term of this Agreement, of its intention not to renew this Agreement. If substantially all of the assets of either Party are sold the buyer may, upon Nine (9) months written notice, terminate this contract.

1.2 Except as otherwise provided for herein, in the event that either Party commits a material breach of this Agreement, and fails to cure such breach within Thirty (30) days after written notice of such breach from the nonbreaching Party, the non-breaching Party may terminate this Agreement.

1.3 Neither Party shall be relieved of its respective obligations arising prior to the termination of this Agreement.

1.4 Notwithstanding anything to the contrary contained herein the service term for the initial service order is 90 days as a trial service. At the end of the 90 day trial service term, the service can be disconnected with no penalty to customer with 5 days written notice to Global NAPs.

2. Severability

In the event that any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any respect under the laws of the jurisdiction governing the entire Agreement, such unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such unenforceable provision or provisions had never been contained herein.

3. Amendments; Waivers

3.1 Except as otherwise provided herein, this Agreement may be amended only by written Agreement signed by authorized representatives of both Parties.


CONFIDENTIAL

3.2 No waiver of any provisions of this Agreement and no consent to any default under this Agreement shall be effective unless the same shall be in writing and signed by or on behalf of the Party against whom such waiver or consent is claimed. No course of dealing or failure of any Party to enforce any term, right or condition of this Agreement shall be construed as a waiver of such term, right or condition.

4. Independent Contractors

Each Party shall perform its obligations hereunder as an independent contractor and not as the agent, employee or servant of the other Party, and neither Party nor any person furnished by such Party shall be deemed employees, agents or servants of the other Party or entitled to any benefits available under the plans for such other Party's employees.

5. No Exclusivity

Nothing herein shall be construed to prohibit either Party from entering into similar arrangements with any third Party, or to use its own assets and personnel for any legitimate business purpose.

6. Force Majeure

Neither Party shall be held liable for any delay or failure in performance of any part of this Agreement from any force majeure condition, including acts of God, acts of civil or military authority, government regulations, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, explosions, earthquakes, nuclear accidents, floods, strikes, power blackouts, unusually severe weather conditions, inability to secure products or services of other persons or transportation facilities, acts of Global suppliers, acts or omissions of transportation common carriers, or other causes beyond their reasonable control whether or not similar to the foregoing conditions.

7. Warranty

GLOBAL warrants that it has as of the Effective Date hereof, the right to provide the Service to CLIENT. GLOBAL makes no other warranties with respect to its provision of the Service under this Agreement, either express or implied. GLOBAL AND ITS SUPPLIERS EXPRESSLY DISCLAIM ALL IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

CONFIDENTIAL

jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding. Process in any action or proceeding referred to in the preceding sentence may be served on either Party anywhere in the world.

11. Executed in Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same document.

12. Headings

The headings and numbering of sections in this Agreement are for convenience only and shall not be construed to define or limit any of the terms herein or affect the meaning or interpretation of this Agreement.

13. Entire Agreement

This Agreement, including any Attachments, constitutes the entire Agreement between the Parties and supersedes all prior oral or written Agreements, representations, statements, negotiations, understandings, proposals or undertakings with respect to the subject matter hereof.

14. Notices and Demands

All notices, demands, requests, elections, or other communications herein provided to be given or which may be given by one Party to the other Party shall be made in writing and, except as otherwise provided herein, such notices, demands, requests, elections, or other communications shall be deemed to have been duly given when received. If hand delivered, any such notice, demand, request, election or other communication shall be deemed to have been received on the business day received; if sent by registered or certified mail, return receipt requested, the date of receipt; if sent by overnight courier, the day after delivery to the courier; and if sent by electronic facsimile and followed by an original sent via overnight or first class mail, the date of confirmation of the facsimile; and in all cases shall be addressed as follows:

If to GLOBAL:

CONFIDENTIAL

8. Liabilities

GLOBAL SHALL NOT BE LIABLE FOR ANY LOSS OR DAMAGE INCURRED BY REASON OF OR INCIDENTAL TO GLOBAL'S PROVISION OF SERVICE UNDER THIS AGREEMENT AND SUCH LIMITATION OF DAMAGES BY GLOBAL SHALL INCLUDE, BUT NOT BE LIMITED TO, AMOUNTS FOR DIRECT, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING LOST REVENUE OR LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY THEREOF, WHETHER SUCH DAMAGES ARISE OUT OF BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER THEORY OF LIABILITY AND WHETHER SUCH DAMAGES WERE FORESEEABLE OR NOT AT THE TIME THIS AGREEMENT WAS EXECUTED.

THE PARTIES ACKNOWLEDGE THAT CLIENT IS AN ENHANCED SERVICE PROVIDER AND IS PROVIDING VOIP SERVICES. GLOBAL SHALL BE UNDER NO OBLIGATION TO DEFEND OR INDEMNIFYCLIENT FOR CLAIMS BY THIRD PARTIES ARISING FROM THE PROVISION OF VOIP SERVICES. GLOBAL MAKES NO REPRESENTATION TO CLIENT REGARDING VOIP SERVICES.

9. Indemnification

To the extent not prohibited by law, and except as otherwise provided herein, the Parties shall indemnify, defend and hold each other and their suppliers harmless from and against any loss, cost, claim, injury or liability brought by a person not a party or an affiliate under this Agreement that relates to or arises out of their own acts or omissions or the acts or omissions of their employees, agents or contractors in the use of the Service under this Agreement, whether negligent or otherwise. The Parties shall notify each other of any claims as soon as practicable, and reasonably cooperate with each other in the defense of any claims.

10. Governing Law

This Agreement shall be deemed to be a contract made in the State of Massachusetts, and the construction, interpretation, and performance of this Agreement shall be governed by the substantive laws of said State. Any action or proceeding brought by either Party shall be brought only in the courts of the State of Massachusetts, County of Norfolk, and each of the Parties consents to

Sent By: TPC Networks; 201 573 0740; Oct-28-04 8:07PM; Page 7/12

CONFIDENTIAL

William J. Rooney, Jr.
General Counsel
Global NAPs, Inc.
Ten Merrymount Rd.
Quincy, MA 02169

If to CLIENT: At the address set forth in the Agreement.

The address to which such notices may be given by either Party may be changed by written notice given by such Party to the other Party pursuant to this Section. All notices sent hereunder, whether by mail, overnight courier, or personal delivery, shall be sent return receipt requested.

Kevin J Burke
President
TPC networks, INC
645 Rita Drive
River Vale, NJ, 07675



CONFIDENTIAL

15. Third-Party Beneficiaries

This Agreement shall not provide any person not a Party to this Agreement with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement. Either Party may, however, assign this contract to an affiliate, parent or subsidiary upon Seven (7) days written notice.

16. Delegation and Assignment

16.1 Neither Party may assign, transfer, or sell its rights under this Agreement, or delegate its obligations hereunder, without the prior written consent of the other Party which written consent will not be unreasonably withheld. The Parties may, however, assign their rights or delegate their obligations to affiliated corporations, or parent or subsidiary corporations.

16.2 Subject to the above restrictions, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their permitted assigns and successors.

17. Survival

The provisions contained herein, the provisions contained in the Telephone Switch Service Agreement and the provisions contained in the Collocation Agreement, if any, between the Parties shall survive the termination of said Agreements.

18 Governmental Compliance

18.1 Each Party shall perform this Agreement in compliance with all applicable federal, state, county, and local laws, regulations, government agency orders or decisions and codes, and shall obtain permits and certificates where needed. In the event that such permits or certificates cannot be obtained, or in the event that legislative, regulatory, other legal action or changes in laws invalidate a material term(s) of this Agreement or adversely affects a Party's ability to perform a material term(s) of this Agreement, the Parties shall attempt to renegotiate a new term(s) as may be required to allow this Agreement to continue. In the event that such new term(s) cannot be renegotiated, and the ability of one or both Parties to perform this Agreement has been materially adversely affected, then, the adversely affected Party shall have the right to terminate this agreement upon Thirty (30) days notice.



18.2 All obligations under this Agreement shall be performed in compliance with those statutes, government agency orders, and regulations prohibiting discrimination against any employee or applicant for employment because of race, color, religion, sex, national origin, age, or handicap. Where required by law, certificates of compliance shall be provided.

19. Confidentiality

The Parties covenant and agree that they will not either during the term of this agreement, or at any time thereafter, disclose to anyone any confidential information concerning each other business or affairs. Information shall be considered confidential only if it is clearly marked as confidential or designated in writing as confidential before being provided to the other Party.

Sent By: TFC Networks; 201 579 0740; Oct-26-04 8:08PM; Page 10/12

CONFIDENTIAL

WITNESS our hands and seals this 25 day of October 2004.

Global Naps, Inc. ("GLOBAL")

By: [signature]

Kevin Burke

("CLIENT")

Company TPC Networks
Address 645 Rita Drive
City, State Zip River Vale, NJ, 07675
Name Kevin Burke
Phone 201-573-0628
Fax 201-573-0740

By: [signature]

CONFIDENTIAL

# Schedule A
## Service Order Form for Origination and Termination Services

Date: October 25, 2004
Customer: TPC Networks
Start Date: 11/1/2004

Circuit Type and Associated Charges
Bandwidth: DS3
Quantity: 1
Installation Charge: Waived
Monthly Flat Rate DS3 Recurring Charge: $[redacted]
Extended Monthly Recurring Charge: $[redacted]
NOTES: Start with 4 Ds1s for test, then migrate to full DS3

CLIENT Billing Information
Company Name:TPC Networks
Street Address: 645 Rita Drive
Suite, Room, Floor: A/P
City, State, Zip Code: River Vale, NJ, 07675
Billing Contact: Cathy Burke
Billing Email: CBurke@TPCNetworks.com
Billing Phone: 201-573-0628
Billing Fax: 201-5730-740

Date:October 25, 2004

Name: Kevin Burke

Customer Signature: ____________

# EXHIBIT 6

POINTONE™

Kihm Schroeder
Vice President Operations

PointOne
6500 River Place Blvd.
Building: 2 Suite: 200
Austin, TX 78730

August 1, 2008

Dave/Brad,

Per your request enclosed is a description of some of the products and services we provide.

PointOne is an Enhanced Service Provider (ESP) serving the VoIP communications industry. We operate a significant North American IP network that is 100% VOIP with no legacy components whatsoever. PointOne purchases communications services from GNAP in order to process these enhanced voice calls.

Nomadic VoIP is one type of IP traffic that traverses the PointOne Network. Nomadic VoIP enables users to take their VoIP gear with them as they travel, and access PointOne's services via a broadband Internet connection anywhere in the world.

Sincerely
Kihm Schroeder



# GLOBAL NAPs, INC. TELEPHONE SWITCH SERVICE AGREEMENT

Global NAPs, INC. ("GLOBAL") and _UniPoint Services, Inc.____________ ("CLIENT"), an Enhanced Service Provider hereby agree, subject to the Global General Terms and Conditions, which are incorporated herein by reference, that GLOBAL shall provide to CLIENT the following service as set out below:

1. Description of Service: GLOBAL shall provide CLIENT with telephone service as may be more particularly described as follows:

   During the Term of this Agreement, CLIENT shall request Local Origination Service and Local Termination Service to be provided hereunder by submitting such requests to Service Provider from time to time, on the Service Provider service order form(s) ("Service Order").

   Service Provider will provide Local Origination Services to any users making a call to a DID Number in order to directly access Service Provider's switch located in a Serviceable Rate Centers.

   Service Provider will provide Local Termination Services to any end user served within the Serviceable Rate Centers.

2. Start Date: Per Customer Order

3. Compensation

   Compensation for these services shall consist of Monthly recurring charges (MRC). The Monthly recurring charge (MRC) will be paid by the 1st of each month. Payments will be based on the schedule attached hereto and the services ordered. GLOBAL will be responsible for blocking any "off-net" calls, which are outside of GLOBAL's "on-net" footprint, and CLIENT will be not be responsible for paying any additional charges for such calls.

4. Payment

   4.1 CLIENT shall pay GLOBAL the set up fee and the first monthly trunk charge prior to the turnup of any service or providing service. Subsequent monthly trunk charges will be billed in advance of the month to which they apply. GLOBAL shall invoice CLIENT for outbound service, and these invoices shall be paid within Thirty (30) days following the date of CLIENT's invoice. CLIENT payments to GLOBAL shall be made without set off.

4.2 Any charges not paid when due, shall be subject to late charges at one and one-half percent (1 1/2%) per month.

4.3 GLOBAL may terminate this Agreement if any charge is not paid in full prior to due date. In such event, CLIENT shall be responsible for all unpaid charges plus all of Global costs and expenses associated with the collection of said unpaid charges (including attorneys' fees).

4.4 For disputed invoices, requests for billing adjustments together with all supporting documentation must be received by GNAPS within sixty (60) days from the date of the invoice in dispute or the right to a billing adjustment will be waived. All such requests must be in writing and must clearly identify the amount in dispute and the specific items in dispute. Requests for billing adjustments that do not provide adequate information for analysis by GNAPS, as determined in GNAPS's sole discretion, will be rejected and any outstanding amounts will be due according to the invoice which was the subject of the request. In the event of a billing dispute, Customer must timely pay any undisputed amounts.

4.5 If the GNAPS network is not available to the client for more than 45 consecutive minutes in a given day, that day shall be considered "Downtime". Client downtime caused by direct action or inaction on the part of GNAPS, and being wholly under the control of GNAPS, will be credited to the client. For the purpose of credit calculation, each day of downtime shall be assessed the dollar value of 1/30th of the discounted rate, as listed in the Order form. If Downtime occurs on more than 4 days in a period of 90 consecutive days, Client may at its sole discretion, terminate any or all agreements with GNAPS without penalty.

If any LATA served by the GNAPS network is not available to the client for more than 45 consecutive minutes in a given day (not including scheduled maintenance), that day shall be considered "Limited Downtime". If Limited Downtime occurs on more than 4 days any 90-day period, Client may at its sole discretion terminate any or all agreements with GNAPS without penalty.

5. <u>Certain Federal, State and Local Taxes</u>

5.1 Any state or local excise, sales, or use taxes (excluding any taxes on income) resulting from the performance of this Agreement shall be borne by the Party upon which the obligation for payment is imposed under applicable law even if the obligation to collect and remit such taxes is placed upon the other Party. Each Party shall be responsible for filing all returns for federal, state or local sales, use, excise, governmental, or other taxes or tax-like fees imposed on or with respect to its services.

CONFIDENTIAL

5.2    To the extent permitted by applicable law, the Party obligated to pay such taxes may contest the same in good faith and shall be entitled to the benefit of any refund, provided that such Party cannot permit any lien to exist on any assets of the other Party by reason of any such contest.

CONFIDENTIAL

WITNESS our hands and seals this 8th day of October, 2003.

Global NAPs, Inc. ("GLOBAL")

By: ______________________
(Signature)

______________________
(Name)

______________________
(Title)

("CLIENT") UniPoint Services, Inc.

Company 6500 River Place Blvd
Address Bldg 2, Suite 200
City, State Zip Austin, Texas 78730
Name Mike Holloway
Phone 512-735-1200
Fax 512-735-1210

By: ______________________
Clay Johnson, CFO



# GENERAL TERMS AND CONDITIONS

The following General Terms and Conditions are incorporated into the agreements between Global NAPs, INC., Global NAPs Realty, INC. and/or Global NAPs Networks, Inc. (each hereinafter referred to as ("GLOBAL") and _UniPoint Services. Inc.____________ ("CLIENT").

1. <u>Term and Termination</u>

1.1 The initial term of this Agreement is one year, and each Customer Order, is 6 months. Thereafter, this Agreement will be automatically renewed for consecutive one (1) year periods unless either party provides the other party with written notification, at least sixty (60) days prior to the expiration of the then current term of this Agreement, of its intention not to renew this Agreement. Customer orders will become month to month with a 30 day notice to cancel at the end of the six month term. If substantially all of the assets of either Party are sold the buyer may, upon Nine (9) months written notice, terminate this contract.

1.2 Except as otherwise provided for herein, in the event that either Party commits a material breach of this Agreement, and fails to cure such breach within Thirty (30) days after written notice of such breach from the nonbreaching Party, the non-breaching Party may terminate this Agreement.

1.3 Neither Party shall be relieved of its respective obligations arising prior to the termination of this Agreement.

1.4 Notwithstanding anything to the contrary contained herein the service term for the initial service order is 90 days as a trial service. At the end of the 90 day trial service term, the service can be disconnected with no penalty to customer with 5 days written notice to Global NAPs.

2. <u>Severability</u>
In the event that any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any respect under the laws of the jurisdiction governing the entire Agreement, such unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such unenforceable provision or provisions had never been contained herein.

3. <u>Amendments: Waivers</u>

3.1 Except as otherwise provided herein, this Agreement may be amended only by

CONFIDENTIAL

written Agreement signed by authorized representatives of both Parties.

3.2 No waiver of any provisions of this Agreement and no consent to any default under this Agreement shall be effective unless the same shall be in writing and signed by or on behalf of the Party against whom such waiver or consent is claimed. No course of dealing or failure of any Party to enforce any term, right or condition of this Agreement shall be construed as a waiver of such term, right or condition.

4. Independent Contractors

Each Party shall perform its obligations hereunder as an independent contractor and not as the agent, employee or servant of the other Party, and neither Party nor any person furnished by such Party shall be deemed employees, agents or servants of the other Party or entitled to any benefits available under the plans for such other Party's employees.

5. No Exclusivity

Nothing herein shall be construed to prohibit either Party from entering into similar arrangements with any third Party, or to use its own assets and personnel for any legitimate business purpose.

6. Force Majeure

Neither Party shall be held liable for any delay or failure in performance of any part of this Agreement from any force majeure condition, including acts of God, acts of civil or military authority, government regulations, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, explosions, earthquakes, nuclear accidents, floods, strikes, power blackouts, unusually severe weather conditions, inability to secure products or services of other persons or transportation facilities, acts of Global suppliers, acts or omissions of transportation common carriers, or other causes beyond their reasonable control whether or not similar to the foregoing conditions.

7. Warranty

GLOBAL warrants that it has as of the Effective Date hereof, the right to provide the Service to CLIENT. GLOBAL makes no other warranties with respect to its provision of the Service under this Agreement, either express or implied. GLOBAL AND ITS SUPPLIERS EXPRESSLY DISCLAIM ALL IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY OR



FITNESS FOR A PARTICULAR PURPOSE.

8. Liabilities

GLOBAL SHALL NOT BE LIABLE FOR ANY LOSS OR DAMAGE INCURRED BY REASON OF OR INCIDENTAL TO GLOBAL'S PROVISION OF SERVICE UNDER THIS AGREEMENT AND SUCH LIMITATION OF DAMAGES BY GLOBAL SHALL INCLUDE, BUT NOT BE LIMITED TO, AMOUNTS FOR DIRECT, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING LOST REVENUE OR LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY THEREOF, WHETHER SUCH DAMAGES ARISE OUT OF BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER THEORY OF LIABILITY AND WHETHER SUCH DAMAGES WERE FORESEEABLE OR NOT AT THE TIME THIS AGREEMENT WAS EXECUTED.

THE PARTIES ACKNOWLEDGE THAT CLIENT IS AN ENHANCED SERVICE PROVIDER AND IS PROVIDING VOIP SERVICES. GLOBAL SHALL BE UNDER NO OBLIGATION TO DEFEND OR INDEMNIFYCLIENT FOR CLAIMS BY THIRD PARTIES ARISING FROM THE PROVISION OF VOIP SERVICES. GLOBAL MAKES NO REPRESENTATION TO CLIENT REGARDING VOIP SERVICES.

9. Indemnification

To the extent not prohibited by law, and except as otherwise provided herein, the Parties shall indemnify, defend and hold each other and their suppliers harmless from and against any loss, cost, claim, injury or liability brought by a person not a party or an affiliate under this Agreement that relates to or arises out of their own acts or omissions or the acts or omissions of their employees, agents or contractors in the use of the Service under this Agreement, whether negligent or otherwise. The Parties shall notify each other of any claims as soon as practicable, and reasonably cooperate with each other in the defense of any claims.

10. Governing Law

This Agreement shall be deemed to be a contract made in the State of Massachusetts, and the construction, interpretation, and performance of this Agreement shall be governed by the substantive laws of said State. Any action or



CONFIDENTIAL

proceeding brought by either Party shall be brought only in the courts of the State of Massachusetts, County of Norfolk, and each of the Parties consents to jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding. Process in any action or proceeding referred to in the preceding sentence may be served on either Party anywhere in the world.

11. Executed in Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same document.

12. Headings

The headings and numbering of sections in this Agreement are for convenience only and shall not be construed to define or limit any of the terms herein or affect the meaning or interpretation of this Agreement.

13. Entire Agreement

This Agreement, including any Attachments, constitutes the entire Agreement between the Parties and supersedes all prior oral or written Agreements, representations, statements, negotiations, understandings, proposals or undertakings with respect to the subject matter hereof.

14. Notices and Demands

All notices, demands, requests, elections, or other communications herein provided to be given or which may be given by one Party to the other Party shall be made in writing and, except as otherwise provided herein, such notices, demands, requests, elections, or other communications shall be deemed to have been duly given when received. If hand delivered, any such notice, demand, request, election or other communication shall be deemed to have been received on the business day received: if sent by registered or certified mail, return receipt requested, the date of receipt: if sent by overnight courier, the day after delivery to the courier; and if sent by electronic facsimile and followed by an original sent via overnight or first class mail, the date of confirmation of the facsimile: and in all cases shall be addressed as follows:

CONFIDENTIAL

If to GLOBAL:

William J. Rooney, Jr.
General Counsel
Global NAPs, Inc.
Ten Merrymount Rd.
Quincy, MA 02169

If to CLIENT: At the address set forth in the Agreement.

The address to which such notices may be given by either Party may be changed
by written notice given by such Party to the other Party pursuant to this Section.
All notices sent hereunder, whether by mail, overnight courier, or personal
delivery, shall be sent return receipt requested.



15. Third-Party Beneficiaries

This Agreement shall not provide any person not a Party to this Agreement with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement. Either Party may, however, assign this contract to an affiliate, parent or subsidiary upon Seven (7) days written notice.

16. Delegation and Assignment

16.1 Neither Party may assign, transfer, or sell its rights under this Agreement, or delegate its obligations hereunder, without the prior written consent of the other Party which written consent will not be unreasonably withheld. The Parties may, however, assign their rights or delegate their obligations to affiliated corporations, or parent or subsidiary corporations.

16.2 Subject to the above restrictions, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their permitted assigns and successors.

17. Survival

The provisions contained herein, the provisions contained in the Telephone Switch Service Agreement and the provisions contained in the Collocation Agreement, if any, between the Parties shall survive the termination of said Agreements.

18 Governmental Compliance

18.1 Each Party shall perform this Agreement in compliance with all applicable federal, state, county, and local laws, regulations, government agency orders or decisions and codes, and shall obtain permits and certificates where needed. In the event that such permits or certificates cannot be obtained, or in the event that legislative, regulatory, other legal action or changes in laws invalidate a material term(s) of this Agreement or adversely affects a Party's ability to perform a material term(s) of this Agreement, the Parties shall attempt to renegotiate a new term(s) as may be required to allow this Agreement to continue. In the event that such new term(s) cannot be renegotiated, and the ability of one or both Parties to perform this Agreement has been materially adversely affected, then, the adversely affected Party shall have the right to terminate this agreement upon Thirty (30) days notice.



18.2 All obligations under this Agreement shall be performed in compliance with those statutes, government agency orders, and regulations prohibiting discrimination against any employee or applicant for employment because of race, color, religion, sex, national origin, age, or handicap. Where required by law, certificates of compliance shall be provided.

19. Confidentiality

The Parties covenant and agree that they will not either during the term of this agreement, or at any time thereafter, disclose to anyone any confidential information concerning each other business or affairs. Information shall be considered confidential only if it is clearly marked as confidential or designated in writing as confidential before being provided to the other Party.

CONFIDENTIAL

WITNESS our hands and seals this 8th day of October, 2003.

Global Naps, Inc. ("GLOBAL")

By: ______________________
(Signature)

______________________
(Name)

______________________

("CLIENT") UniPoint Services, Inc.

Company 6500 River Place Blvd
Address Bldg 2, Suite 200
City, State Zip Austin, Texas 78730
Name Mike Holloway
Phone 512-735-1200
Fax 512-735-1210

By: ______________________
Clay Johnson, CFO



# Schedule A
# Service Order Form for Origination and Termination Services

**Date:** 10/7/03
**Customer:** UniPoint Services, Inc
**Start Date:** Per customer acceptance of DS3

**Circuit Type and Associated Charges**
**Bandwidth:** DS3
**Quantity:** 4
**Installation Charge:** waived
**Monthly Flat Rate DS3 Recurring Charge:** $[redacted]
**Extended Monthly Recurring Charge:** $[redacted]
**NOTES:** The existing DS3 which is currently billed to UniPoint at $[redacted] will be repriced at $[redacted]. This "repriced" DS3 represents one (1) of the four (4) DS3s identified in this contract Schedule A. This order is the Contract executed between Global and UniPoint on/around 10/8/2003.

**CLIENT Billing Information**
**Company Name:** UniPoint Services, Inc.
**Street Address:** 6500 River Place Blvd
**Suite, Room, Floor:** Building 2, Suite 200
**City, State, Zip Code:** Austin, TX 78730
**Billing Contact:** Jennifer Martin
**Billing Email:** jmartin@pointone.com
**Billing Phone:** 512-735-1200
**Billing Fax:** 512-735-1210

Date: 10/8/03

Name: Clay Johnson

Customer Signature: [signature]



AMENDMENT No. 1 TO THE TELEPHONE SWITCH SERVICE AGREEMENT EXECUTED BETWEEN GLOBAL NAPs AND UNIPOINT SERVICES, INC.

THIS AMENDMENT No. 1 to THE TELEPHONE SWITCH SERVICE AGREEMENT EXECUTED BETWEEN GLOBAL NAPs AND UNIPOINT SERVICES, INC. is made this 1st day of September , 2007 ("Effective Date") by and between UNIPOINT SERVICE, INC. ("UNIPOINT"), a _Texas__________ corporation, and Global NAPs Networks ("Global NAPs"), a Delaware corporation. Unipoint and Global NAPs Networks being collectively referred to herein as the "Party" or "Parties". All defined or capitalized terms used herein shall have the same meanings ascribed to them in the Agreement, unless specifically otherwise provided in this Amendment No. 1.

RECITALS

WHEREAS, Global NAPs and Unipoint have executed a Telephone Switch Service Agreement dated October 8, 2003 ("Agreement");

WHEREAS, Unipoint and its Affiliates shall have the right to order Services hereunder;

WHEREAS, Global NAPs and Unipoint desire to modify the Agreement in accordance with this Amendment No. 1 and the terms and conditions of the Agreement are hereby incorporated by reference, except to the extent superseded by this Amendment No. 1.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

TELEPHONE SWITCH SERVICE AGREEMENT

SECTION 4: PAYMENT

Section 4.5: The following language shall be added:

4.5 The 90 day period will begin as of the effective date of the Amendment No. 1.

4.6 The Global California network will be considered its own network for the purposes of this agreement and this Section 4.5. The Products that PointOne has purchased in the "California Network" are identified in Section 1.2 of Schedule A. Example: if "downtime" occurs in the Global network in California, PointOne may terminate the services that it purchases for the California coverage area without penalty. PointOne may not, however, disconnect any of the East Coast services, identified in Section 1.1

CONFIDENTIAL

of Schedule A, as a result of "downtime" experienced in the Global California Network. The California Network is defined as LATAs 720 and 722.

## GENERAL TERMS AND CONDITIONS

### SECTION 1 TERM AND TERMINATION

Section 1.1: Existing language shall be deleted in its entirety and replaced with the following language:

The term of this Agreement, and the Customer Products with their associated Monthly Charges, identified in Schedule A, shall be for an initial term of one hundred and eighty (180) days from the Effective Date of this Amendment No.1. After the initial one hundred and eighty (180) day term, this Agreement shall automatically renew in successive rolling ninety calendar day periods, under the same terms and conditions hereunder, unless terminated by written notice by one of the Parties. If substantially all of the assets of either Party are sold the buyer may, upon Nine (9) months written notice, terminate this contract.

If either party chooses to terminate any or all services being provided or purchased, proper notification must be sent to the other party. If either party chooses to terminate any or all services being provided or purchased, a ninety (90) day notice would have to be given to the other party. All services and billings for discontinued services will be terminated at the end of the ninety (90) day notice period. All services and billings not affected by the notice period, will continue on the terms and conditions hereunder.

EXAMPLE: If notice is sent on August 15, 2008, the "change" identified in the proper notification will take effect 90 days later, on November 14, 2008. If notice is sent on August 16, 2008, the "change" identified in the proper notification will take effect 90 days later, on November 15, 2008. If notice is sent on August 17, 2008, the "change" identified in the proper notification will take effect 90 days later, on November 16, 2008.

Section 1.4: All language shall be deleted in its entirety.

### SECTION 14 NOTICES AND DEMANDS

Section 14: The following language shall be added:



If to GLOBAL:

Brad Masuret
Global NAPs
10 Merrymount Road
Quincy MA 02169

Dave Shaw
Global NAPs
10 Merrymount Road
Quincy MA 02169

If to UNIPOINT:
Michael Holloway
6500 River Place Blvd
Building 2
Ste 200
Austin, TX 78730

Sam Shiffman
6500 River Place Blvd
Building 2
Ste 200
Austin, TX 78730

Ellery Lovelady
6500 River Place Blvd
Building 2
Ste 200
Austin, TX 78730

SCHEDULE "A" SERVICE ORDER FORM AND ORIGINATION AND TERMINATION SERVICES

SCHEDULE A: All language shall be deleted in its entirety and replaced with the following:

CONFIDENTIAL

Section 1.1: The following table represents the Unipoint Product IDs and the associated Monthly Recurring Costs that are to be governed by the language in the Telephone Switch Service Agreement dated October 8, 2003 ("Agreement"); and This AMENDMENT No. 1 to The Telephone Switch Service Agreement Executed between GLOBAL NAPs AND UNIPOINT SERVICES, INC. effective this 1st day of September, 2007. Pricing shall remain in effect for the term of this Amendment No.1.

| UNPOINT PRODUCT ID | MONTHLY RECURRING COST |
|---|---|
| ATL05 | $[redacted] |
| ATL06 | $[redacted] after9/30/07($[redacted] until 9/30/07) |
| ATL07 | $[redacted] |
| RES02 | $[redacted] |
| RES03 | $[redacted] |
| RES04 | $[redacted] |
| RES05 | $[redacted] |
| RES06 | $[redacted] |
| RES07 | $[redacted] |
| RES08 | $[redacted] |
| RES09 | $[redacted] |
| | |
| NYC01 | $[redacted] after10/14/07($[redacted] until 10/14/07) |

Section 1.2:

The following UNIPOINT Product IDs are considerd an exception to the terms and conditions outlined in section 1.1. These Product IDs are covered under a 30 day term with a 30 day advance notice to disconnect.

| LOS01 | $[redacted] |
|---|---|

Section 1.3: UNPOINT may request additional services from Global. Those additional services will be governed by the same term and conditions contained in the Telephone Switch Service Agreement dated October 8, 2003 ("Agreement"); and This AMENDMENT No. 1 to The Telephone Switch Service Agreement Executed between GLOBAL NAPs AND UNIPOINT SERVICES, INC. is made effective 1st day of August, 2007 UNLESS otherwise noted on the Global NAPs Service Order Form.



CONFIDENTIAL

IN WITNESSS WHEREOF, the Parties have executed this Amendment No. 1 on the date written below.

Unipoint Services, Inc.

By: [signature]

Name: MIKE HOLLOWAY

Title: PRESIDENT/CEO

Date: 9/4/07

Global NAPs Networks

By: [signature]

Name: SAMUEL ZAILZOUR

Title: CONTRACTS ADMINISTRATOR

Date: 9/24/07

# EXHIBIT 7

CONFIDENTIAL

GLOBAL NAPs, INC. TELEPHONE SWITCH SERVICE AGREEMENT

Global NAPs, INC. ("GLOBAL") and NTERA ("CLIENT"), an Enhanced Service Provider hereby agree, subject to the Global General Terms and Conditions, which are incorporated herein by reference, that GLOBAL shall provide to CLIENT the following service as set out below:

1. Description of Service: GLOBAL shall provide CLIENT with telephone service as may be more particularly described as follows:

   During the Term of this Agreement, CLIENT shall request Local Origination Service and Local Termination Service to be provided hereunder by submitting such requests to Service Provider from time to time, on the Service Provider service order form(s) ("Service Order").

   Service Provider will provide Local Origination Services to any users making a call to a DID Number in order to directly access Service Provider's switch located in a Serviceable Rate Centers.

   Service Provider will provide Local Termination Services to any end user served within the Serviceable Rate Centers.

2. Start Date: Per Customer Order

3. Compensation

   Compensation for these services shall consist of Monthly recurring charges (MRC). The Monthly recurring charges (MRC) will be paid by the 1st of each month. Payments will be based on the schedule attached hereto and the services ordered.

4. Payment

   4.1 CLIENT shall pay GLOBAL the and the first monthly trunk charge prior to the turnup of any service or providing service. Subsequent monthly trunk charges will be billed in advance of the month to which they apply. GLOBAL shall invoice CLIENT for outbound service, and the undisputed portions of the invoices shall be paid within Thirty (30) days following the date of CLIENT's invoice. CLIENT payments to GLOBAL shall be made.

   4.2 Any undisputed charges not paid when due, shall be subject to late charges at one and one-half percent (1 1/2%) per month.

CONFIDENTIAL

4.3    GLOBAL may terminate this Agreement if any charge is not paid in full prior to due date. In such event, CLIENT shall be responsible for all unpaid charges plus all of Global costs and expenses associated with the collection of said unpaid charges (including attorneys' fees).

4.4    For disputed invoices, requests for billing adjustments together with all supporting documentation must be received by GNAPS within sixty (60) days from the date of the invoice in dispute or the right to a billing adjustment will be waived. All such requests must be in writing and must clearly identify the amount in dispute and the specific items in dispute. In the event of a billing dispute, Customer must timely pay any undisputed amounts.

If the GNAPS network is not available to the client for more than 45 consecutive minutes in a given day, that day shall be considered "Downtime". Client downtime caused by direct action or inaction on the part of GNAPS, and being wholly under the control of GNAPS, will be credited to the client. For the purpose of credit calculation, each day of downtime shall be assessed the dollar value of 1/30th of the discounted rate, as listed in the Order form.

5.    Certain Federal, State and Local Taxes

5.1    Any state or local excise, sales, or use taxes (excluding any taxes on income) resulting from the performance of this Agreement shall be borne by the Party upon which the obligation for payment is imposed under applicable law even if the obligation to collect and remit such taxes is placed upon the other Party. Each Party shall be responsible for filing all returns for federal, state or local sales, use, excise, governmental, or other taxes or tax-like fees imposed on or with respect to its services.

5.2    To the extent permitted by applicable law, the Party obligated to pay such taxes may contest the same in good faith and shall be entitled to the benefit of any refund, provided that such Party cannot permit any lien to exist on any assets of the other Party by reason of any such contest.

nt By: HP LaserJet 3100; 6175075201; Dec-4-06 4:38PM; Page 4
6175075201; Dec-4-06 4:38PM; Page 4
Sent By: A.B.S.; 9544578802; Mar-11-04 12:21PM; Page 12/12

CONFIDENTIAL

WITNESS our hands and seals this ______ day of ________________, 20___.

Global NAPs, Inc. ("GLOBAL")

By: ______________________
(Signature)

______________________
(Name)

______________________
(Title)

("CLIENT")

Company
Address
City, State Zip
Name
Phone
Fax

By: ______________________ 3/5/04

Global NAPs Confidential

Page 3

CONFIDENTIAL

condition.

4. Independent Contractors

Each Party shall perform its obligations hereunder as an independent contractor and not as the agent, employee or servant of the other Party, and neither Party nor any person furnished by such Party shall be deemed employees, agents or servants of the other Party or entitled to any benefits available under the plans for such other Party's employees.

5. No Exclusivity

Nothing herein shall be construed to prohibit either Party from entering into similar arrangements with any third Party, or to use its own assets and personnel for any legitimate business purpose.

6. Force Majeure

Neither Party shall be held liable for any delay or failure in performance of any part of this Agreement from any force majeure condition, including acts of God, acts of civil or military authority, government regulations, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, explosions, earthquakes, nuclear accidents, floods, strikes, power blackouts, unusually severe weather conditions, inability to secure products or services of other persons or transportation facilities, acts of Global suppliers, acts or omissions of transportation common carriers, or other causes beyond their reasonable control whether or not similar to the foregoing conditions.

7. Warranty

GLOBAL warrants that it has as of the Effective Date hereof, the right to provide the Service to CLIENT. GLOBAL makes no other warranties with respect to its provision of the Service under this Agreement, either express or implied. GLOBAL AND ITS SUPPLIERS EXPRESSLY DISCLAIM ALL IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

8. Liabilities

GLOBAL SHALL NOT BE LIABLE FOR ANY LOSS OR DAMAGE INCURRED BY REASON OF OR INCIDENTAL TO GLOBAL'S PROVISION

CONFIDENTIAL

OF SERVICE UNDER THIS AGREEMENT AND SUCH LIMITATION OF DAMAGES BY GLOBAL SHALL INCLUDE, BUT NOT BE LIMITED TO, AMOUNTS FOR DIRECT, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING LOST REVENUE OR LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY THEREOF, WHETHER SUCH DAMAGES ARISE OUT OF BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER THEORY OF LIABILITY AND WHETHER SUCH DAMAGES WERE FORESEEABLE OR NOT AT THE TIME THIS AGREEMENT WAS EXECUTED.

THE PARTIES ACKNOWLEDGE THAT CLIENT IS AN ENHANCED SERVICE PROVIDER AND MAY BE PROVIDING VOIP SERVICES. GLOBAL SHALL BE UNDER NO OBLIGATION TO DEFEND OR INDEMNIFYCLIENT FOR CLAIMS BY THIRD PARTIES ARISING FROM THE PROVISION OF VOIP SERVICES. GLOBAL MAKES NO REPRESENTATION TO CLIENT REGARDING VOIP SERVICES.

9. Indemnification

To the extent not prohibited by law, and except as otherwise provided herein, the Parties shall indemnify, defend and hold each other and their suppliers harmless from and against any loss, cost, claim, injury or liability brought by a person not a party or an affiliate under this Agreement that relates to or arises out of their own acts or omissions or the acts or omissions of their employees, agents or contractors in the use of the Service under this Agreement, whether negligent or otherwise. The Parties shall notify each other of any claims as soon as practicable, and reasonably cooperate with each other in the defense of any claims.

10. Governing Law

This Agreement shall be deemed to be a contract made in the State of Massachusetts, and the construction, interpretation, and performance of this Agreement shall be governed by the substantive laws of said State. Any action or proceeding brought by either Party shall be brought only in the courts of the State of Massachusetts, County of Norfolk, and each of the Parties consents to jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding. Process in any action or proceeding referred to in the preceding sentence may be served on either Party anywhere in the world.

CONFIDENTIAL

11. Executed in Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be an original; but such counterparts shall together constitute but one and the same document.

12. Headings

The headings and numbering of sections in this Agreement are for convenience only and shall not be construed to define or limit any of the terms herein or affect the meaning or interpretation of this Agreement.

13. Entire Agreement

This Agreement, including any Attachments, constitutes the entire Agreement between the Parties and supersedes all prior oral or written Agreements, representations, statements, negotiations, understandings, proposals or undertakings with respect to the subject matter hereof.

14. Notices and Demands

All notices, demands, requests, elections, or other communications herein provided to be given or which may be given by one Party to the other Party shall be made in writing and, except as otherwise provided herein, such notices, demands, requests, elections, or other communications shall be deemed to have been duly given when received. If hand delivered, any such notice, demand, request, election or other communication shall be deemed to have been received on the business day received; if sent by registered or certified mail, return receipt requested, the date of receipt; if sent by overnight courier, the day after delivery to the courier; and if sent by electronic facsimile and followed by an original sent via overnight or first class mail, the date of confirmation of the facsimile; and in all cases shall be addressed as follows:

If to GLOBAL:

William J. Rooney, Jr.
General Counsel
Global NAPs, Inc.
Ten Merrymount Rd.
Quincy, MA 02169

Sent By: HP LaserJet 3100; 6175075201; Dec-4-06 4:39PM; Page 8/12

ent By: A.B.S.; 9544678802; Mar-11-04 12:19PM; Page 5

CONFIDENTIAL

If to CLIENT: At the address set forth in the Agreement.

The address to which such notices may be given by either Party may be changed by written notice given by such Party to the other Party pursuant to this Section. All notices sent hereunder, whether by mail, overnight courier, or personal delivery, shall be sent return receipt requested.

Global N.A.'s Confidential

Page 8



CONFIDENTIAL

15. Third-Party Beneficiaries

This Agreement shall not provide any person not a Party to this Agreement with any remedy, claim, liability, reimbursement, cause of action or other right in excess of those existing without reference to this Agreement. Either Party may, however, assign this contract to an affiliate, parent or subsidiary upon Seven (7) days written notice.

16. Delegation and Assignment

16.1 Neither Party may assign, transfer, or sell its rights under this Agreement, or delegate its obligations hereunder, without the prior written consent of the other Party which written consent will not be unreasonably withheld. The Parties may, however, assign their rights or delegate their obligations to affiliated corporations, or parent or subsidiary corporations.

16.2 Subject to the above restrictions, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the Parties and their permitted assigns and successors.

17. Survival

The provisions contained herein, the provisions contained in the Telephone Switch Service Agreement and the provisions contained in the Collocation Agreement, if any, between the Parties shall survive the termination of said Agreements.

18 Governmental Compliance

18.1 Each Party shall perform this Agreement in compliance with all applicable federal, state, county, and local laws, regulations, government agency orders or decisions and codes, and shall obtain permits and certificates where needed. In the event that such permits or certificates cannot be obtained, or in the event that legislative, regulatory, other legal action or changes in laws invalidate a material term(s) of this Agreement or adversely affects a Party's ability to perform a material term(s) of this Agreement, the Parties shall attempt to renegotiate a new term(s) as may be required to allow this Agreement to continue. In the event that such new term(s) cannot be renegotiated, and the ability of one or both Parties to perform this Agreement has been materially adversely affected, then, the adversely affected Party shall have the right to terminate this agreement upon Thirty (30) days notice.

CONFIDENTIAL

18.2 All obligations under this Agreement shall be performed in compliance with those statutes, government agency orders, and regulations prohibiting discrimination against any employee or applicant for employment because of race, color, religion, sex, national origin, age, or handicap. Where required by law, certificates of compliance shall be provided.

19. <u>Confidentiality</u>

The Parties covenant and agree that they will not either during the term of this agreement, or at any time thereafter, disclose to anyone any confidential information concerning each other business or affairs. Information shall be considered confidential only if it is clearly marked as confidential or designated in writing as confidential before being provided to the other Party.

CONFIDENTIAL

WITNESS our hands and seals this _______ day of _________________, 20___.

Global Naps, Inc. ("GLOBAL")

By: ______________________
(Signature)

______________________
(Name)

______________________

("CLIENT")

Company
Address
City, State Zip
Name
Phone
Fax

By: ______________________ 3/4/04

Sent By: HP LaserJet 3100; 6175075201; Dec-4-06 4:40PM; Page 12/12
6175075201; Dec-4-06 4:40PM; Page 12/12
Sent By: A.B.S.; 9544578802; Mar-11-04 12:20PM; Page 9/12

CONFIDENTIAL

# Schedule A
# Service Order Form for Origination and Termination Services

**Date:**
**Customer:**
**Start Date:** Per customer acceptance of DS3

**Circuit Type and Associated Charges**
**Bandwidth:** DS3
**Quantity:**
**Installation Charge:**
**Monthly Flat Rate DS3 Recurring Charge:** $
**Extended Monthly Recurring Charge:** $
**NOTES:**

**CLIENT Billing Information**
**Company Name:**
**Street Address:**
**Suite, Room, Floor:**
**City, State, Zip Code:**
**Billing Contact:**
**Billing Email:**
**Billing Phone:**
**Billing Fax:**

Date: ______________________

Name: ______________________

Customer Signature: ______________________

Global NAPs Confidential
Page 12

# EXHIBIT 8

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service Commission held in the City of New York on March 19, 2008

COMMISSIONERS PRESENT:

Garry A. Brown, Chairman
Patricia L. Acampora
Maureen F. Harris
Robert E. Curry, Jr.
Cheryl A. Buley

CASE 07-C-0059 - Complaint of TVC Albany, Inc. d/b/a Tech Valley Communications Against Global NAPs, Inc. for Failure to Pay Intrastate Access Charges.

ORDER DIRECTING NEGOTIATION

(Issued and Effective March 20, 2008)

BY THE COMMISSION:

INTRODUCTION

On January 12, 2007, TVC Albany, Inc. d/b/a Tech Valley Communications (TVC) filed a complaint against Global NAPs, Inc. (GNAPs) demanding that GNAPs pay intrastate access charges for termination of toll calls that GNAPs transports for its customers for termination on the TVC facilities-based network.[1] TVC requests that the Commission order GNAPs and any of its affiliates operating in New York to pay all allegedly past due[2] and future intrastate access charges, with interest, to TVC for termination of these toll calls. If GNAPs fails to pay

---

1 TVC claims that toll traffic from GNAPs is delivered to a Verizon New York Inc. (Verizon) tandem and routed by Verizon to the TVC network.

2 TVC claims $41,070.78 is due for bills issued from December 15, 2003 through December 15, 2006.

intrastate access charges owed, TVC requests that the Commission (1) authorize it to block GNAPs' service and (2) revoke GNAPs' Certificate of Public Convenience and Necessity (CPCN).[3]

In its response and replies, GNAPs claims that it is not required to pay intrastate access charges to TVC because the calls it routes to TVC's customers are nomadic Voice over Internet Protocol (VoIP) calls. GNAPs asserts these calls are subject to exclusive federal jurisdiction, exempt from state regulation,[4] and under existing Federal Communication Commission (FCC) rules, not subject to imposition of intrastate access charges.

In this Order, we decline to require GNAPs to pay access charges to TVC for termination of calls routed through the TVC network. We conclude that instead, TVC and GNAPs should negotiate a compensation agreement governing the joint rates, terms and conditions for services over their networks. If negotiation fails, then TVC may request that it be relieved of any obligation to complete calls routed to its network from GNAPs' customers.

PETITION

TVC states that, while there are no direct interconnections between GNAPs and TVC, Verizon routes GNAPs traffic to TVC. This arrangement, according to TVC, entitles Verizon and TVC to assess intrastate access charges for the portions of service provided by the two carriers. TVC asserts that its tariff authorizes intrastate access charges for terminating GNAPs' traffic through an intermediate carrier and that any telecommunications company providing service under a

---

[3] GNAPs is an affiliate of GNAPs Networks, a national carrier operating a national fiber optic backbone network.

[4] Vonage Holding Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission, 19 F.C.C. 22404 (2004) (Minnesota/Vonage Order).

CPCN is required to comply with the terms of that tariff. TVC further argues that its termination of toll calls provides a direct economic benefit to GNAPs by making collection of toll revenues from GNAPs' customers possible. TVC therefore asserts that GNAPs failure to pay for services unjustly enriches GNAPs at TVC's expense. TVC maintains that GNAPs' failure to pay intrastate access charges constitutes an unjust and unreasonable practice and a willful violation of Public Service Law (PSL) §91 and §201 of the Act (although it offers no specific rationale under §201). TVC argues that the Commission has jurisdiction to order payment of intrastate access charges in this case, because TVC's intrastate tariff controls.

ANSWER AND REPLIES

On February 8, 2007, GNAPs filed an Answer to TVC's Complaint. On March 1, 2007, TVC filed a Reply to GNAP's Answer; and, on March 7, 2007, GNAPs filed a Reply to TVC's Reply. On April 6, 2007, TVC submitted a letter to the Secretary to the Commission presenting further arguments; and, GNAPs, on April 10, 2007, submitted a letter to the Secretary to the Commission, replying to some of the points raised in the TVC letter.

FCC Jurisdiction and Preemption of State Regulation

GNAPs argues that VoIP services are interstate and not subject to intrastate access charges based on the FCC's determinations that VoIP traffic is jurisdictionally interstate, preempting state jurisdiction over VoIP services.[5] Because VoIP services are interstate and not subject to intrastate tariffs or

---

[5] In its letter to the Secretary, GNAPs discusses the Eighth Circuit's Vonage decision), affirming the FCC's Minnesota/Vonage Order, Minnesota Public Utilities Commission v. Federal Communications, 483 F.3d 570 (2007)(Eighth Circuit decision).

to state regulation, GNAPs concludes that intrastate charges may not be imposed.[6]

TVC asserts that the FCC determination regarding VoIP services and related judicial decisions do not resolve issues relating to imposition of intrastate charges for VoIP traffic and that prior determinations deal solely with general state requirements for certification, filing of tariffs, and provision of 911 emergency services. TVC further argues that the basis of the FCC's decision to preempt state regulation over VoIP services was based on an acknowledgment that transmission of VoIP service over the Internet precludes any practical method of identifying or separating the interstate and intrastate components of the service for purposes of establishing a dual federal/state regulatory scheme. TVC goes on to assert that this basis adopted by the FCC (i.e., impossibility of identifying and separating interstate and intrastate traffic) is weakened by a subsequent determination,[7] in which the FCC authorizes VoIP providers, if possible, to calculate contributions to the Universal Service Fund (USF) based on the actual percentage of interstate and intrastate revenues, as indicated by traffic studies or actual measurements. The FCC recognized that a VoIP provider with the capability to track

---

[6] In its letter to the Secretary, GNAPs states that the Eighth Circuit Vonage Decision made clear that the FCC determined that VoIP is jurisdictionally interstate, subject to the FCC's exclusive jurisdiction, and that the FCC preempted state regulation for a number of reasons, including the possibility that state policies may conflict with federal policies.

[7] WC Docket 06-122, Universal Service Contribution Methodology, et al., Report and Order and Notice of Proposed Rulemaking, 21 F.C.C. 7518 (2006)(Universal Service Contribution Order).

customer calls could become subject to state regulation.[8]  TVC
maintains that based on the FCC's recognition that VoIP traffic
can be distinguished as interstate or intrastate, the Commission
is not foreclosed from requiring GNAPs to pay TVC's switched
access charges.

In reply, GNAPs asserts that TVC only partially
describes the basis for the FCC's preemption of state regulation
over VoIP service.  It adds that the FCC also decided that,
Vonage's service is too "multi-faceted" to rely on a user's
location for establishing state or federal jurisdiction.  GNAPs
states that, although the FCC's Universal Service Order may, as
TVC claims, call into question the FCC's justification for
asserting exclusive jurisdiction over VoIP traffic, the FCC has
not changed its decision regarding VoIP service jurisdiction
and, thus, TVC has no legal basis for ignoring the preemption
ruling.

Applicability of Intrastate Tariff

GNAPs states that TVC's intrastate access tariff does
not apply to interstate services because: (1) the tariff does
not explicitly state that it imposes intrastate access charges
on interstate services or refer to VoIP services, (2) TVC and
GNAPs have not agreed to apply the intrastate tariff to GNAPs
services, and (3) the FCC has not specifically authorized
imposition of access charges for VoIP traffic and this issue is
within the exclusive jurisdiction of the FCC and the subject of
a pending FCC rulemaking.

---

[8] In its Letter to the Secretary, TVC states that the Eighth
Circuit decision supported this argument:  "the FCC recognized
the potentially limited temporal scope of its pre-emption of
state regulation in this area in the event technology is
developed to identify the geographic location of nomadic VOIP
communications."

In its response, TVC noted GNAPs' statement that if a contractual agreement exists between the two carriers or if an applicable tariff imposes charges then an intermediate carrier may be liable for charges to a terminating carrier. TVC states that GNAPs' use of the TVC network and constructive ordering of access services did constitute an agreement between the carriers. Therefore, according to TVC, this agreement supersedes any requirement that its access tariff specifically state it applies to VoIP traffic, because its terms refer to provision of a two-point communications path between a customer designated premises and an end user's premises, and, thus, apply broadly to non-local traffic delivered for termination.[9]

In its reply, GNAPs contests TVC's claim that its tariff is broadly written to apply to any non-local traffic. GNAPs claims that TVC's tariff is limited to non-local intrastate traffic and the tariff does not apply to GNAPs' VoIP traffic because the FCC has ruled that VoIP traffic is jurisdictionally interstate. GNAPs further maintains that customers lack notice that termination of VoIP traffic is subject to access charges, that TVC provided no notice to its customers that it would impose access charges on VoIP traffic, and that no order of any agency calls into question the exclusive federal jurisdiction over VoIP traffic to permit these charges. GNAPs concludes that TVC's tariff does not refer to VoIP service, that the FCC decided that VoIP service is jurisdictionally interstate, and that, under the filed rate doctrine, TVC may not charge rates for services not referenced in the tariff.

Commission Authority

GNAPs, referring to the Minnesota/Vonage Order, asserts that the Commission has no jurisdiction to approve

---

[9] PSC No. 3- Telephone Access Services Tariff, §1 and §6.1.

intrastate access charges because the FCC precluded state regulation over rates and services for VoIP services. It asserts that the Minnesota/Vonage Order prohibits the Commission from regulating rates and terms applicable to VoIP services.

In reply, TVC states that, as GNAPs acknowledges, since the FCC has not definitely ruled on the issue of imposing intrastate access charges on VoIP traffic, this Commission may resolve the issue, as TVC claims the Commission did in another case.[10]

In reply, GNAPs maintains that the FCC asserted exclusive jurisdiction over VoIP services and that this means that this Commission is without authority to resolve issues of compensation that the FCC reserves to itself. It claims that the only exception to this rule is state Commission interpretation of an interconnection agreement entered into pursuant to §252 of the Act.

Classification of VoIP as a Telecommunications Service

GNAPs asserts that the FCC has not classified VoIP as a telecommunications service or an information service, that the obligation to pay access charges is limited to telecommunications service, and thus, access charges are not applicable to the VoIP services provided by GNAPs.

In its reply, TVC looks at the lack of classification of VoIP services from a different perspective, claiming that, since the FCC did not specifically classify VoIP as an information or telecommunications service, no exemption from intrastate access charges pertains to VoIP.

---

[10]  Case 01-C-1119, Frontier Telephone of Rochester - Intrastate Carrier Access Charges, Order Requiring Payment of Intrastate Carrier Access Charges (issued May 31, 2002).

Enhanced Service Provider Exemption

GNAPs maintains that, unless the FCC rules that VoIP is a telecommunications service, it is not subject to access charges because the traffic falls within the FCC's general exemption from payment of certain access charges established for Enhanced Service Providers (ESP).

In response, TVC argues that the FCC declined to determine the status of Vonage as a telecommunications carrier or an information service provider (ISP) and, in the VoIP Universal Service Contribution Order, determined that providers of VoIP service are providers of interstate telecommunications. TVC further submits that several states have rejected GNAPs' argument that the FCC general exemption of ESPs from payment of interstate access charges applies to VoIP providers.[11] It further argues that GNAPs' ESP exemption argument is without merit because the scope of the FCC exemption applies to ESP-bound traffic, which is not the traffic at issue here, and the FCC made no clear statement preempting a state's ability to determine whether intrastate access charges apply to VoIP traffic.

In reply, GNAPs states that TVC's reliance on the California Public Utility Commission's decision is misplaced because that decision interpreted the terms applicable to VoIP traffic established in an interconnection agreement between the parties. GNAPs states that the decision has no relevance to the issues presented in TVC's complaint because the parties have no interconnection agreement to interpret. Further, TVC's tariff, limited to intrastate services, does not apply to jurisdictionally interstate traffic.

---

[11] E.g., Matter of Cox California Telecom, LLC v. Global Naps California, Inc., Case 06-04-026, Opinion Granting Complainant's Motion for Summary Judgment (issued January 11, 2007).

GNAPs Status as an Intermediate Carrier

GNAPs states that the FCC determined that terminating local exchange carriers, such as TVC, are not permitted to impose access charges on intermediate carriers, such as GNAPs, that do not provide originating end-user dial tone, unless such charges are imposed under a contract or tariff. GNAPs maintains that TVC's tariff does not include specific provisions authorizing recovery of access charges from intermediate carriers and TVC and GNAPs have not entered into any contracts governing interconnection. GNAPs disputes any claim that it is an interexchange carrier, asserting such a carrier now establish a billing relationship with the end-user customer.

In response, TVC rejects GNAPs argument that as an intermediate carrier GNAPs is not subject to the application of certain charges. According to TVC, the case that GNAPs submitted in support of its argument (Iowa Network Services v. Qwest, 385 F. Supp. 2d 850 (S.D. Iowa 2005)) related solely to cellular (CMRS) carriers and did not consider an exemption from charges for a carrier transmitting VoIP calls from an ISP to a Competitive Local Exchange Carrier (CLEC). In addition, TVC questions whether GNAPs is, in fact an intermediate carrier. In asserts that if Vonage is an ESP as GNAPs claims, GNAPs itself is an originating carrier and should, therefore, be subject to its tariffed access charges since it delivers traffic from Vonage. In reply, GNAPs challenges TVC's analysis of its intermediate carrier issue, stating that the authority that TVC relies upon is unpersuasive because the type of traffic at issue in this proceeding is irrelevant to the court's analysis.

Procedural Requirements

GNAPs submits that the decision to require intermediate carriers to pay access charges is a decision of national significance and affects other similarly situated carriers. It thus argues that the Commission have a generic

proceeding to resolve issues, solicit public participation, assess impact on intermediate carriers' operational and financial planning, evaluate the possibility of discontinuance of service by VoIP providers due to the increased costs, and analyze effects of authorizing access charges on deployment of advanced services. In the alternative, GNAPs suggests that the Commission defer to the FCC for determination on the issue of applicability of access charges to VoIP traffic.

In response, TVC asserts that GNAPs' request for a formal rulemaking is a stalling tactic that would enable the company to continue unjustly enriching itself at the expense of TVC. It also maintains that further information is required for this Commission's determination of jurisdictional issues, including nature of the calls, relationship of GNAPs to Vonage and its customers, routing of the traffic and capability of tracking the originating and terminating points of the calls. TVC proposes that the parties gather more factual evidence through the submission of interrogatories and discovery requests.

In reply, GNAPs proposes that the FCC is the proper forum for a determination on the issues that TVC presents. It recommends that TVC seek a ruling from the FCC that geographically separable traffic is subject to intrastate switched access charges.

Negotiated Settlement

GNAPs states that it will not pay intrastate access charges to terminate traffic that is jurisdictionally interstate. GNAPs goes on to assert that it is prepared to discuss with TVC the costs of originating and terminating traffic between their networks, that TVC's insistence that its tariff alone governs the access charges precludes such

discussions, and that the discussions must include costs of transporting traffic originating from TVC's customers.

## BACKGROUND

### Preemption of State Rate Regulation over nomadic VoIP Traffic

In 2004, the FCC determined, in part, that nomadic VoIP services[12] provided by Vonage should be deemed exclusively interstate for jurisdictional purposes.[13] The FCC's determination was based, in part, on the jurisdictionally mixed nature of Vonage's service and the impracticality, if not impossibility,[14] of separating intrastate and interstate portions of nomadic VoIP service and also accurately determining geographical locations of the origination and termination points of nomadic VoIP calls. The FCC's determination arguably applies to similar VoIP-to-VoIP, VoIP-to-landline and landline-to-VoIP calls (interconnected VoIP calls) because the VoIP part of the call is not confined to the geographic location associated with the customer's billing address or assigned telephone number.[15]

The FCC also determined that compliance with state rate and entry regulations would negate valid federal policies and undermine objectives of promoting continued development of the Internet and encouraging deployment of advanced telecommunications services. The FCC made no determination relating to classification of VoIP services generally as information services, exempt from federal and state regulation,

---

12 Nomadic VoIP describes a service used to place a call at any location through a broadband Internet connection.

13 *See generally*, Minnesota/Vonage Order.

14 47 U.S.C. §152(b).

15 "The Internet's inherently global and open architecture obviates the need for any correlation between Vonage's DigitalVoice service and its end users' geographic locations" Minnesota/Vonage Order at pp. 23-24.

or as telecommunications services, subject to a broad array of state and federal requirements.[16]

In 2007, the Eighth Circuit Court of Appeals upheld the FCC's preemption of state regulation as it applies to nomadic VoIP services.[17] The Court granted deference to the FCC's findings that the difficulty of identifying call points for nomadic VoIP[18] made it impractical, if not impossible, to separate service into intrastate and interstate components.[19]

To date, the FCC has not determined a specific regulatory classification and compensation scheme for VoIP and there are currently at least three open dockets at the FCC addressing the proper classification of VoIP, whether access charges should apply and whether to forbear from applying the ESP exemption to VoIP originated traffic.

---

16 The FCC deferred this decision because regulatory classification of VoIP is the subject of its IP-Enabled Services Proceeding (IP-Enabled Services, WC Docket No. 04-36, Notice of Proposed Rulemaking, 19 F.C.C. Rcd 4863 (2004) (IP-Enabled Services proceeding).

17 The court noted that there were fundamental differences between Vonage's digital voice service and telephone service provided over the circuit-switched network. Specifically, the court noted that the geographic locations of traditional circuit-switched communications are readily known, while VoIP communications are not tied to identifiable geographic locations. The court further contrasted a distinction between nomadic VoIP and fixed VoIP because the latter communication, while using the same technology, originates and terminates at a fixed location.

18 The Court decided that the FCC only suggested that it would preempt state regulation of fixed VoIP services and did not actually make a final agency determination. Therefore, VoIP providers who can track the geographic end-points of calls do not qualify for the preemptive effects of the Vonage order.

19 Minn. Pub. Utility Comm'n v. FCC, 483 F.3d 570 (8th cir. 2007).

DISCUSSION

GNAPs claims that the traffic it sends for termination over the TVC's network is interconnected VoIP.[20] GNAPs further claims that, because interconnected VoIP has not been classified as a telecommunications service or an information service, there is no obligation to pay access charges because that obligation is limited to a telecommunication service. TVC disagrees and suggests that the lack of classification does not preclude the application of intrastate access charges here.

The FCC raised the issue of the classification of interconnected VoIP in 2004 in its IP Enabled Services proceeding. Specifically, the FCC requested comments on "[w]hich classes of IP-enabled services, if any, are 'telecommunications service' [and] … [w]hich, if any, are 'information services'?"[21] Although the FCC has applied many other telecommunications regulations to interconnected VoIP services since 2004, it has refrained from classifying VoIP as either a telecommunications service or an information service. For purposes of the dispute at issue in this proceeding, it is not necessary to decide whether interconnected VoIP constitutes a telecommunications service or an information service. Resolution of that issue can await the outcome of the FCC's IP-Enabled Services proceeding.

Classifying interconnected VoIP as either a telecommunications service or in information service will not

---

20 Under the circumstances presented in this proceeding, GNAPs, a competitive local exchange carrier (CLEC), transports calls to a Verizon, an incumbent local exchange carrier (ILEC), tandem. Verizon then transports the calls to the TVC, also a CLEC, network. TVC terminates the calls to its end-users through its facilities.

21 IP-Enabled Services, WC Docket No. 04-36, Notice of Proposed Rulemaking, 19 FCC Rcd. 4863, ¶ 43 (2004)(IP-Enabled Services proceeding).

have any affect on the FCC's subsequent holding that nomadic VoIP is exclusively interstate. In 2004, the FCC declared that, notwithstanding the classification of interconnected VoIP, nomadic VoIP is an interstate service because it would be impractical, if not impossible, to separate interstate and intrastate components of that call.

On November 26, 2007, Department of Public Service Staff (Staff) requested that GNAPs provide evidence to support its claim that the traffic it sends to the TVC network for termination is primarily VoIP, largely for the benefit of Vonage (i.e., nomadic VoIP) customers. GNAPs responded under protective cover dated December 4, 2007. GNAPs provided affidavits from its customers that send traffic to New York representing that the traffic it handles is VoIP, largely for the benefit of Vonage and other similarly situated providers of interconnected VoIP. Staff has advised that it appears from the evidence submitted by GNAPs most, if not all, the traffic GNAPs sends to the TVC network for termination is nomadic VoIP.

The Commission determines here that because the Minnesota/Vonage Order and Eighth Circuit Court of Appeals decision establishes that nomadic VoIP service is interstate, our authority to impose intrastate access rates over nomadic VoIP service is precluded because rate treatment of nomadic VoIP service falls under the exclusive jurisdiction of the FCC.

TVC alternatively requests that the Commission require GNAPs to pay intrastate access charges based on TVC's tariff on file with the Department of Public Service. TVC states that its access tariff need not specifically state that it applies to VoIP traffic, because its terms apply broadly to non-local traffic delivered to it for termination. GNAPs states that the traffic routed to Verizon and onto to the TVC network is primarily, if not exclusively, nomadic VoIP. GNAPs argues that the Minnesota/Vonage Order and Eighth Circuit decision foreclose

this Commission from applying intrastate tariffs on interstate calls.

For reasons stated above, we agree with GNAPs.[22] Because nomadic VoIP is interstate in nature, and because its rates are exclusively under the FCC's jurisdiction, we are similarly precluded from imposing the TVC intrastate access tariff. Under the FCC's decisions, nomadic VoIP is treated as interstate subject to exclusive federal rate jurisdiction. Applying the TVC intrastate access tariff to an interstate service would be inappropriate and conflict with valid federal laws and policies.[23]

Our analysis does not end here, however. Under PSL §97(3), the Commission has broad authority to require interconnection among telecommunication carriers regardless of the nature of the traffic. That authority is not preempted by federal law. Any telecommunications carrier that delivers traffic over the public switched telephone network (PSTN) for another carrier can reasonably expect to be compensated irrespective of whether the traffic originates on the PSTN, on an IP network, or on a cable network. TVC further asserts that it is unwilling to allow calls to continue to terminate for free because it claims it results in an unjust enrichment for GNAPs and is confiscatory.

---

[22] As for GNAPs claim that the traffic at issue is subject to the FCC's ESP exemption, the FCC has not yet classified VoIP traffic as telecommunication, information, or enhanced service. We agree with TVC that, until the FCC makes a determination on the classification of VoIP service, the issue remains open and the ESP exemption should not apply.

[23] Applying an intrastate tariff rate to an interstate service could also sidestep the FCC's exclusive jurisdiction over the regulatory classification and intercarrier compensation of nomadic VoIP.

We believe it is important to preserve a fully interconnected telecommunications network. Interconnection is a critical component of growth for facilities-based competition in New York. However, this Commission also has a long history of ensuring that the one carrier's use of another's network is not without reasonable compensation. TVC claims it has a constitutional right to a fair and reasonable return on its network investment. Granting TVC's request to authorize it to block calls routed from GNAPs could potentially compromise this seamless telecommunications network causing a disruption in customer calls. We, therefore, need to balance the importance of a seamless telecommunications network with TVC's expectation that it will be compensated for its use of that network.

Our preferred course of action in the first instance is for GNAPs and TVC to enter into private contract negotiations on the rates, charges, terms and conditions for the exchange of nomadic VoIP traffic. For its part, GNAPs indicates that it is willing to discuss with TVC the costs of originating and terminating traffic on their networks. TVC and GNAPs operate as competitive carriers in the telecommunications markets and are in the best position of determining the market value of the routing services in question, including the termination of calls on TVC's network and the possible origination of calls by TVC customers to the GNAPs' system.

Absent a private contract, the Commission will consider TVC's request to discontinue accepting incoming traffic from GNAPs. Any such consideration will be done in accordance with the Commission's migration guidelines and policies. We do not take lightly a request to discontinue service and will only be considered under extreme circumstances. Should negotiations fail, TVC can renew its request to discontinue service to GNAPs.

Finally, while GNAPs claims that it is not subject to access charges because it is an intermediate carrier, this claim

is moot. We have already decided that we cannot impose intrastate access charges on nomadic VoIP because it is an interstate service. We need not determine the merits of GNAPs claimed exemption under its intermediate carrier status. GNAPs and TVC should enter into private negotiations.[24]

CONCLUSION

Based on our findings, the Commission concludes that it is without jurisdiction to require GNAPs to pay intrastate access charges to TVC to the limited extent the traffic is nomadic VoIP as defined by the FCC and upheld on deferential grounds by the Eighth Circuit Court of Appeals. Similarly, the TVC intrastate tariff does not apply to nomadic VoIP traffic. Therefore, the parties should work out a traffic exchange agreement establishing rates, charges, terms and conditions for nomadic VoIP traffic.

The Commission orders:

1. The complaint of TVC Albany, Inc. d/b/a Tech Valley Communications is denied to the extent it requests authorization to recover intrastate access charges from Global NAPs, Inc. for termination of nomadic VoIP traffic.

2. TVC Albany, Inc. d/b/a Tech Valley Communications and Global NAPs, Inc. are directed to negotiate rates, terms, and conditions for the exchange of traffic between them consistent with the discussion in the body of this Order.

---

[24] See, WC Docket No. 06-55, In the Matter of Time Warner Cable Request for Declaratory Ruling that Competitive Local Exchange Carriers May Obtain Interconnection Under Section 251 of the Telecommunications Act of 1934, as Amended, to provide Wholesale Telecommunication Services to VoIP Providers, Memorandum and Opinion and Order ¶17 (issued March 1, 2007).

CASE 07-C-0059

3. This proceeding is continued.

By the Commission,

(SIGNED) JACLYN A. BRILLING
Secretary

-18-

# EXHIBIT 9

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: ) BK. NO: 05-31929-HDH-11
TRANSCOM ENHANCED SERVICES, LLC,
DEBTOR )

* * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * * * * * * *

COPY

BE IT REMEMBERED, that on the 14th day of April, 2005, before the HONORABLE HARLIN D. HALE, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

A P P E A R A N C E S

SIDLEY AUSTIN BROWN & WOOD, LLP
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603
By: Mr. Shalom L. Kohn

APPEARING FOR AT&T

KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC
1615 M. Street N.W.
Suite 400
Washington, D.C. 20036
By: Mr. Michael K. Kellogg
Mr. Steven Benz
Mr. Colin Stretch

AND

THOMPSON & KNIGHT, LLP
1700 Pacific Avenue
Suite 3300
Dallas, Texas 75201
By: Mr. David Bennett
Mr. John Brannon

APPEARING FOR SOUTHWESTERN BELL

McGUIRE, CRADDOCK & STROTHER, P.C.
500 N. Akard
Suite 3550
Dallas, Texas 75201
By: Mr. J. Mark Chevallier
Mr. Steven Thomas

APPEARING FOR THE DEBTOR



INDEX

PAGE

Appearances.....................................2
Exhibit Index...................................5
Proceedings.....................................6

MR. BRITT BIRDWELL

DIRECT EXAMINATION
BY: Mr. Thomas..........................27

CROSS-EXAMINATION
BY: Mr. Kohn............................39
BY: Mr. Stretch.........................50

REDIRECT EXAMINATION
BY: Mr. Thomas..........................53

RECROSS-EXAMINATION
BY: Mr. Kohn............................54

MR. JODY CRAFT

DIRECT EXAMINATION
BY: Mr. Thomas..........................58

CROSS-EXAMINATION
BY: Mr. Kohn............................81
BY: Mr. Stretch.........................98

REDIRECT EXAMINATION
BY: Mr. Thomas.........................119

RECROSS-EXAMINATION
BY: Mr. Kohn...........................134

MR. BERNARD KU

DIRECT EXAMINATION
BY: Mr. Stretch........................131

CROSS-EXAMINATION
BY: Mr. Thomas.........................148

REDIRECT EXAMINATION
BY: Mr. Stretch........................179

RECROSS-EXAMINATION
BY: Mr. Thomas.........................183

Reporter's Certificate.........................196



E X H I B I T  I N D E X

PAGE FIRST REFERENCED

Exhibit No. 1......................................38

Exhibit No. 22.....................................44

Exhibit No. 38.....................................59

Exhibit No. 39.....................................32

Mr. Thomas?

You may step down, Mr. Birdwell. There -- requested that we take a five-minute break. We'll take a break until just 25 until.

UNIDENTIFIED SPEAKER: I'm sorry. When will we be returning?

THE COURT: In five minutes.

(Recess ensued.)

THE COURT: Mr. Thomas?

MR. THOMAS: Your Honor, the debtor calls Jody Craft to the stand. Your Honor, it appears Jody Craft is in the men's room.

THE COURT: Okay.

MR. THOMAS: If you'll give us just one minute.

THE COURT: Sure.

MR. THOMAS: We call Jody Craft to the stand.

(Witness was sworn by the Court.)

THE COURT: You may be seated.

MR. JODY CRAFT,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. THOMAS:

Q Mr. Craft, would you state your full name for

the record, please?

A Yes, Jody Craft, J-o-d-y, Craft.

Q Okay.

MR. THOMAS: May I approach the witness, Your Honor?

THE COURT: You may.

Q Mr. Craft, I'll show you what's been marked as Debtor's Exhibit Number 38.

A Okay.

MR. THOMAS: May I approach the bench, Your Honor?

THE COURT: You may.

Q This document purports to be your resume. Did you prepare this document?

A That's correct.

Q Is it -- does it accurately summarize your qualifications and experience?

A That is correct.

Q Is it a true and correct copy of your resume?

A Yes.

MR. THOMAS: Your Honor, we would move to admit 37 and 38.

MR. KOHN: No objection, Your Honor.

THE COURT: 38 is in.

Q Would you give the Court a brief description

of your background and experience.

A Sure. I have been roughly doing telecommunications for 12 years, started out in the U.S. Air Force Agency, and my resume went on to MFS (phonetic) which is a local exchange carrier, one of the first competitive, local exchange carriers where I did field engineering. Subsequently, I joined ISPs where I did engineering and product development functions. My latest post prior to today has been with T-Systems International which is a business unit of Deutsche Telecom, the German incumbent telecommunications carrier.

There I headed IP product development for two years for their international IP development portfolio. We comprised about 700 products making about three billion euro of annual revenue in over 50 countries.

Q Is that a -- was that part of Deutsch Telecom itself or a division or --

A Yeah. It was -- T-Systems was a wholly-owned business unit of Deutsche Telecom Group. Deutsch Telecom Group's a holding company composed of four business units, T-Mobil, which is the mobile company, T-Systems, which is the international enterprise networking division, T-Com which is the incumbent,

kind of the SBC of Germany?

Q Okay.

A And then T-Online which is a residential-based, consumer-based ISP like America Online. It's the second largest ISP in Europe.

Q What specifically were you --

A T-Systems was the one I was responsible for for the IP services portfolio at T-Systems which is the global enterprise networking division.

Q Okay. When I -- as we talk today, I'm going to try to wait until you finish your answer and try to -- please try to wait until I finish my question before you --

A Oh, absolutely. I'm sorry.

Q -- speak. And so what was the specific name of this division?

A My division?

Q Yes?

A IP product management.

Q Okay. And did you say that Deutsch Telecom has operations like SBC?

A Yes, within Germany and four other countries. They're the national incumbent in these countries.

Q Does it have operations -- and that is SBC being a ILEC or CLEC?

A Yes, that's correct.

Q And what about any similarities with -- between Deutsche Telecom and the activities of AT&T?

A Yes. They are an IEC (phonetic) carrier. They offer the same, similar portfolio to AT&T. The only thing that's not similar is AT&T had a broadband division that was cable based and Deutsch Telecom doesn't involve themselves in the cable business.

Q Does Deutsche Telecom have activities in the United States?

A Yes. They have many activities in the United States.

Q Does it include activities such as what SBC and AT&T do?

A They have no access activities in the United States. Obviously, that's the incumbent RVOX, RBOX CLECs. But they do have T-Systems International or T-Systems North America which sells to enterprises in the United States, and they have T-Mobil.

Q Okay. And would it be fair if I refer to his division that you were dealing with as T-Systems?

A Yes. That would be absolutely correct.

Q Okay. Could you explain to the Court what services T-Systems provided to Deutsche Telecom?

A Certainly. Well, T-Systems -- we can look at

it two different ways. T-Systems was what they call the lead house IP development group in the Deutsche Telecom Group, so that designation was by the CEO, Kalie Verica (phonetic), the prior CEO. We did all IP strategy and development functions for Deutsche Telecom Group at a central product development function out of Germany, which was my group.

We also -- our primary focus was development of IP-based services for multi-national enterprises.

Q And how does T-Systems compare with the activities of Transcom?

A It's very similar. T-Systems had carrier services groups that we did offer wholesale services to IXC's much like Transcom is doing today. We also offered to multi-national corporations as I had mentioned. That's actually why I brought to T-Systems. When I joined T-Systems, I was asked to develop their next-generation managed services suite, which are a suite of IP-based products that obviously sit on an IP network, infrastructure, but they can be faxed and quickly deployed at a low cost compared to traditional development mechanisms.

It's much like the architecture of Transcom today. To my understanding, Transcom has

defined an architecture that's IP-based. The first set of services that have come out of this architecture is obviously their long-distance voice termination services or transport services and they were developing a much richer portfolio to do more managed IP services, so it's very similar.

Q What did Deutsche Telecom need a T-Systems to do these things for?

A Well, we -- we had a lot of experience in the IP area at T-Systems due to the large shift of IP service requirements by large enterprises in the mid to late '90s actually. We built up networks for some of the largest corporations in the world. DiamlerChrysler, Ford Motor Company, Behr Pharmaceuticals. So we privately transported more IP than any carrier in the world I could easily say. We basically did 40 tier-bits of traffic per month.

MR. KOHN: Your Honor, you know, this is very interesting about Deutsche Telecom. I'm not hearing yet where it's relevant to what we're doing here so I don't know if this is a relevance objection or it's (inaudible few words due to not speaking into a microphone) future relevance objection, but I do want to make that point.

THE COURT: You want to -- you want to

tie it up.

MR. THOMAS: Sure, Your Honor. Would you like me to respond or let the witness tie it up for us.

THE COURT: I think maybe the objection is generally move along maybe.

MR. THOMAS: Okay.

Q Let's talk about -- you said that there were similarities between T-Systems and Transcom?

A Absolutely.

Q Can -- can you just boil that down for the Court and explain --

A Yeah. To be more specific, there's portfolio correlations. So the portfolio which we launched is the inter-select portfolio is very similar to what Transcom's product focus is today. So what we did was we deployed a service area in Europe, the United States and Asia very similar to there service area that Transcom has employed in Dallas, so they're in a very early phase as compared to where our portfolio was.

But in this -- this -- this service area acts as kind of an adaptor to any network infrastructure. And what we were able to do is roll out services to that -- that one service area that

would be ubiquitous to the entire network. So I could put a managed DNL (phonetic) service in one of the service areas and it would be available across our entire network infrastructure much like Transcom has the capabilities.

Q So you're saying that Deutsche Telecom IXC and -- and -- ILEC -- ILEC services could implement this T-Systems company rather than developing the network themselves?

A That's correct.

Q And did it save them -- were there -- were there any benefits to doing it that way?

A We -- we had considerable savings. We had it from the development cycle for product release. We went from three years to three months as far as -- so there obviously, there's a cost savings and time of development.

Infrastructure savings, in the past when we rolled out new products or when Deutsche Telecom roll out new products, they had to build a network to accommodate that product for that service they were offering. In this new model, we were able to just basically plug in one of these service areas, the new service that we'd like and utilize the existing infrastructure. So we had the extreme -- you know,

the enormous cost of infrastructure to employ internationally that we didn't have to accommodate for and each new service roll out.

Q And -- and you're saying Transcom does the same thing?

A Absolutely. Absolutely. They have the same capabilities with their soft-switch environment. Because it's a central control planning with a distributed physical plane. So physically, network's connected to them in eight locations in the U.S., but they have a centralized management at their location in Dallas. So they can plug in features there and utilize that infrastructure and -- and as well, utilize the infrastructure to their customers.

So if an IXC was to interconnect with their network, whatever services were enabled in the central fabric within their Dallas location, they would be able to extend those services to their partners network infrastructure.

Q Does T-Systems pay access charges?

A On -- on our services in the interim select portfolio, no we do not pay any.

Q And is that analogous to what Transcom is --

A Yes, to the same services that Transcom would do. Obviously we paid on our additional telephony

carrier services business, but not in the interselect IP-based services.

Q Have you had a chance to review the AT&T order?

A Yes, I have.

Q And from the point of IP telephony, do you understand AT&T -- what AT&T was doing with their specific service?

A Yes, I do.

Q Could you explain to the Court what it was AT&T was doing from a telephony point of view?

A From a telephony point of view from what I could read in the order, it just seemed they were just transporting voice on traditional TDM, and then converting it to an IP -- IP transport and back to TDM. It's basically pipes lined up in a row, I guess you could say like water hoses, and if a green water hose that I transport voice in converted over to a yellow water hose and then back to a green water hose. I couldn't tell from the order that they did anything other than just change transport mechanisms.

Q Who benefitted -- from what you could tell from the order, who benefitted from AT&T's specific service?

A Well, it's obvious AT&T benefitted from it

because there's no cost reduction for the customer. The (inaudible word) in order.

Q Could you tell if anyone else benefitting from that service?

A I couldn't, no.

Q Who benefits from the services of T-Systems?

A T-Systems? Well, T-Systems benefits from it, Deutsche Telecom Group, our -- their customers and the in customers that are involved.

Q What about form -- from Transcom's services? Who benefits from those?

A The same -- the same for Transcom. Transcom sees cost savings against the traditional carrier model. Transcom's IXC services can also, you know, obviously procure these at a substantial cost savings, and then their end customers see a cost savings. As well, since this is IP-based, they gain flexibility and ease of deployment of new features.

Q Okay. Over the AT&T order, the Court said that the customers of AT&T didn't pay any different rates. Is that true with Transcom?

A No. The Transcom is very competitive obviously with their rates.

Q SBC has alleged that all of those cost savings are just because there are no access charges

paid; is that true?

MR. STRETCH: Your Honor, objection. I don't know that there's any such allegation.

MR. THOMAS: Your Honor, that's been specifically some of the questioning to the witness, Mr. --

THE COURT: Since I took into account the testimony last time, overrule the objection?

A Could you please repeat the question?

Q Sure. SBC has alleged that all of those cost savings are just because no access charges are paid. Is that true?

A I'm not familiar with the specific financials of Transcom, but no. In the model, just being IP-based and the way they can deploy products, I know most cost savings is in the infrastructure, not in termination.

Q SBC has argued that if there's so much cost savings, why doesn't Transcom just pay access charges? Is there -- can you think of any reason why Transcom wouldn't do that?

A Well, there -- there -- in -- in the ESP space, they obviously run the operating in a very competitive environment. Although they would be probably cheaper if -- if they had the volumes of

AT&T, than let's say an AT&T. They would not be able to compete with competitors in their ESP space as well, so it would still take them out of market I feel.

Q Could Transcom push a button and start paying access charges and acting like AT&T tomorrow morning?

A No. No.

Q Would it be an easy thing or a complicated thing for them --

A I think it would be quite complicated just -- Transcom is not configured like a telecom backbone. Transcom is configured, like I was saying, as kind of an adaptor to infrastructures to roll out services to -- to interconnect with traditional PSTN network, they would have buy trunking to all the central offices that they would wish to terminate to as well as they would have to buy very expensive trunking to the SS7 network in the U.S. as well as signal system seven networks overseas to be able to do international termination. So it's a complete infrastructure investment they would have to make.

Q Is that -- is that expensive?

A Oh, yeah. Very expensive.

Q And could they do it in a day or two?

A No, it is years.

MR. STRETCH: Your Honor, may I interject an objection? There's been no establishment of a foundation. We have no idea if he's ever actually seen what Transcom does or knowledge of their particular architecture.

THE WITNESS: Okay.

THE COURT: Do you want to lay some foundation?

Q What familiarity do you have with Transcom's system?

A I'm somewhat familiar with it. I actually met Mr. Birdwell two years ago when I was -- when I just started at Deutsche Telecom. His softswitch vendor asked him to come look at what I was doing as far as the portfolio goes because he was interested in entering this (inaudible word) service space.

So at that time, he was able to look at our infrastructure, how our development was going and he made us aware of kind of his architecture at that time. So if his architecture hadn't changed in the last year and a half, two years, then I'm -- I'm very familiar with where it was.

Q You saying that he looked at T-Systems architecture?

A Yes. Yes.

Q And you were working with and he -- he -- they were doing the same thing that T-Systems was doing?

A Yeah, well -- well, no. They -- they can't do the same things because they haven't invested nearly as much money, but during the early stages, they were doing what we were doing. I -- I welcomed him to our development labs because our overhead in a company that size is significant. So I would look for outsourcing partners like in the U.S. that could do this. I wanted a partner that was like -- like Transcom to come in and see if they could do similar services.

MR. STRETCH: Your Honor, this is pure hearsay. There's -- there's absolutely no foundation in anything he has said about it. Renew the objection and move to strike the testimony based on the absence of foundation.

THE COURT: Response?

MR. THOMAS: Your Honor, he's testified that he has been in contact with the people at Transcom. He has worked with them not just in -- in that meeting but in communications since that time. He's been informed of what their systems are like and what they do. This isn't like a box that you sit on a

table and you can go in and you can open it up. This is an entire network. No -- a human being can't walk in a room and see the whole thing. This is a --

THE COURT: Overruled.

MR. THOMAS: Thank you, Your Honor.

Q So if the -- we were talking about the cost of Transcom implementing -- changing over to do access like AT&T. Is it -- is it a small cost or is it a very large cost? Can you give us any idea?

A All I can say is compared to the way they're doing business today, obviously, it's a significant cost.

MR. STRETCH: I'm sorry, Your Honor. May I interrupt? Same objection. You have no foundation as to what it cost AT&T to do access.

MR. THOMAS: Your Honor, he's --

THE COURT: Overruled.

MR. THOMAS: Thank you, Your Honor.

Q Could you give us just an idea?

A Over a magnitude, we say 30 percent cost savings just in -- in our -- but our volumes were much different. There's -- I mean, it's impossible without knowing the exact numbers, but I know just due to the efficiencies of the network and the way he rolls out product that they're -- it's definitely a lot less

expensive, and it's hard to qualify a lot less, I know. But I would say it has to be less expensive because all of the trunking, geographically, to interconnect his network to the traditional PSTN is trunks he wouldn't have to buy today. So there is additional cost in every geographic region that he wished to deploy as well as additional costs for signaling trunking.

So he would have to build database systems. He would have to buy additional trunking that they don't do today, Transcom would as well as additional management platforms. So I can't put a price because his volume's going to determine his price, but it's more than he's paying today.

Q And it would take months or --

A Years, I feel years with the staffing that Transcom has, absolutely.

Q Have you ever come across or had any exposure to the Varaz media gateways that are used by Transcom in your work with T-Systems?

A Yes. I -- I -- I've had some. Obviously, we were -- we had a relationship with ECI which is (inaudible few words) at T-Systems, and I have met with their sales representatives from ECI as well as my engineers, my development engineers labeled Varaz'

media gateway, ECI Veraz' media gateway in comparison to the Nortel, Lucent and Ericsson gateways in the past.

Q Are you familiar with the packet loss concealment in Varaz' media gateway?

A Somewhat, yes.

Q Do you understand it to be -- how do you understand that system to compare with other media gateways in the industry?

A Well, as -- as sold and as, you know, basically, we -- we didn't have anywhere the -- near sophisticated gears we would require in our development labs. But as sold and as best we could tell, the algorithm was very intuitive in Veraz' packet loss concealment algorithms compared to the other vendors that we had tested.

Their algorithms where normally on the output side, there's packet loss, what we saw in the other equipment, they would either duplicate the signal that they had (inaudible word) as a sample or they would just omit it. We say that Varaz would actually be intuitive to try to actually recreate the original wave shape. So, you know, there's -- there's obviously a lot of value to that. We couldn't use Varaz because it didn't scale to what we needed, but

as far as that feature goes, that -- they are unique in that feature.

Q And when you talk about the original wave shape, are you talking about the original wave shape in the analog format when it first --

A Right, the input signal.

Q Okay.

A And it -- it tries to predict. Obviously, it doesn't have full visibility, but it's an intuitive prediction algorithm.

Q And that would include predicting the wave shape even before it entered the PSTN?

A That's correct.

Q In your mind, does Transcom system change the content of every call that passes through it?

A Yes.

MR. STRETCH: Objection, calls for legal conclusion.

MR. THOMAS: Actually, Your Honor --

THE COURT: Sustained -- sustained as to legal conclusion. The witness may give his understanding if he has one.

Q Is it your understanding -- based on your understanding of what content is in the transmission of -- of telephone calls, is it -- does Transcom's

system change the content of every telephone call that passes through it?

A In my opinion, they alter the content of what the transmission is.

Q In your -- in your mind as you understand the terms in the industry, is Transcom an enhanced service or a telecommunications service?

MR. STRETCH: Objection, Your Honor.

THE COURT: Same objection and same ruling. The witness may give his understanding if he has one.

MR. THOMAS: Yes.

Q And I'm just asking you for your understanding.

A Right. All -- all I can do is base off my understanding of Transcom and of the CSP. Transcom's not licensed as a carrier. They provide advanced managed services if I had to put them into a stack. And to my understanding of the ESP definition by the FCC, I would put TSN in an element of ESP other than carrier.

Q And just in -- in -- succinctly, I mean, can you tell the Court why you think it's better to run a call through Transcom's service than to just leave it on the TDM?

A Well, I -- I -- I think it's kind of three fold. I think there's a cost savings, obviously in their current cost model if -- if things weren't to change. I think there is a quality improvement actually, and finally, there's flexibility.

So my ability to gain new features, if I'm buying -- if I'm interconnecting to this provider would be much easier than to role in the future to some other providers.

Q Do you mean Transcom's customers?

A Yes, correct, Transcom's customers and their end users. I mean, IP-based telephony is -- is in its infancy, believe it or not, and as far as us arguing about it, it's years old. But as far as product development goes, it's in its infancy. It reinvents the portability we have on the telecommunications networks. Reinvents our -- you know, the way we talk to each other. We no longer are geographically limited. We can have UNI, IEDs (phonetic) to ourself. There's many, many, many new developments that I see in the pipeline that if you're connected to an infrastructure like Transcom's you're capable of receiving as compared to a traditional telephony network.

Q And so Transcom's system allows an old

architecture, IEXC (phonetic) to have next generation capabilities?

A Absolutely. I mean, from the managed services perspective, that's absolutely right.

Q And that's what you were talking about when you were talking about an adaptor?

A That's correct.

Q Okay. Does Transcom's service offer a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information?

MR. STRETCH: Your Honor, same objection.

MR. THOMAS: Your Honor, I'm asking him the specific facts.

THE COURT: Same ruling. The witness may give his understanding if he has one.

A To my understanding of their network, some of those items are correct. Some of them obviously aren't.

Q Does Transcom employ computer process -- according to your understanding, does Transcom employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information?

A To my understanding, yes. It's the elements --

Q To you --

A -- sorry. I was going to finish my sentence.

Q Go ahead.

A Many of those elements, yes.

Q To your understanding, does Transcom provide the subscriber additional, different or restructured information?

A Yes.

Q And when you're talking about the subscriber, who are you talking about in your mind?

A When I'm talking about the subscriber, I'm talking about the end user. But it also can be Transcom's direct testimony.

Q Okay.

MR. THOMAS: Pass the witness, Your Honor.

THE COURT: Mr. Kohn?

CROSS-EXAMINATION

BY MR. KOHN:

Q Now, Mr. Craft, when you were with T-Systems, did they -- did they do business in the United States as well?

A They did.

Q Do they function as T-Systems does where they're sort of active in the middle of a chain of telephone calls?

A Not -- not the direct services that Transcom offers today.

Q All right. So in much respect when you, you know, you had a discussion, you said T-Systems didn't pay access charges, were they, in fact, purchasing terminating services?

A No. We were -- we were -- yeah, we were purchasing PRI-based services, business lines, local business lines.

Q And from whom were you purchasing them?

A Oh, numerous CLECs.

Q And was this -- this was -- you were -- you were with -- with T-Mobil before the access order came down, right?

A Oh, absolutely.

Q All right. And after the access order --

A Excuse me. I was not with T-Mobil, though. I was with T-Systems. I don't want to be incorrect.

Q Okay. I -- I apologize. You were with T-Systems before the access order came down?

A That's correct.

Q Do you know whether their payment of access

charges changed after the access order came down?

A I'm not familiar.

Q Was -- when T-Systems was not paying access charges, was this traffic that started with PSTN and ended with PSTN and something else --

A That's correct. They originated in any of the 50 countries that we serve and it terminates here.

Q Okay. And would -- did you also have services that opened domestically and -- and, you know, originated domestically and terminated domestically?

A No, because we lacked a footprint of that size in the U.S. We did in other countries.

Q So all of the services that you did were international calls that ended up --

A As far as terminating in the U.S., that's correct and other -- like I said --

Q Do you know if the rules for payment of access charges are different whether it starts international or starts national?

A I'm not familiar.

Q Okay. So it may or may not be relevant as to whether T-Mobile -- T-Systems, forgive me, was or was not paying access charges because one possible distinction is it was international and the other is

that your experience is before the access order?

A That's correct.

Q Okay. Now, with respect to the flexible platform that you have --

A Uh-huh.

Q -- and, you know, let me see if I -- as you've heard from my questions, I'm really not great technically in this area, but I'm going to try to get it in sort of a common sense kind of way.

A No problem.

THE COURT: I think you -- you're better than you're saying, Mr. Kohn.

MR. KOHN: The rule -- the rule to expertise, Your Honor, is using the right buzzwords and I don't know that. So I may understand it, but if I don't use the buzzwords, I'm not going to -- you know, it doesn't count.

Q Essentially, if I have this right, there's this computer somewhere which constitutes the IP system and that's very flexible. And if you run all kinds of things through that computer, you can offer all kinds of bells and whistles to your customers. Is that a fair description --

A It pains me to say that, but if in it's most simplistic form, sure, we'll do that.

Q Yeah. Okay. And there are -- there are lots of technical requirements as to what you have to do to make it work and make it interface --

A Yeah, but actually, I'd like to do a better one than that and -- and just say an IP network is -- is a system of roads that tie cities together and the computer is a service. So there's a central on ramp -- there's a central on ramp that leads to all roads. And -- and Transcom's an infrastructure and this infrastructure of (inaudible few words) systems was basically this on ramp.

Q Okay. Well, let's take the last piece of the road.

A Okay.

Q All right. And let's understand exactly -- and what -- before I get there, one of the things that you have which is very flexible is that if you have the roads in place and the little intelligence in the computer directing it, various things can come in. And if you're flexible enough in the computer, you can designate them to different roads and come back?

A Absolutely.

Q You can do enhanced voice mail and you can use call redirecting and do all kinds of different -- you know, put a video picture on and do all kinds of

different things if you have the (inaudible word) infrastructure in place?

A Absolutely.

Q And, in fact, the long-term goal of T-Systems was to enable all of these bells and whistles to -- to occur?

A It was -- yeah, the mid and short-term goal. Actually, we -- like I said, we rolled out a substantial number of services over two years.

Q Right. And that included things which were more than traditional calls, telephone calls from one person to another?

A Absolutely.

Q All right. And, in fact, the growth that you were anticipating and the buzz in this business was all these exciting new things, not just --

A Services.

Q -- not just a telephone call?

A That's correct.

Q And -- all right. Now, let's talk about the last bit of this little system that you have --

A Okay.

Q -- where currently Transcom is coming and sending signals to AT&T in Texas.

A All right.

Q Which AT&T is now functioning as being a local provider of some sort --

A Okay.

Q -- right? Isn't that correct?

A Yes.

Q And what AT&T is doing based on its contract before the suspension was it was taking this phone traffic that it was getting and sending it over to this line over there which is a local line?

A Uh-huh.

Q Now, AT&T has a switch in Texas which enabled them to do this; isn't that correct?

A That's correct.

Q Okay. Let's switch --

A Or many.

Q Huh?

A Or many.

Q Or many. But a switch is basically just like a computer that says, Send it here?

A If you in your traditional telephony sense, yeah. I mean, it routs, but there's many more than an IP environment. It's two different architectures.

Q Okay. But -- but somehow or other, AT&T's getting a signal and sending it over to a local line?

A That's correct.

Q Okay. When is the conversion happening which changes the IP signal into a PSTN signal so the person who picks up the phone is able to respond to it?

A The media gateways of the interconnect point.

Q And where's that sit as between Transcom and AT&T and the SBC --

A On Transcom's side to the interconnection.

Q So Transcom takes the signal and before it hands it off to AT&T, it's -- it's already in PSTN form?

A Yes.

Q So as a phone call comes in --

A Well, excuse me. That's -- and -- I -- I'm trying to take it easy because you're not using all the technical terminology.

Q All right.

A Obviously, but in PSTN format, do you mean an INT with a SS7 signal? That is not what Transcom does.

Q Well, what is it that it gives AT&T?

A Okay. They give AT&T a PRI, to my understanding, which is primarily rate ISDN line. And in a primary rate ISDN line, it's a fully-encapsulated circuit. Some channels are used for signaling which you would normally -- not normally but traditionally

have trunking between the SS7 system which is the national signaling system and the telephone network, and then there's payload on a PRI. And payload is actually these voice calls that are -- that -- the actual content, the -- the speech that they're terminating to the end customer, but their multiplex. They're all packed together.

In a traditional environment, you have SS7 trunking and you have INTs or trunks between the switches. You signal out this line to set up the call to make the phone ring on the far end to tell the switches where to route them, and you send payload in these trunks. The way Transcom terminates with AT&T is via a PRI where they send signaling and payload down the same circuit to the switch.

Q And this media gateway that they have, this -- what -- how does it work that this thing ends up working in a local line to be able to get to the right person?

A It signals in band -- like I'm saying in a PRI. The PRI interface on the far switch interprets the signaling, translates it to the SS7 signal to terminate it to its local switch.

Q Okay. And is -- and is there a reason that when this traffic comes to AT&T that they can't just

send it over to a different kind of line, an access line as opposed to a -- the local line?

A Yeah, because it doesn't have the SS7 signaling gateway like I'm saying.

Q Okay. Why -- why is it that the information can't come around in this packet and the media gateway just convert it?

A I don't know if I understand that question.

Q In other words, you're going to send signals and there has -- there has to be some kind of data?

A Right.

Q I mean, why isn't that just can't go over -- we'll send the information and we need to turn it over to a local line?

A Because they're not architected that way. They're architected to deliver phone calls over ISDN lines. Their primary architecture is to add services to this. It's not to just terminate the calls.

Q Okay. Is there -- now, this flexible IP system that you have --

A Uh-huh.

Q -- is there a reason that that system can't distinguish at the get go between traffic where you have all these enhanced services and traffic which is just standard long distance to long distance calls?

You know, PSTN to PSTN calls?

A If -- if you were to develop a system and architect it to filter that, I'm certain you can.

Q And that was a choice that was made when these systems were set up, right?

A I don't know their thinking.

Q Okay.

A All I know --

Q When you set the system up for --

A T-Systems.

Q -- for T-Systems, yeah?

A It was for convergence.

Q It was -- it was intended for these future services?

A It was -- correct.

Q If there was -- if there was a requirement to separate out traditional phone-to-phone long distance traffic that went through an IP line in between, was that something that you would have been able to do when you were at T-Systems computers?

A It would have been very costly for us to do that.

Q All right. Now, you indicated that there were possible cost savings even apart from access charges?

A Of course.

Q All right. But you also, I think, indicated that if Transcom had to pay access charges, it couldn't compete with people who had economies of scale?

A Of course not. Well, there's two -- two (inaudible word) in the work. What I actually said was people with the same business model at Transcom, if Transcom had to pay access charges, they were definitely not being able to compete. And what I was also saying is if Transcom had the volumes, the scale that AT&T had, then I think there would be a significant backbone savings comparable to what AT&T could see. They were not the same thing. It's two different things.

Q Oh, I see. So is there -- I mean -- I mean, T-Systems is probably a large company, had the basis of economies of scale?

A Yeah. We -- we -- we had 45,000 employees.

Q And if -- I mean, a company like T-Systems for example had been subject to access charges, do you think it would be reasonable to compete with somebody who's a smaller scale but for whatever reason under similar circumstances -- similar service, similar factors didn't pay access charges?

A We had -- we had revenue -- I will say it this way. We had a converge solution, a completely converge solution, a much more mature solution, so I -- I could subsidize my margins on my other businesses to accommodate the termination charges. But Transcom right now is doing voice services and enhanced voice services and, you know, it's two different competitions. They would compete in a space that was going to be completely separate for us. We would sell a conversion solution and they would just focus on voice.

They would probably win the voice business because we would be more expensive. I don't know if I could ever subsidize down to a level that they were at.

Q But -- but if they paid access charges, it wouldn't be that much of a subsidy?

A We'd beat them. We'd beat them.

Q You'd beat them?

A Yeah.

Q Okay. So this is a game where somebody who doesn't have economies of scale manages to compete because he doesn't pay access charges?

A No. I think it's a -- I think it's a game where you have somebody that's, you know, entering a

new -- part of the telecommunications market, new -- new part of the communications market, and I think this is required to have that area grow. I think that's where we're going. I think that by them not having to pay these access charges allows them to grow.

You know, guys like Deutsche Telecom, guys like AT&T or companies -- I'll say guys but I mean companies obviously, you know, we -- we -- we have plenty of money to fund new product developments and shut them down day in and day out normally for new development. And, you know, many times we will fund projects to play in areas that are -- that are growing, and we find if we can play with the same rules as the competition in that area. If we can't, then many times we'll pull out and other times, we'll keep it going.

Q And -- and that's a very sound policy argument, do you -- would you agree with me with your laymen's interpretation that those kinds of policy judgments are give to the FCC to decide who to subsidize?

A They're given to whatever powers that be who will hear it.

Q Okay. All right. Now, let me ask you with

respect to this notion of the change. You're not -- I know you've had some technical training, but you're not a technical person that looks at signals and --

A No, no. I'm -- I'm not an engineer by training or trade, nor have I ever been.

Q Have you had discussions with any of your -- you also told me that your -- your lab didn't have the capability of testing the Varaz system?

A No. I stated we have the capability of testing the Varaz system. We didn't have the capability of testing their algorithim.

Q Their algorithm?

A Yeah. You have to have some pretty significant, you know, physics people on board and equipment to test their absolute -- you know, absolutely test their algorithm to an extent.

Q And you understand that, you know, when the FCC said the change affected by AT&T isn't the meaningful change, you read the --

A Yeah, I did. I read it.

Q -- access order. And you won't know how -- what percentage of Transcom's actual signal is, quote, changed? You have done that analysis?

A No. I just know it's changed.

Q Okay. And is -- do you -- and to your

understanding, is any change a change no matter how minimus?

A It's according to what kind of change you mean, change of form or change of content. I think the content -- I think the content is affected on the Transcom network. Any degree of change is change. Any degree of dark in this room is dark.

Q And if Transcom -- and if somebody goes off and repeats a packet because there's a dropped packet instead of using the Transcom system, they simply substitute the old -- the prior Trans packet, that's a change, too, isn't it?

A I think that's a change but I don't think there's any enhancement to the signal. That's was a -- that's a lazy solution. I just -- okay, that's what the last guy did.

Q All right. But it is a change?

A Yeah, but -- sure it's a change, but it's not an enhancement.

Q Okay. How long does the -- do you know how long the time period for the dropped packet? What duration are we talking about?

A I'm not sure.

Q Would 100 for the second sound about right to you?

A That sounds right, pretty good.

Q And so is it -- is it your understanding that if you have a five-minute call and you change something in 100th of a second, that that's kind of a change?

A If it's every packet, then it's a huge change.

Q And what if it's only drop packets?

A No, that's what I mean. If it's every drop packet in a five-minute call, that's a significant change in normal -- normal IP instances.

Q How much -- how many packets get dropped?

A You can usually drop anywhere from 2 to 5 percent packet -- you have packet loss on most private network communications. Across the internet, you can have anywhere up to 20 percent packet loss.

Q All right. So if you have a slight difference in the -- you know, and what is the difference and what in auditory sound between the repetition of the prior one and the other one in terms of the dropped --

A I'm not qualified to answer that.

Q Okay. Now, you don't profess to be a -- an -- an expert in -- in interpretation of FCC orders, right?

A Not by any means.

Q Okay. And you personally didn't test the AT&T transmission and compare it to the Transcom transmission?

A No, I had never done that.

Q Okay. And you -- so, you know, in listening to the two signals, you can't tell me how much one is enhanced over the other of them --

A Well, with test equipment I could, but no, not with my ear.

Q You haven't -- you haven't done that before here today?

A No. No. Why would you?

MR. KOHN: One moment, Your Honor.

THE COURT: Take your time, Mr. Kohn.

MR. KOHN: I have nothing further, Your Honor.

THE COURT: Okay. Thank you, Mr. Kohn.

Mr. Stretch?

MR. STRETCH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. STRETCH:

Q Mr. Craft, I want to touch on a little bit of the background that I think was skipped over at the outset. Can you describe your educational background?

A Yeah. It was mostly Air Force where I -- (inaudible few words) college of the Air Force. I got to have a two-year degree before I was discharged.

Q Okay. Did you -- did you attend college prior to entering --

A Yeah, Louisiana Tech briefly but it was to pursue, let me remember -- Political Science, actually. I wanted to be a lawyer and I -- I was not successful.

Q Okay. You talked about a conversation you had with Mr. Birdwell about a year and a half or two years ago --

A About a year and a half ago, yeah.

Q -- in which he described Transcom's system; is that correct?

A Uh-huh. It was Scott Birdwell. Did I say Scott?

Q Oh. I think -- I think you did.

A Yeah.

Q Scott Birdwell. Okay. Aside from that conversation, do you have any other -- anything else that gave you familiarity with Transcom --

A Yeah. I -- I flew over on an invite of ECI Varaz and Transcom to come meet with Chad Frasier, their CTO.

Q Okay. And when was that?

A That was last summer. I'm sorry. Last summer, I would have left. Summer of 2003 would have been when that was.

Q Okay.

A Yeah.

Q And what was the purpose of that visit?

A The purpose of that visit was obviously to give a -- kind of a more detailed product development understanding to Chad of what we were doing and what our capabilities were and to get a better understanding of what Chad was doing here with Transcom's network.

Q With the -- the purpose of entering into a business relationship?

A Just -- we do this all the time. We do it with AT&T all the time at the time. It's -- it's very good to meet and see where development is, you know, and obviously new development areas of telecommunications companies. It's supposedly fine for us to talk about that area because we're not generating revenue on it and there's possibilities of partnership. So we'll meet and see what the capabilities of another telecom provider is just as an, you know, informal meeting just to see if we're --

you know, possibilities to partner down the line.

Q Okay.

A That's kind of what product guys like me do. We just -- you know, we go around other companies and see where it's going and ways to find, you know, the time and skill for our company and partnerships for our companies.

Q And did this possibility of a partnership down the line ever turn into anything with Transcom?

A No, it didn't turn into anything.

Q Okay. Do you have any current business relationship with Transcom?

A Yeah. I'm -- I'm a consultant for Transcom on and off right now. I -- they wanted to do -- actually, it's not for Transcom. I'm for source communications which is a company owned by Scott Birdwell, and that is to do actually a YMAX (phonetic) -- looking at YMAX product development which is completely outside of this.

Q Okay. So that's a -- that's a business relationship with a company owned by Mr. Birdwell?

A Yeah, that's correct.

Q Any other business relationship with Mr. Birdwell?

A No.

Q With any -- with any other person affiliated with Transcom?

A Nope.

Q Okay. Did you speak with anyone about Transcom's system in the last 30 -- immediately in preparation for your testimony?

A I asked Chad today about SIP (phonetic), but that was completely from another subject, but that's about it.

Q Okay. So you're testifying here based solely on your -- your -- your meeting with Chad Frasier summer of, what was it, 2003?

A Yeah. Well, obviously, there's casual conversations that occur between Scott and I and Rick and I on occasion. So it's the same architecture. It's obvious because we talk about PRI terminations and things like that. So, no, I haven't said, Have you done any redesigns but I -- the assumption is he has the same system.

Q Okay. So just so I'm fair and -- I understand your knowledge of Transcom's system is based on a conversation with Chad Frasier --

A Uh-huh.

Q -- during the summer of 2004; is that correct?

A 2003.

Q 2003?

A Uh-huh.

Q A conversation with Scott Birdwell about a year and a half ago and then casual conversations in connection with your work for -- for Mr. Birdwell?

A Yeah.

Q Okay. Did you review any technical literature, any -- any material in preparation for your testimony?

A Yeah. I looked at -- I went back and looked over basically the Varaz literature on their soft switches as well as looked at Cisco's and Lucent's, Nortel's, Ericcon's soft switch literature --

Q Okay.

A -- on packet concealments, stuff like this.

Q What about -- are you -- are you familiar with a company called Sonas?

A Oh, yeah. Absolutely. We deployed Sonas, actually.

Q Okay. We talked about -- we talked about what -- the services Transcom provides.

A Uh-huh.

Q And -- and is it correct to say you testified that presently they provide transmission of voice

calls?

A That's correct.

Q Okay. Are you aware of any other services that they've deployed in their network presently?

A I'm not in -- in depth -- deep into their portfolio. I don't have an in-depth knowledge of their portfolio. I know they do more than just termination services but I'm not familiar with the specifics of each.

Q Okay. I want to talk specifically now about voice calls that traverse Transcom's network. And you talked about an on ramp --

A Right.

Q -- to an interconnected set of highways and an off ramp?

A Right.

Q And Transcom, is it correct to say that Transcom sort of sits at either end?

A Yeah, they can. That's right.

Q Okay. Now, I want to talk about calls that come into the Transcom on ramp --

A Uh-huh.

Q -- in TDM format and that exit --

A Okay.

Q -- the off ramp in TDM format?

A Okay.

Q To your knowledge has Transcom carried calls of that nature?

A To my knowledge, yes.

Q Okay. Would -- is it safe to assume that calls that come into TDM and leave from TDM originate and terminate on the public switch telephone network?

A It's a safe assumption, yes.

Q Okay. Is it likely the case?

A I -- I don't know. I mean, it's according to how their PRI interconnections are, which I'm not, you know, intimate with. They could have private termination points to, that doesn't get the PSTN on either side.

Q Okay.

A Like with the local access. They -- there's -- there's services that a CLEC could offer where they do private line trunking into an office, let's say, or an in-user environment.

Q Uh-huh.

A And then they have a switch in front of that. They terminate PRI to the switch, and the CLEC would terminate on to their customer on a private line that would never actually touch the PSTN.

Q Okay. Let me put it this way: If a call

comes into the on ramp and -- let me rephrase that.

If a call originates on the PSTN and terminates on the PSTN --

A Uh-huh.

Q -- would it likely hit the on ramp in TDM format and the off ramp in TDM format?

A If that's the way the interconnection is established, yes.

Q Now, talking about just those types of calls --

A Uh-huh.

Q -- you're correct -- you testified -- please correct me if I'm wrong, that using the IP network in between creates efficiencies?

A Uh-huh.

Q Can you explain that in more detail?

A Absolutely. You're talking about IP versus traditional TDM.

Q Yes.

A Oh, yeah, that's -- that's actually very simple -- it's simple. Traditional TDM -- actually, the acronym stands for time division multiplexion. To give you an example of TDM, let's say Fort Worth to Dallas was a TDM trunk and that means just a line between the two markets, and we had TDM multiplexors

on each end, that's kind of what combines the signals to put on our trunk.

Q Uh-huh.

A If I'm using TDM, each lane of the highway between Fort Worth and Dallas would be a channel on this TDM system. If one car entered the lanes, the lane would be the same size and one car would use it all the way to Fort Worth -- or all the way to Dallas from Fort Worth and get off.

If it's an IP environment, they utilize stat muxing (phonetic), statistical multiplexion. Statistical multiplexion, they would only utilize a portion of the highway big as the cars that are entering in Fort Worth to bring it to Dallas. So it's flexible. It's expandable as far as the capacity that would be utilized on the backbone. So you're able to put more packets or more payload packets into a statistically muxed (phonetic) trunk than you are on a TDM system.

Basically, the channel's alive all the time on the TDM system whether the traffic's on it or not. The channel opens, it closes on a statistical mux system as data enters it.

Q So you're able to move more traffic more efficiently?

A Absolutely.

Q Okay. And there are cost savings associated with that?

A Of course.

Q Okay. Now, you testified that those -- that Transcom to your knowledge passes those cost savings on to -- to its IXC customers; is that correct?

A To my understanding, yes.

Q Okay. So the basic point is that Transcom can carry the call between Dallas and Fort Worth more efficiently than a wire line carrier?

A That's correct.

Q Okay. To your knowledge, does Transcom pass any of those cost savings on to end users?

A It has to pass them on if it's -- if it's cheaper than traditional IXC termination.

Q To your knowledge, does Transcom pass --

A Yes. To my knowledge, they pass on that savings.

Q Okay. What is that knowledge based on?

A What is that knowledge based on? They're -- obviously, I've seen the rates before, so I know what their rates are.

Q I'm talking about to end users, not to -- not to IXC's?

A Oh, to -- oh, I'm sorry. My -- my bad. I assumed you meant end user by their customer. To end users, I obviously have no idea.

Q Okay.

A But their customer base, yes, they do.

Q They give a cheaper --

A They give it to their IXC customers. As far as does the IXC passes on to their customer, Transcom has no control over that.

Q Okay. Now you testified it would take years for Transcom to sort of switch over to an alternative termination provider.

A To -- to -- to my understanding of Transcom's capabilities, yes.

Q Okay. Now, would that -- would that -- well, do you know how long it took Transcom to establish service in the first place with AT&T?

A No.

Q Do you think it took years?

A No. I -- I think it was a quick scenario of they just buying regular, you know, local access business lines from you. It's rather a quick process.

Q Okay. But if they wanted to do something different, it would take years?

A Yeah. It's not the -- it's not the

relationship that takes time, it's the infrastructure built out as I pointed out earlier. They would actually have to deploy trunking and SS7 connectivity and management systems and staff to do this in a traditional method as compared to the way they do it today.

Q Okay. Have you -- have you stated how long it would take to deploy service to a new area like that in that --

A Yeah, I've deployed services to new areas all over the world.

Q Okay. And each time it takes years to set it up?

A No. But I have, you know, unlimited -- well, you know, virtually unlimited budget. I had a lot of budget available to do deployments as long as it was economically feasible in my company.

Q Okay.

A And -- and a lot of staff which Transcom lacks both.

Q Okay. So it's -- it's not a question of any technical impediment to changing over service, just you got to have the people to get it done?

A I think you'll put them out of business if they did that, period. Because their -- their costs

are going to change because of the infrastructure and because of the staffing requirement.

Q Okay.

A And they operate in the U.S. only.

Q Okay. And have you reviewed Transcom's financial situation?

A Like I said, I have not.

Q Have not.

A I -- I -- I have been in this industry long enough, regardless of my education level, I've managed multi-billion dollar budgets. I understand what it costs to deploy a fiberoptic line to a dial-up connection. And it's based solely on -- you know, my understanding of cost, I can tell you for someone to come into the market today and say, I will compete with AT&T and SBC with the same infrastructure, build it green field and pay exactly what is expected today, they will be under in less than a year, easily. As a matter of fact, I don't know anybody that would fund a company like that.

Q Do you -- are you familiar with how many companies are providing inter-exchange service in the United States today?

A A considerable amount but I'm not familiar with the exact number.

Q There's -- would you say there's at least a dozen?

A Oh, IXC services?

Q Yeah.

A Yeah. I'd say there's easily a dozen.

Q Okay. And to your knowledge, do these companies have access connections with local exchange carriers?

A Yes.

Q Okay. Now, you talked about -- it's your understanding the Varaz equipment changes the content?

A Yes, to my understanding due to their -- due to their algorithm.

Q Due to their algorithm. So what you're talking about is the replacement packet that the Varaz equipment generates to replace a lost packet; is that correct?

A That's right.

Q Is there any other change in content that the Varaz equipment --

A Well, there's obviously many changes in content, but that's what's unique to Varaz. I think there's -- there's always going to be changes in a packetized voice system, obviously just with route replication and things like this. So Varaz is unique,

I feel, in their algorithm, and I -- I can't begin to go -- I would have to go back and get really into our lab reports, but there's some numerous changes always in an IP network.

Q Okay. When you say Varaz is unique, you mean they just do a better job. They provide a better quality packet?

A Correct. They -- they provide the best quality packet.

Q Okay. And when you say best quality, what you mean is that the -- the -- the voice at the originating end of the call --

A Uh-huh.

Q -- is replicated more accurately at the terminating end; isn't that correct?

A That's correct.

Q I'm sorry?

A That's correct.

Q That's correct. Okay. So the change in content that you're describing is actually intended to better replicate the content if you consider content to be the actual voice transmission; isn't that correct?

A If you want to speak to that algorithm, yeah, that's exactly what I'm saying.

Q You talked about your understanding that Transcom is an enhanced service provider based -- based on your understanding?

A Right.

Q And that was based on, as I understand it, two facts; one, that they're not licensed as a common carrier --

A That's right.

Q -- and two, based on your understanding of the FCC's rules and order in effect?

A Right. Right.

Q Okay. Can you explain the basis of your understanding of the FCC's rules and orders?

A Yeah. It's a -- an enhanced service provider is one that deploys computer systems to, you know, store forward enhanced communication services outside of a common carrier environment other than just the transportation of communications.

Q Okay. Are you familiar with FCC statements to the effect that services that do not alter the fundamental character of telephone service are not enhanced services but rather are telecommunication services?

A I'm not familiar with that.

Q Are you familiar with FCC statements to the

effect that where the purpose of the service is to facilitate the placement of a telephone call the service is a telecommunication service and not an enhanced service?

A I think that might have been the statement, actually in one of their recent rulings.

Q Okay. This is a statement from 1990 that I'm --

A Really. I -- I -- I read a document recently that had made a statement like that.

Q Where to the effect that where the purpose of the service is to facilitate the placement of a telephone call?

A Right.

Q Okay.

A I read a document like that, but if it's in 1990, obviously, there's been many more rulings since then.

Q When Transcom is transporting calls that originate on the PSTN and terminate on the PSTN; isn't it correct to say that they're facilitating the completion of that call?

A In -- in the barest technical sense, they would be facilitating -- that would be one thing they do do is facilitate the completion of that call.

Q Isn't that the primary purpose of the service?

A Yeah.

Q Now, you also talked about whether Transcom makes available to end users the capability for accessing, manipulating or processing information. And I believe your answer was they do some of those things; is that right?

A Right. Right. You can access the data obviously in an IP network. You have this ability to layer four and an OSI model, layer four mechanisms that would give you unique user data would give you unique call information, would give you unique quality information. So their customer base, they could provide that type of information from their infrastructure about each and every call. They can make us out of that.

Q They can --

A And there's multiple uses for that, to add, to develop new services, to direct development of new services, to monitor and manager the services, to develop new billing services, things like this.

Q Okay. And all of those capabilities are made available to Transcom's customers, that is the inter exchange carriers with whom they --

A They would be offered as products and services. Obviously, that's the uniqueness of the network is you would offer that as a service, and they could be able to offer these services to their customers.

Q To their customers meaning inter --

A The IXC's, that's correct.

Q Okay. But these services aren't offered to end users; isn't that correct?

A End users, not in that -- not in that capacity. Their -- their direct customers could manipulate that -- what they're receiving from Transcom and offer as an advance service to their users, that is correct though.

Q Okay. So -- but the end user, when the end user picks up a telephone --

A Uh-huh.

Q -- okay and makes a call and it's routed over Transcom's --

A Network.

Q -- facilities.

A Right.

Q Okay. In what -- isn't it correct that end users aren't actually offered a -- a capability to access, manipulate or process information?

A I have no idea what their end users that make calls are offered. I meant (inaudible few words) no, I'm not, but I don't know.

Q Okay. So you -- you actually don't know what end users are provided when Transcom carries --

A Well, Transcom offers to IXC's and then what IXCs offer to their end users the IXCs determine. Now, they have access to a certain data sect from Transcom due to their infrastructure, and the IXCs, you know, contact Transcom or Transcom offers a service based on this data set, and the IXC has capability to manipulate that data and offer it as a service to its end users?

Q Okay. But to your knowledge, is any IXC actually doing this for any of its end users?

A I don't know. I just don't know.

Q Okay. One other quick question. Do you know what -- what equipment AT&T was using in the service that was at issue in the FCC's order?

A No, I'm not familiar with what implements they were using.

Q Okay. Have you investigated it, tried to find out in any way?

A No.

Q Okay. Do you know what sort of packet

replacement technology AT&T was using?

A No. And what -- and what I read from the AT&T order and everything, AT&T never made mention of technology so much as they were doing a format conversion. It was IP based. They did it to save costs. That's all that was in that. That's what I used as a basis --

Q And that fits solely on your reading of the FCC's order?

A Yeah, exactly.

Q Have you read any of the underlying pleadings describing AT&T's service?

A No, because the ruling was -- seems to be quite final in that, so I thought it would be a great synopsis. I didn't dig any deeper.

Q Okay. Thank you.

A Thank you.

THE COURT: Mr. Thomas?

REDIRECT EXAMINATION

BY MR. THOMAS:

Q Just a couple of quick questions, Mr. Craft.

A No problem.

Q To your knowledge, does Transcom handle international calls?

A I don't know if they can determine if it's

international or -- or -- or, you know, long distance. It's just a call originating from another network.

Q Okay. You were talking about calls coming in and TDM -- is it -- what's -- what's an enterprise customer?

A An enterprise customer? I like to put that in a box -- I'll define that as a business customer if you would like to say.

Q A business customer with lots of phones?

A Yeah. A business customer -- yeah, absolutely.

Q And very advanced phones?

A Some can. Some are actually surprisingly behind the times, yes.

Q But there's some of them that have extremely advanced, computerized --

A Yeah, there are many modern installations in many enterprises, things like that. That's correct.

Q Uh-huh. And isn't it true that some enterprise customers collect in through a CLEC and direct their calls through a CLEC coming out of their system in any of a variety of formats but then converting it into TDM to get into the CLEC?

A Oh, yeah. Yeah. Absolutely.

Q So -- so -- so just because a call comes in

to Transcom in TDM format doesn't really give you any indication as to whether or not it began in PSTN, in TDM, or began with an enterprise customer in AKEY (phonetic) or began anywhere in some other form.

A To my knowledge, no, there's no way to tell. If you do a conversion -- let's say you have an IP based, you know, private branch exchange in the office and it converts to TDM for the phone company or to connect it to (inaudible word) for some reason, no, I don't think there's a way you can tell.

Q And converse of that, if you have -- if you confirm that a call began on the PSTN and ended on the PSTN somehow. You confirmed that. And you also know that at some point, the call went through Transcom. Does -- does that -- does the fact that it started in PSTN and ended in PSTN give you any assurance that it entered Transcom in TDM format?

A No. I don't think so. I'm thinking here. Actually, please repeat that question. I want to make sure I answer it as accurately as possible.

Q You got somebody over here who picks up the phone in TDM -- in -- on the PSTN?

A Right.

Q And somebody over here who answers the phone, and they're on the PSTN?

A Uh-huh.

Q And during the course of that phone traversing its way through the system, at some point, it goes through Transcom?

A Okay.

Q Does the fact that the beginning and the end are in PSTN give you any assurance that the call when it entered Transcom was in TDM format?

A No.

Q You used the concept of an adapter earlier?

A Uh-huh.

Q And is it fair to characterize that as you were saying, We have old technology, IXCs, long distance companies, and old technology CLECs or ILECs. And you're able to take this little new company, drop it in the middle and they can suddenly be next generation -- offering next generation services to their customers?

A That's correct.

Q Isn't that altering the fundamental character of the telecommunications service offered by all of those parties involved?

A Yeah, the new services would be. Yeah, of course.

Q Because the old service was just regular TDM?

A Uh-huh.

Q And the difference is that these IXC and these CLECs instead of having just invest millions and millions of dollars to change their structure, their network structure all over the country, they can sort of sign up with Transcom and have next gen capabilities tomorrow morning?

A Absolutely. It's an outsourcing opportunity for them to gain services without doing the development.

MR. THOMAS: Pass the witness.

THE COURT: Mr. Kohn?

RECROSS-EXAMINATION

BY MR. KOHN:

Q I'm going to pick up on your lines about moving to TDM to TDM and not knowing what's at the other end.

You read the access order, did you not?

A I did.

Q Okay. And basically, what it told AT&T is that it could no longer avoid access charges if it started in the PSTN and ended in the PSTN, right?

A Right.

Q And AT&T had to change its system and stop doing that?

A My understanding, yeah.

Q And to your knowledge it changed the system?

A It's my assumption, yes.

Q Okay. Which means that somehow AT&T had to develop the capability of figuring out in some fashion whether a phone was coming in from a PSTN or coming in from a computer or doing anything else that would decide whether this call was inside or outside the terms of the FCC order?

A I don't know what all they changed on their infrastructure. They could have just converted everything back to TDM and they wouldn't have needed the capabilities --

Q And then they would have lost this capability of being able to able to have efficiencies on running IP networks --

A Of course.

Q -- in between. Okay. And anybody else who had a system like AT&T who wanted to use a IP technology for -- where it's not a PSTN with one n, would have had to develop some system to sort out what's coming in one way or the other?

A Please repeat that. I'm sorry.

Q All right. Anybody else who wanted to use IP technology to affect some cost savings --

A Uh-huh.

Q -- but felt themself bound to pay access charges if it was PSTN to PSTN would have had to figure out some way to accommodate those two requirements?

A If their original intent is to avoid access charges, then of course that's correct.

Q Okay. Or alternatively, the could contract with the person they're dealing with to say, Listen, if you send me X -- X kind of traffic, I'm going to charge you one fee and if you're going to send me Y kind of traffic, I'm going to send you another -- I'm going to charge you another fee; isn't that true?

A If they've invested in mechanisms to determine the difference, yes, that's true.

Q Or if they're -- ask their customers to?

A Yeah. But you can't trust what a customer sends you to be originated from one location to the other.

Q So you may have to spot check for example?

A You have to check and you have to have a system that does that check.

Q All right. Let's talk about this idea of dropping a little company in the middle.

A Uh-huh.

Q All right. Now, you have a conditional long distance service, phones call phones, running over the network. And then you take a little company in the middle and, for, you know, it goes 4,000 miles coast to coast or -- or whatever and you -- you have two miles in the middle of where it's running over some little company?

A Uh-huh.

Q Is that the kind of thing to your understanding that's changed the total -- the character and cost structure of the call at both ends in the absence of a delivery of actual new services?

A Could you repeat that question?

Q Yeah. My question is this idea that we dropped a little company in the middle to -- to let us get to the brave new world?

A Uh-huh.

Q And the question is: I understand that for new services?

A All right.

Q But for the old tired and true, ordinary phone calls, do you think that because you put a little company in the middle that somehow or other that should change all the costs and all the expenses and all the allocations and everything else that goes

into the pricing of a telephone network?

A I don't know. I mean, this -- it does. That's just the way the market works.

Q All right. Do you understand when you read the FCC order that maybe what the FCC was kind of saying is that if it kind of looks like a duck and smells like duck, even if it's got a bit of fancy waddle when it kind of got there, it's still a duck and you still pay the same amount?

A No. To me it seemed like the FCC was ruling that, you know, AT&T just changing format without passing any kind of savings to the customers or any kind of benefit to the customers was a selfish maneuver and it didn't classify as an enhanced service.

Q So did it become -- would it become an enhanced service in your estimation if they cut their price and split the savings?

A No, they would have to enhance the signal in some way.

Q All right.

A Which I have no -- no knowledge of nor was it in the order.

Q All right. Thank you.

THE COURT: Thank you, Mr. Kohn.

Mr. Stretch?

MR. STRETCH: Nothing further.

THE COURT: Any re -- redirect, Mr. Thomas.

MR. THOMAS: Nothing further, Your Honor.

THE COURT: Mr. Craft, just I hate to display my ignorance but in -- just concisely, could you say for the record what is an algorithm intuitive. What does that phrase mean?

THE WITNESS: Oh an intuitive algorithm?

THE COURT: Okay. Yeah. Intuitive algorithm.

THE WITNESS: It's -- it -- it -- it takes bits in, okay. This algorithm -- well, obviously an algorithm is a mathematical process. But the -- what it does is it takes a signal that's incoming from the -- the far end switch or the far end media gateway and it samples. When it sees a packet drop, it -- it's -- basically, it's intuitive saying, Well, based on my experience or based on, you know, the knowledge in the algorithm, which I know that's asking for a lot of intuitiveness, but to my understanding, it says, Based on the format that these previous waves have been coming in, 80 percent of the

time, it's this wave shape that would follow. And so it said -- it basically guesses, Boom, that's what it should be, you know.

THE COURT: Anyone have any questions of the witness based on my question?

(No response was given.)

THE COURT: You may step down, sir. Thank you.

MR. CHEVALLIER: Your Honor, we don't have any further live witnesses. The Court has already indicated that it was taking judicial notice of the record made previously in connection with the motion to compel performance and we just reiterate that we do rely for purposes of our record here today on the -- the evidence that the Court heard at our hearing.

And the purpose of this hearing, the exhibits, with the exception of the last two that Mr. Thomas, I believe, introduced, 38 and 39 that had previously been admitted at that hearing, we would reurge their admission in connection to today's hearing to the extent they aren't already admitted by virtue of the Court.

THE COURT: I would think that would apply to all three parties.

# EXHIBIT 10

STATE OF CALIFORNIA ARNOLD SCHWARZENEGGER, *Governor*

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298

FILED
06-04-08
03:13 PM

June 4, 2008

TO PARTIES OF RECORD IN CASE 07-11-018

This proceeding was filed on November 19, 2007, and is assigned to Commissioner Peevey and Administrative Law Judge (ALJ) Yacknin. This is the decision of the Presiding Officer, ALJ Yacknin.

Any party to this adjudicatory proceeding may file and serve an Appeal of the Presiding Officer's Decision within 30 days of the date of issuance (i.e., the date of mailing) of this decision. In addition, any Commissioner may request review of the Presiding Officer's Decision by filing and serving a Request for Review within 30 days of the date of issuance.

Appeals and Requests for Review must set forth specifically the grounds on which the appellant or requestor believes the Presiding Officer's Decision to be unlawful or erroneous. The purpose of an Appeal or Request for Review is to alert the Commission to a potential error, so that the error may be corrected expeditiously by the Commission. Vague assertions as to the record or the law, without citation, may be accorded little weight.

Appeals and Requests for Review must be served on all parties and accompanied by a certificate of service. Any party may file and serve a Response to an Appeal or Request for Review no later than 15 days after the date the Appeal or Request for Review was filed. In cases of multiple Appeals or Requests for Review, the Response may be to all such filings and may be filed 15 days after the last such Appeal or Request for Review was filed. Replies to Responses are not permitted. (See, generally, Rule 14.4 of the Commission's Rules of Practice and Procedure at www.cpuc.ca.gov.)

If no Appeal or Request for Review is filed within 30 days of the date of issuance of the Presiding Officer's Decision, the decision shall become the decision of the Commission. In this event, the Commission will designate a decision number and advise the parties by letter that the Presiding Officer's Decision has become the Commission's decision.

/s/ ANGELA K. MINKIN
Angela K. Minkin, Chief
Administrative Law Judge

ANG:tcg

Attachment

to their end-user customers. GNAPs has refused to pay for these services on the basis that (1) the Commission lacks jurisdiction to impose access charges for this traffic because it is jurisdictionally interstate; (2) pursuant to the federal regulation commonly referred to as the Enhanced Service Provider (ESP) exemption, the traffic is exempt from access charges; and (3) the charges are inaccurate because they do not reflect the nature of the calls.

In D.07-09-050, the Commission previously addressed and rejected GNAPs' arguments that we lack jurisdiction over this matter by virtue of the nature of the traffic at issue. In D.07-01-004 (modified by D.07-08-031, denying GNAPs' rehearing application), the Commission previously addressed and rejected GNAPs' arguments that the traffic is exempt from charges pursuant to the ESP exemption. The charges billed by AT&T accurately reflect the terms of the interconnection agreement.

We order GNAPs to pay AT&T the amount of $18,589,494.17 through the December 2007 bill, plus any charges that have accrued since that time, for AT&T's termination and transiting of traffic delivered to it by GNAPs.

## 2. Background

On November 30, 2001, GNAPs filed Application (A.) 01-11-045 for arbitration of an interconnection agreement to interconnect and exchange traffic with AT&T pursuant to Section 252(b) of the Telecommunications Act. The Commission, in D.02-06-076 (modified by D.03-07-039, denying rehearing), approved the interconnection agreement and ordered the parties to enter into it; the parties did so in 2003.

The interconnection agreement sets forth the terms and conditions under which the parties will interconnect their networks and exchange traffic. The interconnection agreement provides that traffic exchanged between the parties

will be classified as either local, transit, optional calling area, intraLATA toll, or interLATA toll traffic, and specifies the charges for each. The interconnection agreement specifies the different types of trunks that may be established between the parties' networks to exchange the different classes of traffic, and provides that local and intraLATA toll traffic may be combined on the same trunk groups, while interLATA traffic must be transported over a trunk group separate from local and intraLATA toll traffic. GNAPs submitted Access Service Requests to AT&T requesting the establishment of combined local/intraLATA toll trunks, and represented that either 99% or 100% of the traffic would be local. GNAPs and AT&T established combined local/intraLATA toll trunks for their exchange of traffic.

The interconnection agreement specifies the charges for traffic exchanged over the combined local/intraLATA toll interconnection trunks: (1) local calls that AT&T terminates to its own end-users are subject to local reciprocal compensation charges, (2) intraLATA toll calls that AT&T terminates to its own end-users are subject to the intraLATA toll or intrastate access charges specified in AT&T's intrastate access tariff, and (3) calls that AT&T transits to a third party carrier are subject to transit charges.

The agreement requires GNAPs to provide AT&T with quarterly usage reports showing the percent of the traffic delivered over the combined local/intraLATA toll traffic trunks that GNAPs charges as local versus toll,[1] or Percent Local Usage factor (PLU), for AT&T to use to distinguish between local and intraLATA toll traffic for billing purposes. AT&T notified all

[1] GNAPs has the discretion to establish the local calling area for its own customers and, therefore, define what is a local call versus a toll call. (See, *e.g.*, D.02-06-076, pp. 23-24.)

interconnecting carriers that, in the absence of receiving usage reports, it will apply a default PLU percentage of 83% local traffic and 17% intraLATA toll traffic. GNAPs has not provided AT&T with usage reports.

Beginning in or about March 2004, GNAPs has used the combined local/intraLATA toll trunks to deliver traffic to AT&T for termination to AT&T end-users and for transiting to third party carriers. AT&T has billed for terminating and transiting this traffic pursuant to the interconnection agreement, using the default PLU factor. GNAPs has declined to pay any of the billed charges. AT&T brought this action for breach of the interconnection agreement.

GNAPs defends its non-payment of the billed charges on three grounds: (1) the Commission does not have jurisdiction to require payment of access charges because the traffic at issue is jurisdictionally interstate, (2) the traffic for which AT&T seeks compensation is exempt from access charges pursuant to the Federal Communication Commission's (FCC) ESP exemption, and (3) the billed amounts are inaccurate because they do not reflect the nature of the traffic.

### 3. Nature of the Traffic

At the core of all three of its defenses, GNAPs claims that the traffic at issue is exempt from access charges by virtue of its physical and jurisdictional nature. Accordingly, before we consider GNAPs' legal claims, it is necessary to determine the physical nature of the traffic.

GNAPs claims that all of its customers are ESPs. As we stated in D.07-08-031, the more precise term is Internet service providers (ISPs), which are a subclass of ESPs. (D.03-07-039, p. 11.) Consistent with this more precise definition, GNAPs' Assistant General Counsel James Scheltema testified that all the traffic at issue involved the Internet, that is, Internet protocol (IP) format, at

some point in its transmission. AT&T does not appear to dispute this factual assertion.

GNAPs makes the further claim that all the traffic it exchanges is voice over the Internet protocol (VoIP) traffic. The record on this claim is inconclusive. GNAPs' Director of Network Operations Jeffrey Noack testified that GNAPs does not know whether the communication it receives from its customers is voice, data or a mix thereof, and does not know how the traffic was delivered to its ESP customers. In its opening brief, GNAPs points to a very recent decision of the New York Public Service Commission (New York PSC), which determined that the traffic at issue in that case was VoIP, as evidence of the factual nature of the traffic at issue here. However, that determination was based on affidavits from GNAPs' customers that send traffic to New York; we have no evidence in this record to determine that it is also the nature of the traffic that GNAPs sends to AT&T in California.[2] In its reply brief, GNAPs asserts that the nature of its California traffic is the same as its New York traffic, and that the same customers are involved in both sets of traffic. GNAPs' factual assertions in brief do not constitute evidence.

A further factor to be considered is whether the traffic *originated* as IP traffic, as opposed to on the public switched telephone network (PSTN). As discussed above, the evidence shows that GNAPs does not know how the traffic originated. Conversely, AT&T's Area Manager for Regulatory Relations Jason Constable testified that GNAPs' traffic patterns do not match the common traffic

---

[2] New York Public Service Commission Order Directing Negotiation, *Complaint of TVC Albany, Inc. d/b/a Tech Valley Communications Against Global NAPs, Inc. for Failure to Pay Intrastate Access Charges,* Case 07-C-0059 (March 20, 2008).

patterns for IP-originated VoIP. While IP-originated VoIP is typically sent in comparable amounts as it is received, over 97% of the traffic exchanged between GNAPs and AT&T is sent from GNAPs to AT&T. In addition, for the single day of January 8, 2008, AT&T matched nearly 3,500 billing records of GNAPs' traffic that terminated on AT&T's network with billing records for calls that originated from an AT&T incumbent local exchange carrier (ILEC) end-user on the PSTN, in another state dialing a 1+ (long distance) call.

In sum, we find that all of the traffic at issue was delivered to GNAPs from GNAPs' ISP customers (ISPs being a subclass of ESPs), and that GNAPs delivered it to AT&T for termination to AT&T's end-user customers or for transit to a third party carrier. There is no dispute that all of the traffic may have involved IP format at some point in its transmission. We cannot determine on this record whether the traffic at issue is VoIP. However, assuming that some or all of it was VoIP traffic, we find that it likely originated on the PSTN, not on the Internet.

With this understanding of the nature of the traffic at issue, we turn to GNAPs' legal defenses against paying the claimed charges.

**4. Commission Jurisdiction**

GNAPs argues that, because the traffic at issue is IP-enabled and/or VoIP traffic, it is jurisdictionally interstate in nature and the Commission may not exercise jurisdiction over AT&T's claim. GNAPs' argument is barred by the doctrine of judicial estoppel and, in any event, entirely without merit.

AT&T originally brought this claim before a federal court, but GNAPs successfully obtained its dismissal on the ground that this Commission has exclusive jurisdiction over claims for breach of the interconnection agreement. The federal court agreed with GNAPs that AT&T's interconnection agreement

claims must be presented to the Commission for interpretation of the parties' agreement in the first instance.

The doctrine of judicial estoppel bars GNAPs from taking a contrary position here. The doctrine applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); the two positions are totally inconsistent; and (4) the first position was not taken as a result of ignorance, fraud, or mistake." (*Jackson v. County of Los Angeles* (1997), 60 Cal.App.4th 171, 183.) These factors apply here.

In any event, the Commission previously rejected GNAPs' arguments, when it denied GNAPs' application for rehearing of D.07-06-044, in which the Commission suspended GNAPs' Certificate of Public Convenience and Necessity until it pays Cox California Telcom, LLC (Cox) amounts due under those parties' interconnection agreement. D.07-06-044 affirmed our authority under the Telecommunications Act of 1996 to arbitrate, interpret and enforce interconnection disputes, and went on to address GNAPs' specific arguments as follows:

> GNAPs relies on two primary sources to support for its contention that this Commission is without jurisdiction to adjudicate this complaint case that resulted from GNAPs' failure to honor its Interconnection Agreement with Cox. The first source is the Federal Communications Commission's ("FCC") *Notice of Proposed Rulemaking ("NPRM") on IP-Enabled Services* (2004) 19 FCC Rcd 4863, 4864-68. GNAPs asserts that the *NPRM* preempted all regulation of Voice over Internet Protocol (VoIP) traffic. The other source is *In the Matter of Vonage Holdings Corp (2004) 19 FCC Rcd 22404*, aff'd by *Minn. Pub. Util. Comm'n v. FCC* (8th Cir. 2007) 483 F.3d 570, 579. In *Vonage*, the FCC preempted a regulation promulgated by the Minnesota PUC that required

Vonage (a VoIP provider) to comply with state regulations governing telephone services. The Eighth Circuit upheld the FCC's ruling as reasonable because it was impractical or impossible to separate VoIP service into interstate and intrastate components.

GNAPs asserts that *Minn. PUC* upheld the FCC's determination that VoIP is jurisdictionally interstate and subject to the FCC's exclusive jurisdiction. [Fn. omitted.] While *Vonage* and *Minn. PUC* did indicate that state commissions cannot require VoIP providers to comply with state statutes and regulations governing telephone service within their jurisdiction, they did not conclude that state commissions cannot enforce interconnection agreements that require the payment of interconnection charges on VoIP calls that terminate on the PSTN. Thus, GNAPs' reliance on *Vonage* is misplaced. Vonage was solely a VoIP provider which sought to avoid regulation by the Minnesota PUC, whereas GNAPs is not a VoIP provider. The federal district court concluded in its *Order Denying Motion for Preliminary Injunction* in this proceeding that "[t]he fact that Global NAPs may use Internet protocols to receive traffic from its ESP customers before transmitting that traffic to an end point on the PSTN through Cox's facility does not make it a VoIP provider." [Fn. omitted.] Rather, GNAPs is a certificated carrier, licensed by this Commission, and subject to its jurisdiction.

Moreover, just because traffic may be jurisdictionally interstate does not preempt the Commission from review and enforcement of the interconnection agreements. GNAPs claimed that interstate traffic was preempted in the context of ISP-bound traffic, which is deemed to be interstate, and the Court rejected it. [Fn. omitted.] The Court noted that the *ISP Remand Order* "reserve[d] state commission authority in certain relevant matters," including the arbitration, review and enforcement of interconnection agreements, even where they dealt with ISP-bound (interstate traffic). [Fn. omitted.] This Commission also rejects GNAPs' argument.

Nor does the use of IP-enabled services in the transport of a call result in the states being deprived of jurisdiction. [Fn. omitted.] The *AT&T IP Decision* involved calls that were transported in part over IP circuits, although they began and ended as landline-

> based phone calls over the PSTN. It was argued that the pending NPRM on IP-enabled services preempted state access charges for such calls, similar to GNAPs' argument here. Recognizing that the issue of applying access charges to traffic that uses IP was being considered in the NPRM, the FCC nevertheless held that intrastate access charges applies to these calls:
>
>> We are undertaking a comprehensive examination of issues raised by the growth of services that use IP, including carrier compensation and universal service issues, in the *IP-Enabled Services* rulemaking proceeding. *In the interim, however, to provide regulatory certainty, we clarify that AT&T's specific service is subject to interstate access charges*...AT&T obtains the same circuit-switched interstate access for its specific service as obtained by other interexchange carriers, and, therefore, *AT&T's specific service imposes the same burdens on the local exchange as do circuit-switched interexchange calls. It is reasonable that AT&T pay the same interstate access charges as other interexchange carriers for the same termination of calls over the PSTN*, pending resolution of these issues in the *Intercarrier Compensation* and *IP-Enabled Services* rulemaking proceedings. [*Order, In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges* (2004) 19 FCC Rcd 7457, 7464-65, ¶ 15.]
>
> This statement makes clear that the mere use of IP in the transport of calls does not result in federal preemption, nor does the pendency of the NPRM on IP-enabled services.

(D. 07-09-050, pp. 8-12.)

GNAPs makes the same jurisdictional arguments here that the Commission addressed and rejected in D.07-09-050. We do not find them any more persuasive in their repetition.[3]

---

[3] Although AT&T does not raise it as an offense, the doctrine of collateral estoppel might reasonably be held to bar GNAPs' litigation of this jurisdictional issue, as it was conclusively

*Footnote continued on next page*

GNAPs supplements its previous argument with citations to two recent decisions, the New York PSC order discussed previously, and *Vonage Holdings, Corp. v. Nebraska Public Service Commission*, 2008 WL 584078 (D.Neb. 2008). Both of these decisions concern similar facts and appear to follow the earlier *Vonage* decision, and GNAPs' reliance on them is misplaced for the same reasons as is its reliance on *Vonage*. Specifically, these decisions merely reiterate that state commissions may not assess statutory or regulatory charges against VoIP providers; they do not deny the state commissions' authority under the Telecommunications Act of 1996 to arbitrate, interpret and enforce interconnection disputes. Indeed, the *New York PSC Order* affirms the state commissions' authority: rather than allow the complaining carrier to block traffic from the other for lack of compensation, the New York PSC exercised jurisdiction over the dispute by ordering the carriers to work out a traffic exchange agreement establishing rates, charges, terms and conditions for the VoIP traffic at issue there.

GNAPs argues that the billed amounts are intrastate access charges, which cannot be applied to its VoIP or IP-enabled traffic. GNAPs maintains that it should not be penalized for AT&T's failure to provide an interconnection option that reflects that the traffic is jurisdictionally interstate but not subject to access charges. GNAPs' argument is without merit. First, as the FCC determined in the AT&T IP Decision, intrastate access charges may apply to VoIP traffic that begins and ends as landline-based phone calls over the PSTN. (*AT&T IP Decision*, 19

---

determined as against GNAPs in D.07-09-050. (*Vandenburg v. Superior Court* (1999) 21 Cal.4th 815; *see also Parklane Hosiery Co. v. Shore* (1979) 439 U.S. 322, 99 S.Ct. 645, upholding the trial court's discretion to use the doctrine offensively against the defendant.)

FCC Rcd 7457, 7464-65, ¶ 15.) Even assuming that the traffic at issue here is VoIP (which we cannot determine on this record), it ends on the PSTN. The bar against intrastate access charges does not apply to this traffic. Second, the charges are not regulatory charges. Rather, they are contractual charges arising out of the parties' interconnection agreement.

**5. ESP Exemption**

GNAPs asserts that the traffic at issue is exempt from the charges billed by AT&T because the traffic involved the Internet or IP format and, as such, is subject to the FCC's ESP exemption.

The Commission previously rejected GNAPs' arguments that it presented in Case 06-04-026, *Cox California Telecom LLC v. Global NAPs California, Inc.* The Commission determined that "[t]he only relevant exemption from the access charge regime under Federal law is for *ISP-bound traffic* rather than *ISP-originated* traffic...." (D.07-01-004, p. 5, emphasis in original.)

GNAPs cites to ¶ 11 of the *ISP Remand Order* for its proposition that an ESP exemption applies to traffic that is routed to *or from* ISPs. To the contrary, nothing in ¶ 11 refers to traffic that is routed *from* ISPs:

> ISPs, one class of enhanced service providers (ESPs), also may utilize [local exchange carrier (LEC)] services to provide their customers with access to the Internet. In the *MTS/WATS Market Structure Order*, the [FCC] acknowledged that ESPs were among a variety of users of LEC interstate access services. Since 1983, [...] the [FCC] has exempted ESPs from the payment of certain interstate access charges. Consequently ESPs, including ISPs, are treated as end-users for the purpose of applying access charges and are, therefore, entitled to pay local business rates for their connections to LEC central offices and the public switched telephone network (PSTN). Thus, despite the [FCC's] understanding that ISPs use interstate access services, pursuant

> to the ESP exemption, the Commission has permitted ISPs to take service under local tariffs.

By its plain language, ¶ 11 refers to ISPs strictly in the context of their utilization of local exchange carrier services to provide their customers with access *to* the Internet. Here, in contrast, the traffic at issue is traffic that GNAPs receives *from* its ISP customers, not that it delivers *to* them.

GNAPs argues that removing the ESP exemption on the basis that GNAPs' customers, and not GNAPs itself, are ESPs would frustrate the FCC's intent to exempt this traffic from interstate access charges. We do not find intent by the FCC to exempt traffic that originates on the Internet from interstate access charges, regardless of GNAPs' status and the services that it provides to its customers. Even assuming that GNAPs shares the ESP status of its customers, the traffic does not utilize AT&T's services to provide access to the Internet. The ESP exemption does not apply to this traffic.

GNAPs points out that its network architecture is not that of a traditional local exchange carrier; its transport mode is ATM, not analog TDM. GNAPs argues that, although AT&T requires that GNAPs translate its digital traffic into analog TDM mode, this requirement by AT&T cannot be applied to strip it of its character as exempt traffic. These observations are irrelevant to the issue of whether the traffic at issue is ISP-bound. The ESP exemption is inapplicable to traffic that is not ISP-bound, regardless of the traffic's transport mode.

GNAPs argues that the interconnection agreement does not govern traffic that is beyond the Commission's regulatory authority and therefore cannot be applied to overcome the application of the ESP exemption. This argument fails because, as we have discussed, its premise that the traffic is beyond the Commission's regulatory authority is without merit.

### 6. Accuracy of Billed Amounts

AT&T billed GNAPs for terminating and transiting traffic delivered over the combined local/intraLATA toll trunks. AT&T billed the terminating traffic using the default PLU factor to apply the local versus intraLATA toll charges, and billed the transited traffic at the transiting rate. GNAPs does not challenge AT&T's calculation of the bills. Rather, GNAPs asserts that AT&T's bills are inherently inaccurate for being based upon a comparison of NXX codes,[4] and for inappropriately imposing access charges and applying the PLU factor to IP-enabled traffic. We discuss these arguments below.

GNAPs argues that AT&T's invoices are inherently inaccurate because they are generated using Carrier Access Billing System (CABS) billing, which is premised upon a comparison of NXX codes. GNAPs points out that, for VoIP and IP-enabled traffic, the NXX codes do not necessarily reflect the end-user's physical location. Thus, for example, AT&T bills the traffic as local or intraLATA toll even if the end-user originating the call is physically located outside the geographic location pertaining to that particular NXX code. GNAPs argues that, therefore, the bills are inaccurate.

GNAPs is mistaken as to the billing procedure. AT&T did not use NXX codes to determine whether the traffic was local and/or intraLATA toll. Rather, the traffic at issue was deemed to be local and/or intraLATA toll based on its delivery over the combined local/intraLATA toll trunks. Nor did AT&T use NXX codes to distinguish between local and intraLATA toll traffic. Pursuant to the interconnection agreement, all of the traffic that is delivered to AT&T's own

[4] NXX codes are the first three digits in a telephone number, and designate the central office or switch to which the number is assigned.

end-users is billed either as local or intraLATA toll based on the PLU factor provided by GNAPs. Because GNAPs did not provide a PLU factor, AT&T applied the default PLU. NXX codes did not factor into AT&T's billing.

GNAPs' discussion of the relevancy of NXX codes suggests a more fundamental argument, namely, that virtual NXX traffic cannot properly be treated as local for intercarrier compensation purposes. To the contrary, as the Commission previously determined in our decision approving this interconnection agreement (D.02-06-076) and elsewhere (e.g., D.99-9-029, p. 35; D.03-05-075, affirmed in relevant part by Verizon v. Peevey (9th Cir. 2006) 462 F.3d 1142), virtual NXX traffic is "local" based on its rating, regardless of its physical routing. To the extent that the traffic at issue is virtual NXX traffic that was routed from outside the geographic location pertaining to the NXX code, it is nevertheless subject to intercarrier compensation based on the rating pertaining to the NXX code.

GNAPs argues that the billed amounts are intrastate access charges, which cannot be applied to its VoIP or IP-enabled traffic. GNAPs maintains that it should not be penalized for AT&T's failure to provide an interconnection option that reflects that the traffic is jurisdictionally interstate but not subject to access charges. GNAPs' argument is without merit. First, the bar against intrastate access charges only applies to VoIP traffic that *originates* in IP format from the calling party. (*Id.*) Even assuming that the traffic is VoIP (which we cannot determine on this record), it originated on the PSTN. The bar against intrastate access charges does not apply to this traffic, even if it is VoIP. Second, the charges are not regulatory charges. Rather, they are contractual charges arising out of the parties' interconnection agreement.

GNAPs asserts that the charges constitute access charges, which cannot be applied to GNAPs' IP-enabled traffic. As we discussed above, the charges are not regulatory charges. Rather, they are contractual charges arising out of the parties' interconnection agreement, which was approved by the Commission in the exercise of our authority under the Telecommunications Act of 1996 to arbitrate, interpret and enforce interconnection disputes.

GNAPs asserts that the PLU factor is inapplicable to its IP-enabled traffic. This argument reiterates GNAPs' position, which we reject, that IP-enabled traffic is exempt from charges under the interconnection agreement.

GNAPs notes that it provides no dial tone services like traditional carriers and that it only presents its traffic to AT&T in other than IP format because AT&T requires it to do so. These observations do not lead us to conclude that the billing calculation is inaccurate or that the traffic is not governed by the interconnection agreement.

We find that AT&T properly calculated $18,589,494.17 through the December 2007 bill, as the amount due and owed under the interconnection agreement.

## 7. Assignment of Proceeding, Hearings and Submission

Michael R. Peevey is the assigned Commissioner and Hallie Yacknin is the assigned Administrative Law Judge and presiding officer in this proceeding.

Evidentiary hearing was held on March 25, 2008. Opening briefs were filed on April 14, 2008, and the proceeding was submitted upon the filing of reply briefs on April 24, 2008.

## Findings of Fact

1. GNAPs filed A.01-11-045 for arbitration of an interconnection agreement with AT&T.

2. The Commission approved the interconnection agreement in D.02-06-076 (modified by D.03-07-039, denying rehearing) and ordered the parties to enter into it.

3. GNAPs and AT&T entered into the interconnection agreement in 2003.

4. The interconnection agreement provides that traffic exchanged between the parties will be classified as either local, transit, optional calling area, intraLATA toll, or interLATA toll traffic, and specifies the charges for each.

5. The interconnection agreement specifies the different types of trunks that may be established between the parties' networks to exchange traffic, and provides that local and intraLATA toll traffic may be combined on the same trunk groups, while interLATA traffic must be transported over a trunk group separate from local and intraLATA toll traffic.

6. The interconnection agreement provides that (1) local calls that AT&T terminates to its own end-users are subject to local reciprocal compensation charges, (2) intraLATA toll calls that AT&T terminates to its own end-users are subject to the intraLATA toll or intrastate access charges specified in AT&T's intrastate access tariff, and (3) calls that AT&T transits to a third party carrier are subject to transit charges.

7. The interconnection agreement requires GNAPs to provide AT&T with quarterly usage reports showing the percent of the traffic delivered over the combined local/intraLATA toll traffic trunks that GNAPs charges as local versus toll, or Percent Local Usage factor (PLU), for AT&T to use for billing purposes.

8. GNAPs submitted Access Service Requests to AT&T requesting combined local/intraLATA toll trunks, and representing that either 99% or 100% of the traffic would be local.

9. AT&T and GNAPs established combined local/intraLATA toll trunks to interconnect the parties' networks.

10. AT&T notified all interconnecting carriers that, in the absence of receiving usage reports, it will apply a default PLU percentage of 83% local traffic and 17% intraLATA toll traffic.

11. Beginning in or about March 2004, GNAPs has used the combined local/intraLATA toll trunks to deliver traffic to AT&T for termination to AT&T end-users and for transiting to third party carriers.

12. GNAPs has not provided usage reports to AT&T.

13. AT&T applied the default PLU to the traffic that it terminated to its own end-user customers.

14. AT&T has billed for terminating and transiting this traffic pursuant to the interconnection agreement.

15. GNAPs has not paid any of the billed charges.

16. All of GNAPs' customers are ISPs, which are a subclass of ESPs.

17. GNAPs received all of the traffic at issue from its ISP customers.

18. There is no dispute that all of the traffic at issue involved IP at some point in its transmission.

19. GNAPs does not know whether the communication it receives from its customers is voice, data or a mix thereof, and does not know how the traffic was delivered to its ESP customers.

20. We cannot find, on the basis of this record, that the traffic at issue is VoIP traffic.

21. The evidence suggests that the traffic originated on the PSTN, not on the Internet.

22. None of the traffic at issue was delivered to the Internet.

23. AT&T originally brought this claim before a federal court, where GNAPs successfully obtained its dismissal on the ground that this Commission has exclusive jurisdiction over claims for breach of the interconnection agreement.

24. AT&T properly calculated $18,589,494.17 through the December 2007 bill, as the amount due and owed under the interconnection agreement.

**Conclusions of Law**

1. The interconnection agreement governs the terms and conditions under which GNAPs and AT&T will interconnect their networks and exchange traffic.

2. The doctrine of judicial estoppel bars GNAPs from arguing that the Commission lacks jurisdiction over AT&T's claim.

3. The Commission has authority consistent with state and federal law to resolve interconnection disputes.

4. The use of IP-enabled services in the transport of a call does not deprive the Commission of jurisdiction to resolve interconnection disputes.

5. The FCC's ESP exemption from access charges applies only to traffic that is routed to the Internet; it does not apply to the traffic at issue here.

6. Charges for services under the interconnection agreement are contractual charges, not regulatory access charges.

7. The use of IP format in the transmission of traffic prior to its delivery to AT&T does not exempt it from charges under the interconnection agreement.

8. GNAPs should pay AT&T the claimed charges.

9. This case should be closed.

# ORDER

IT IS ORDERED that:

1. Global NAPs California, Inc. shall pay to Pacific Bell Telephone Company, d/b/a AT&T California the amount of $18,589,494.17 through the December 2007 bill, plus any charges that have accrued since that time.

2. Case 07-11-018 is closed.

This order is effective today.

Dated ______________________________, at San Francisco, California.

# EXHIBIT 11

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
ENTERED
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRANSCOM ENHANCED SERVICES, LLC, | § | Case No. 05-31929-HDH-11 |
| | § | |
| | § | |
| Debtor. | § | |

**MEMORANDUM OPINION**

On April 14, 2005, this Court considered Transcom Enhanced Services, LLC's (the "Debtor's") Motion To Assume AT&T Master Agreement MA Reference No. 120783 Pursuant To 11 U.S.C. § 365 ("Motion").[1] At the hearing, the Debtor, AT&T, and Southwestern Bell Telephone, L.P., et al ("SBC Telcos") appeared, offered evidence, and argued. These parties also submitted post-hearing briefs and proposed findings of fact and conclusions of law supporting their positions. This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A) & (O).

## I. Background Facts

This case was commenced by the filing of a voluntary Bankruptcy Petition for relief under Chapter 11 of the Bankruptcy Code on February 18, 2005. The Debtor is a wholesale

[1]Debtor's Exhibit 1, admitted during the hearing, is a true, correct and complete copy of the Master Agreement between Debtor and AT&T.

provider of transmission services providing its customers an Internet Protocol ("IP") based network to transmit long-distance calls for its customers, most of which are long-distance carriers of voice and data.

In 2002, a company called DataVoN, Inc. invested in technology from Veraz Networks designed to modify the aural signal of telephone calls and thereby make available a wide variety of potential new services to consumers in the area of VoIP. The FCC had long supported such new technologies, and the opportunity to change the form and content of the telephone calls made it possible for DataVoN to take advantage of the FCC's exemption provided for Enhanced Service Providers ("ESP"s), significantly reducing DataVoN's cost of telecommunications service.

On September 20, 2002, DataVoN and its affiliated companies filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, before Judge Steven A. Felsenthal. Southwestern Bell was a claimant in the DataVoN bankruptcy case. On May 19, 2003, the Debtor was formed for purposes of acquiring the operating assets of DataVoN. The Debtor was the winning bidder for the assets of DataVoN and on May 28, 2003, the bankruptcy court approved the sale of substantially all of the assets of DataVoN to the Debtor. Included in the order approving the sale, were findings by Judge Felsenthal that DataVoN provided "enhanced information services".

On July 11, 2003, AT&T and the Debtor entered into the AT&T Master Agreement MA Reference No. 120783 (the "Master Agreement"). In an addendum to the Master Agreement, executed on the same date, the Debtor states that it is an "enhanced information services" provider, providing data communications services over private IP networks (VoIP), such VoIP

services are exempt from the access charges applicable to circuit switched interexchange calls, and such services would be provided over end user local services (such as the SBC Telcos).

AT&T is both a local-exchange carrier and a long-distance carrier of voice and data. The SBC Telcos are local exchange carriers that both originate and terminate long distance voice calls for carriers that do not have their own direct, "last mile" connections to end users. For this service, SBC Telcos charge an access charge. Enhanced service providers ("ESP's") are exempt from paying these access charges, and the SBC Telcos had been in litigation with DataVoN during its bankruptcy, and has recently been in litigation with the Debtor, AT&T and others over whether certain services they provide are entitled to this exemption to access charges.

On April 21, 2004, the FCC released an order in a declaratory proceeding between AT&T and SBC (the "AT&T Order") that found that a certain type of telephone service provided by AT&T using IP technology was not an enhanced service and was therefore not exempt from the payment of access charges. Based on the AT&T Order, before the instant bankruptcy case was filed, AT&T suspended Debtor's services under the Master Agreement on the grounds that the Debtor was in default under the Master Agreement. Importantly, the alleged default of the Debtor is not a payment default, but rather pursuant to Section 3.2 of the Master Agreement, which, according to AT&T, gives AT&T the right to immediately terminate any service that AT&T has reason to believe is being used in violation of laws or regulations.

AT&T asserts that the services that the Debtor provides over its IP network are substantially the same as were being provided by AT&T, and therefore, the Debtor is also not exempt from paying these access charges. At the point that the bankruptcy case was filed, service had been suspended by AT&T pending a determination that the Debtor is an ESP, but

AT&T had not yet assessed the access charges that it asserts are owed by the Debtor.

## II. Issues

The issues before the Court are:

(1) Whether the Debtor has met the requirements of § 365 in order to assume the Master Agreement; and

(2) Whether the Debtor is an enhanced service provider ("ESP"), and is thus exempt from the payment of certain access charges in compliance with the Master Agreement.[2]

---

[2] AT&T has stated in its Objection to the Motion that since it does not object to the Debtor's assumption of the Master Agreement provided the amount of the cure payment can be worked out, the Court need not reach the issue of whether the Debtor is an ESP. However, this argument appears disingenuous to the Court. AT&T argues that the entire argument over cure amounts is a difference of about $28,000.00 that AT&T is willing to forgo for now. However, AT&T later states in its objection (and argued at the hearing):

> To be sure, this is not the total which ultimately Transcom may owe. It is also possible that . . . Transcom will owe additional amounts if it is determined that it should have been paying access charges. But at this point, AT&T has not billed for the access charges, so under the terms of the Addendum, they are not currently due. . . . AT&T is not requiring Transcom to provide adequate assurance of its ability to pay those charges should they be assessed, but will rely on the fact that post-assumption, these charges will be administrative claims. . . . Although Transcom's failure to pay access charges with respect to prepetition traffic was a breach, the Addendum requires, as a matter of contract, that those pre-petition charges be paid when billed. This contractual provision will be binding on Transcom post-assumption, and accordingly, is not the subject of a damage award now."

AT&T Objection p. 3-4. As will be discussed below, in evaluating the Debtor's business judgment in approving its assumption Motion, the Court must determine whether or not its approval of the Motion will result in a potentially large administrative expense to be borne by the estate.

AT&T argues against the Court's jurisdiction to determine this question as part of an assumption motion. However, the Court wonders if AT&T will make the same argument with regard to its post-assumption administrative claims it plans on asserting for past and future access charges that it states it will rely on for payment instead of asking for them to be included as cure

## III. Analysis

Under § 365(b)(1), a debtor-in-possession that has previously defaulted on an executory contract[3] may not assume that contract unless it: (A) cures, or provides adequate assurance that it will promptly cure, the default; (B) compensates the non-debtor party for any actual pecuniary loss resulting from the default; and (C) provides adequate assurance of future performance under such contract. *See* 11 U.S.C. § 365(b)(1).

In its objection, briefing and arguments made at the hearing, AT&T does not object to the Debtor's assumption of the Master Agreement, provided the Debtor pays the cure amount, as determined by the Court. It does not expect the Debtor to cure any non-monetary defaults, including payment or proof of the ability to pay the access charges that have been incurred, as alleged by the SBC Telcos, as a prerequisite to assumption. *See In re BankVest Capital Corp.*, 360 F.3d 291, 300-301 (1st Cir. 2004), *cert. denied*, __ U.S. __, 124 S.Ct. 2874, 159 L.Ed. 2d 776 (2004) ( "Congress meant § 365(b)(2)(D) to excuse debtors from the obligation to cure non-monetary defaults as a condition of assumption.").

Only the Debtor offered evidence of the cure amounts due at the hearing totaling $103,262.55. Therefore, based on this record, the current outstanding balance due from Debtor to AT&T is $103,262.55 (the "Cure Amount"). Thus, upon payment of the Cure Amount Debtor's Motion should be approved by the Court, provided the Debtor can show adequate assurance of future performance.

AT&T argues that this is where the Court's inquiry should cease. Since AT&T has

---

payments under the present Motion.

[3] The parties agree that the Master Agreement is an executory contract.

suspended service under the Master Agreement, whether or not the Debtor is an ESP, and thus exempt from payment of the disputed access charges is irrelevant, because no future charges will be incurred, access or otherwise. This is because no service will be given by AT&T until the proper court makes a determination as to the Debtor's ESP status. However, in its argument, AT&T ignores the fact that part of the Court's necessary determination in approving the Debtor's motion to assume the Master Agreement is to ascertain whether or not the Debtor is exercising proper business judgment. *See In re Lilgeberg Enter., Inc.*, 304 F.3d 410, 438 (5th Cir. 2002); *In re Richmond Leasing Co.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

If by assuming the Master Agreement the Debtor would be liable for the large potential administrative claim, to which AT& T argues that it will be entitled,[4] or if the Debtor cannot show that it can perform under the Master Agreement, which states that the Debtor is an enhanced information services provider exempt from the access charges applicable to circuit switched interexchange calls, and the Debtor would loose money going forward under the Master Agreement should it be determined that the Debtor is not an ESP, then the Court should deny the Motion. On this record, the Debtor has established that it cannot perform under the Master Agreement, and indeed cannot continue its day-to-day operations or successfully reorganize, unless it qualifies as an Enhanced Service Provider.

AT&T and SBC Telcos argue that a forum selection clause in the Master Agreement should be enforced and that any determination as to whether the Debtor is an ESP, and thus exempt from access charges, must be tried in New York. While this argument may have validity in other contexts, the Court concludes that it has jurisdiction to decide this issue as it arises in the

---

[4] See n. 2 above.

context of a motion to assume under § 365. *See In re Mirant Corp.*, 378 F.3d 511, 518 (5th Cir. 2004) (finding that district court may authorize the rejection of an executory contract for the purchase of electricity as part of a bankruptcy reorganization and that the Federal Energy Regulatory Commission did not have exclusive jurisdiction in this context); *see also*, *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997) (Bankruptcy Court possessed discretion to refuse to enforce an otherwise applicable arbitration provision where enforcement would conflict with the purpose or provisions of the Bankruptcy Code).

*In re Orion*, which is heavily relied upon by AT&T, is inapplicable in this proceeding. *See In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993). On its face, *Orion* is distinguishable from this case in that in *Orion*, the debtor sought damages in an adversary proceeding at the same time it was seeking to assume the contract in question under Section 365. The bankruptcy court decided the Debtor's request for damages as a part of the assumption proceedings awarding the Debtor substantial damages. Here, the Debtor is not seeking a recovery from AT&T under the contract which would augment the estate. Rather the Debtor is only seeking to assume the contract within the parameters of Section 365. Similar issues to the one before this Court have been advanced by another bankruptcy court in this district.

The court in *In re Lorax Corp.*, 307 B.R. 560 (Bankr. N.D. Tex. 2004), succinctly pointed out that a broad reading of the Orion opinion runs counter to the statutory scheme designed by Congress. *Lorax*, 307 B.R. at 566 n. 13. The *Lorax* court noted that *Orion* should not be read to limit a bankruptcy court's authority to decide a disputed contract issue as part of hearing an assumption motion. *Id.* To hold otherwise would severely limit a bankruptcy court's inherent

equitable power to oversee the debtor's attempt at reorganization and would diffuse the bankruptcy court's power among a number of courts. The *Lorax* court found such a result to be at odds with the Supreme Court's command that reorganization proceed efficiently and expeditiously. *Id.* at 567 (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 376 (1988)). This Court agrees. The determination of the Debtors status as an ESP is an important part of the assumption motion.

Since the Second Circuit's 1993 *Orion* opinion, the Second Circuit has further distinguished non-core and core jurisdiction proceedings involving contract disputes. In particular, if a contract dispute would have a "much more direct impact on the core administrative functions of the bankruptcy court" versus a dispute that would merely involve "augmentation of the estate," it is a core proceeding. *In re United States Lines, Inc.*, 197 F.3d 631, 638 (2d Cir. 1999) (allowing the bankruptcy court to resolve disputes over major insurance policies, and recognizing that the debtor's indemnity contracts could be the most important asset of the estate). Accordingly, the Second Circuit would reach the same conclusion of core jurisdiction here since the dispute addressed by the Motion "directly affect[s]" the bankruptcy court's "core administrative function." *United States Lines*, at 639 (citations omitted).

Determination, for purposes of the motion to assume, of whether the Debtor qualifies as an ESP and is exempt from paying access charges (the "ESP Issue") requires the Court to examine and take into account certain definitions under the Telecommunications Act of 1996 (the "Telecom Act"), and certain regulations and rulings of the Federal Communications Commission ("FCC"). None of the parties have demonstrated, however, that this is a matter of first impression or that any conflict exists between the Bankruptcy Code and non-Code cases.

Thus, the Court may decide the ESP issues for purposes of the motion to assume.

Several witnesses testified on the issues before the Court. Mr. Birdwell and the other representatives of the Debtor were credible in their testimony about the Debtor's business operations and services. The record establishes by a preponderance of the evidence that the service provided by Debtor is distinguishable from AT&T's specific service in a number of material ways, including, but not limited to, the following:

     (a)    Debtor is not an interexchange (long-distance) carrier.

     (b)    Debtor does not hold itself out as a long-distance carrier.

     (c)    Debtor has no retail long-distance customers.

     (d)    The efficiencies of Debtor's network result in reduced rates for its customers.

     (e)    Debtor's system provides its customers with enhanced capabilities.

     (f)    Debtor's system changes the content of every call that passes through it.

On its face, the AT&T Order is limited to AT&T and its specific services. This Court holds, therefore, that the AT&T Order does not control the determination of the ESP Issue in this case.

The term "enhanced service" is defined at 47 CFR § 67.702(a) as follows:

> For the purpose of this subpart, the term enhanced service shall refer to services, offered over common carrier transmission facilities used in interstate communications, which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information. Enhanced services are not regulated under title II of the Act.

The term "information service" is defined at 47 USC § 153(20) as follows:

> The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

Dr. Bernard Ku, who testified for SBC was a knowledgeable and impressive witness. However, during cross examination, he agreed that he was not familiar with the legal definition for enhanced service.

The definitions of "enhanced service" and "information service" differ slightly, to the point that all enhanced services are information services, but not all information services are also enhanced services. See First Report And Order, *In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934*, as amended, 11 FCC Rcd 21905 (1996) at ¶ 103.

The Telecom Act defines the terms "telecommunications" and "telecommunications service" in 47 USC § 153(43) and (46), respectively, as follows:

> The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, *without change in the form or content* of the information as sent and received. (emphasis added).

> The term "telecommunications service" means the offering of *telecommunications* for a fee directly to the public, or to such class of users as to be effectively available directly to the public, regardless of the facilities used. (emphasis added).

These definitions make clear that a service that routinely changes either the form or the content of the transmission would fall outside of the definition of "telecommunications" and therefore would not constitute a "telecommunications service."

Whether a service pays access charges or end user charges is determined by 47 C.F.R.

§ 69.5, which states in relevant part as follows:

> (a) End user charges shall be computed and assessed upon end users . . . as defined in this subpart, and as provided in subpart B of this part. (b) Carrier's carrier charges [i.e., access charges] shall be computed and assessed upon all interexchange carriers that use local exchange switching facilities *for the provision of interstate or foreign telecommunications services.* (emphasis added).

As such, only telecommunications services pay access charges. The clear reading of the above provisions leads to the conclusion that a service that routinely changes either the form or the content of the telephone call is an enhanced service and an information service, not a telecommunications service, and therefore is required to pay end user charges, not access charges.

Based on the evidence and testimony presented at the hearing, the Court finds, for purposes of the § 365 motion before it, that the Debtor's system fits squarely within the definitions of "enhanced service" and "information service," as defined above. Moreover, the Court finds that Debtor's system falls outside of the definition of "telecommunications service" because Debtor's system routinely makes non-trivial changes to user-supplied information (content) during the entirety of every communication. Such changes fall outside the scope of the operations of traditional telecommunications networks, and are not necessary for the ordinary management, control or operation of a telecommunications system or the management of a telecommunications service. As such, Debtor's service is not a "telecommunications service" subject to access charges, but rather is an information service and an enhanced service that must pay end user charges. Judge Felsenthal made a similar finding in his order approving the sale of the assets of DataVoN to the Debtor, that DataVoN provided "enhanced information services". *See* Order Granting Motion to Sell, 02-38600-SAF-11, no. 465, entered May 29, 2003. The

Debtor now uses DataVoN's assets in its business.

Because the Court has determined that the Debtor's service is an "enhanced service" not subject to the payment of access charges, the Debtor has met its burden of demonstrating adequate assurance of future performance under the Master Agreement. The Debtor has demonstrated that it is within Debtor's reasonable business judgment to assume the Master Agreement.

Regardless of the ability of the Debtor to assume this agreement, the Court cannot go further in its ruling, as the Debtor has requested to order AT&T to resume providing service to the Debtor under the Master Agreement. The Court has reached the conclusions stated herein in the context of the § 365 motion before it and on the record made at the hearing. An injunction against AT&T would require an adversary proceeding, a lawsuit. Both the Debtor and AT&T are still bound by the exclusive jurisdiction provision in § 13.6 of the Master Agreement, as found by the United States District Court for the Northern District of Texas, Hon. Terry R. Means. As Judge Means ruled, any suit brought to enforce the provisions of the Master Agreement must be brought in New York.

**IV. Conclusion**

In conclusion, the Court finds that the provisions of 11 U.S.C. § 365 have been met in this case. Because the Court finds that the Debtor's service is an enhanced service, not subject to payment of access charges, it is therefore within Debtor's reasonable business judgment to assume the Master Agreement with AT&T.

Only the Debtor offered evidence of the cure amounts at the hearing. Based on the record at the hearing, the current outstanding balance due from Debtor to AT&T is $103,262.55. To

assume the Master Agreement, the Debtor must pay this Cure Amount to AT&T within ten (10) days of the entry of the Court's order on this opinion.

A separate order will be entered consistent with this memorandum opinion.

SIGNED: 4/28/05

**Harlin D. Hale**
**United States Bankruptcy Judge**

# EXHIBIT 12

Rec'd from Schelkens 5/12/08

# GLOBAL NAPS, INC.

Mettel
Attn: CABS Dispute
44 Wall Street
6th Floor
NY, NY 10005

emeschino@mettel.net

Re: BANs: 188AH755NH 188AE977NH 0334E357MA 188AE357NH 0334E976MA 188AE976NH 7677E977NY 0334H755MA 1962H755RI

To Whom It May Concern:

I am in receipt of the above referenced invoice(s). As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company to Global.**

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

GNAPs file date 12/5/06

# GLOBAL NAPS, INC.

September 11, 2006

Mettel
Attn: CABS Dispute
44 Wall Street
New York, NY 10005

Mettel@csscabs.com, emeschino@mettel.net

Re: BANs: 186AE975ME 8526E975NY 1962E975RI 191AE975VT
0334E975MA 7677E975NY 188AE975NH

To Whom It May Concern:

I am in receipt of the above referenced invoice(s). As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company to Global.

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

GNAPs file date: 8/5/06

# GLOBAL NAPS, INC.

Mettel
Attn: CABS Dispute
44 Wall Street
6th Floor
NY, NY 10005

emeschino@mettel.net

Re: BANs: 188AJ356NH 186AJ356ME 0334J356MA 7677D521NY 191AD521VT

To Whom It May Concern:

I am in receipt of the above referenced invoice(s). As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company to Global.**

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

GNAPs file date 6/5/07

# GLOBAL NAPS, INC.

Mettel
Attn: CABS Dispute
PO Box 1056
New York, NY 10268-1056

Mettel@cssoabs.com

Re: BANs: 556A5133MD 249A5133VA 76775133NY

To Whom It May Concern:

I am in receipt of the above referenced invoice(s). As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company to Global.**

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

GNAPs fl. ltr. 1/5/05

# GLOBAL NAPS, INC.

Mettel
Attn: CABS Dispute
PO Box 1056
New York, NY 10268-1056

Mettel@csscabs.com

Re: BAN: 59825133NJ
Invoice: 41035133-D-04340
Dated: 12-5-04

To Whom It May Concern:

I am in receipt of the above referenced invoice. As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company to Global.**

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

GNAPS file 59825133NJ, 12/5/04

# GLOBAL NAPS, INC.

Mettel
Attn: CABS Dispute
PO Box 1056
New York, NY 10268-1056

Mettel@csscabs.com

Re: BAN: 02425133PA
Invoice: 41065133-D-04249
Dated: 9-5-04

To Whom It May Concern:

I am in receipt of the above referenced invoice. As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company** to Global.

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

GNAPs file 02425133PA 9/5/04

# GLOBAL NAPS, INC.

Mettel
Attn: CABS Dispute
PO Box 1056
New York, NY 10268-1056

Mettel@csscabs.com

Re: BAN: 02405133FL
Invoice: 41015133-D-04249
Dated: 9-5-04

To Whom It May Concern:

I am in receipt of the above referenced invoice. As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company to Global.**

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

GNAPs fx 02405133FL 9/5/04

# GLOBAL NAPS, INC.

Mettel
Attn: CABS Dispute
PO Box 1056
New York, NY 10268-1056

Mettel@csscabs.com

Re: BAN: 02345133NY
Invoice: 41005133-D-04187
Dated: July 5, 2004

To Whom It May Concern:

I am in receipt of the above referenced invoice. As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company to Global.**

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

GNAPs file 02345133NY 7/5/04

# GLOBAL NAPS, INC.

Mettel
Attn: CABS Dispute
PO Box 1056
New York, NY 10268-1056

Mettel@csscabs.com

Re: BAN: 02345133NJ
Invoice: 41025133-D-04187
Dated: July 5, 2004

To Whom It May Concern:

I am in receipt of the above referenced invoice. As you are aware, our companies do not have an interconnection agreement governing the terms and conditions of exchanging telecommunications service. What you may not be aware of is that the traffic you deliver and receive from my company, Global NAPs, Inc., or its affiliates ("Global") and subsidiaries, is "information access traffic" As such, the intercarrier compensation controlling the traffic is subject to federal law, specifically the provisions delineated in the ISP Remand Order. Simply put, the ISP Remand Order provides for bill-and-keep on the traffic we exchange since we were not exchanging traffic prior to the effective date of the Order in 2001. Accordingly, the invoice and account are disputed in full. **Unless and until Global provides written correspondence to the contrary, please consider this letter as disputing all similar invoices from your company** to Global.

If you are not aware of the interplay of federal law and how it governs the exchange of traffic between our two companies, I will be glad to discuss this with you. Please don't hesitate to call me at 212-202-2100

Sincerely,

Robert J. Fox
Vice President – Industry Relations
Global NAPs, Inc.
24 Wayne Court
Northport, N.Y. 11768
Tel. 212-202-2100
Fax 212-202-2101
rfox@gnaps.com

CABS file 02345133NJ 7/5/04