UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Manhattan Telecommunications Corp.,
d/b/a Metropolitan Telecommunications,
a/k/a MetTel
44 Wall Street
6th Floor
New York, NY 10005

*Plaintiff,*


v.


**GLOBAL NAPS, INC.,**

*Defendant*

---

08 – CIV-3829 (Judge Rakoff)


**BRIEF OF DEFENDANT GLOBAL NAPS,
INC. IN OPPOSITION TO MOTION OF
PLAINTIFF METTEL FOR SUMMARY
JUDGMENT**


Joel Davidow (JD-4500)
KILE GOEKJIAN REED & MCMANUS, PLLC
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806


William J. Rooney, Jr. (WR-8317)
Jeffrey C. Melick (JM-1686)
89 Access Road, Suite B
Norwood, MA 02062
(781) 551-9956

*Counsel for Defendant*

## AUTHORITIES

### Cases

*Advamtel, LLC, et al. v. AT&T Corp.*, 118 F.Supp.2d 680 (E.D. Va. 2000) ........................... 4-5, 5

*All American Tel. Co. v. A.T.&T.*, 2008 WL 2876424 (S.D.N.Y. July 24, 2008) ........................... 8

*AT&T v. City of New York*, 83 F.3d 549 (2nd Cir. 1996).................................................................5

*Global NAPs, Inc. v. Verizon*, 454 F.3d 91 (2nd Cir. 2006) .............................................................8

*Verizon v. Global NAPs, Inc.*, 463 F.Supp.2d 330 (E.D.N.Y. 2007)........................................6, 7, 8

### Rules

47 CFR §69.5(b) ...............................................................................................................................8

### FCC Rulings

*In re Access Charge Reform*, 14 FCC Rcd 14221 (1999)................................................................5

*In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges*, FCC WC Docket No. 02-361, 19 FCC Rcd 7457 (2004)...............................................................................................................................................5

## I.    Introduction

Each side has moved for summary judgment, and this Court has set a three-brief schedule in which the first is the motion and support, the second is an opposition to the other side's motion, and the third, a reply brief, is a defense of the party's own motion.

For purposes of this opposition, Defendant Global NAPs, Inc. ("Global") cannot deny that MetTel is a telephone company with tariffs and customer/suppliers and that, if computers are accurate, some of the calls Global has forwarded for its customers have ultimately reached MetTel customers. Global's own motion for summary judgment relies primarily on affirmative defenses: as an intermediate traffic forwarder it is exempt from access charges and that the traffic it forwards is "enhanced" (*i.e.*, changed in form or content) and is thus exempt from the access fees paid by regular long-distance companies on regular telephone calls that have not been enhanced. We will return to these issues in our reply brief. Now, however, having deposed MetTel, we can show in this brief that MetTel is not entitled to compensation irrespective of the applicability of exemptions or, at least, that its claim, regardless of our affirmative defenses, would depend on material facts not yet established.

## II.    Plaintiff's Summary Judgment Motion Is Factually Deficient And Legally Flawed.

MetTel acknowledges that it never had a contract with Global, never received a request (oral or written) to terminate the traffic Global forwards, never was connected directly to Global, and may never have actually terminated any Global-forwarded traffic to its dial-tone customers in New York city or elsewhere. *See* Transcript, Dep. of David Aronow, Aug. 12, 2008, ("Aronow Tr.") at 5-6, 12-13. (Pertinent pages attached as Exhibit A.)

### A.    MetTel's theory of "constructive ordering" has been held to be a circumstantial evidence contention not suitable for summary judgment.

As noted above, MetTel admitted the following:

Q.    Has MetTel ever signed a contract of any kind with Global NAPs?
A.    Not that I'm aware of, no.
Q.    To your knowledge, has Global NAPs ever asked you directly in some form of communication to forward their traffic? Have you ever received a letter or phone call from Global NAPs?
A.    No, they did not.
Q.    Have you ever had a direct interconnection with Global NAPs?
A.    I don't believe so, no.

*See* Aronow Tr. at 5-6.

MetTel's claim must be based on the plain language of its interstate and/or intrastate/interLATA tariffs. Those tariffs state that they apply to "customers" who "subscribe" to them. *See* MetTel Tariff at 3 (attached as Exhibit B); *see also* Aronow Tr. at 26-27. Since, as noted, MetTel's 30(b)(6) deponent (and its trial counsel here) admitted that Global never "subscribed" to any such tariff, and did not directly connect to MetTel, its claim can only be made out pursuant to the legal doctrine of "constructive" subscription. MetTel now says as much, but that doctrine is not expressly pleaded in either of Plaintiff's two complaints.

Even if we assume that the doctrine of constructive ordering can be asserted even if clearly pleaded, the first question is whether establishing a constructive ordering cause of action requires a factual inquiry, preventing summary judgment. MetTel assumes not, but one case it cites, *Advamtel, LLC, et al. v. AT&T Corp.*, 118 F.Supp.2d 680 (E.D. Va. 2000), holds that such liability only adheres if the receiver of services (1) is *interconnected* in such a manner that it can expect to receive access services; (2) fails to take reasonable steps to prevent the receipt of access services; and (3) does in fact receive such services. *Id.* at 685 (citing *In re Access Charge Reform*, 14 FCC Rcd 14221 (1999) at ¶ 188). Here, Global is admittedly not directly interconnected to MetTel at all. Since Global's traffic routed to MetTel dial-tone customers is

2

sent over Verizon lines, MetTel's right to tariff such calls, and Global's right not to be double-billed, would have to be examined factually,[1] thus precluding summary judgment for MetTel.

In MetTel's only other constructive ordering case, *AT&T v. City of New York*, 83 F.3d 549 (2nd Cir. 1996), the Second Circuit reversed, rather than sustained, a grant of summary judgment to Plaintiff, holding that a jury must determine whether defendant was reasonable in not anticipating that certain traffic would go through it to plaintiff's end users. *Id.* at 555.

**B.    MetTel's case rests on alleged rights granted to it by Verizon, which are not yet either pleaded or proved.**

MetTel, through its president and counsel, Mr. Aronow, admits that Verizon, rather than MetTel, terminated all or most Global traffic that went to MetTel's dial-tone customers, but claims that since it paid for a lease of Verizon lines or acts as a Verizon reseller, it is entitled to intercarrier compensation from Global:

> Q.    Tell me how it happens.
> A.    Essentially what happens is this. It doesn't go from -- most of our traffic is on Verizon's network, we just lease the line from Verizon. So we're like a reseller but technically we're not. So the way it works, relatively straightforward, let's say -- let's say a SBC local customer in Texas somewhere wants to call a MetTel customer in New York City, let's say an LD carrier, okay, so the SBC bell company routes the local portion of the call, hand it off to their AT&T long distance affiliate, transport the call to New York, to a Verizon tandem, then Verizon will terminate the call to the end user. Because it's on Verizon's network, not on our network, we just lease the line from Verizon. So what happens is Verizon charges us a fee for handling traffic over that line, but we bill the access. So we'll get call records from Verizon, then we'll bill AT&T for that terminating access portion of the call. Now, to clarify we also have our own facilities, so some of the customers -- some of the calls will get routed actually through our switch at 75 Broad, and they'd be terminated to the customer. But the vast majority of customers are actually on Verizon's network.

*See* Aronow Tr. at 12-13. After this "explanation", the following dialog ensued:

---

[1]    Judge Ellis in *Advamtel* also joins other courts in dismissing unjust enrichment (quasi-contract) claims. 118 F.supp.2d. at 688 ("This quasi-contract theory is unpersuasive; it misconceives the scope of the filed-rate doctrine"). See Memorandum in Support of Defendant's Motion for Summary Judgment, Pt. IV.C at 14-15 ("Mem. in Support").

> Q.    Will you provide us after the deposition with a document which sets out that rate [between Verizon and MetTel]?
>
> A.    I have a problem with that, because I don't – have to review that with counsel. See, I'm not sure if I can disclose that document.

*See* Aronow Tr. at 15. If, as now appears, MetTel's case is based on rights allegedly assigned to it by Verizon, it has to plead and disclose the nature and limits of those rights, which it has not done. It did not plead that it is an assignee of Verizon's switched access fees, nor explain such in its statement of key facts. Global has not seen any paper setting out the alleged agreement.

## III.    Plaintiff Is Not Entitled To Summary Judgment, Or Any Judgment, Under Controlling Facts And Law.

In 2004, the FCC expressly noted that one reason it was studying intercarrier competition was to address *"the application of access charges to VoIP . . .* [as] *. . .* '[IP] telephony threatens to erode access revenues for LECs because *it is exempt from the access charges traditional long distance carriers must pay.'"*[2]    The FCC explained that it was mindful of "Congress' directive in section 230 'to foster and preserve the dynamic market for Internet-related services' and 'the strong federal interest in ensuring that regulation does nothing to impede the growth of the Internet – which has flourished under our 'hands off' regulatory approach – or the development of competition'", and noted in its footnote that "as an example of the Commission's 'hands off' regulatory approach, it exempted enhanced service providers (ESPs) from paying access charges to avoid imposing severe rate increases on ESPs and to avoid disrupting the industry segment."[3]

---

[2]    *In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges*, FCC WC Docket No. 02-361, 19 FCC Rcd 7457, ¶9 (2004) (quoting *Developing a Unified Intercarrier Compensation Regime*, FCC Docket No. 01-92, Notice of Proposed Rulemaking, 16 FCC Rcd 9610 (2001))(emphasis added).

[3]    *Id.* at par. 14 (inner citations omitted).

4

MetTel is an LEC and is angry that VoIP carriers like Global are exempt from paying it the access charges it sets out in its tariffs. MetTel views VoIP traffic as normal because, even if enhanced along its way, it arrives at MetTel in an traditional Time Division Multiplexing ("TDM") form. Nevertheless, MetTel's dissatisfaction with FCC rulings does not change the fact that Global's traffic is exempt from access charges! Plaintiff's quarrel is with the FCC and its rules. Suing an exempt carrier is not a proper way to vent.

In any event, it is also logical that Global should be exempt from MetTel's tariffs, not only because Global's traffic is enhanced, rather than standard, telecommunications, but also because Global is not a traditional long distance carrier. It has no traditional end-user customers, and it does not charge on a minute-of-use/toll basis.[4]  Global does not move calls from the caller's exchange area to the recipient's, but instead simply rents its switches and transport capacity to other carriers for a monthly fee that applies regardless of how much traffic it forwards or where that traffic goes.

MetTel's own tariff says that it applies to interexchange carriers and end-users. Global is neither. Further, as we pointed out in our initial brief, the FCC agrees with this analysis, having stated in one of its opinions that access charges cannot be used against intermediate carriers, which is exactly what Global is.[5]

MetTel claims that *Verizon v. Global NAPs, Inc.*, 463 F.Supp.2d 330 (E.D.N.Y. 2007) "controls" this case. MetTel's Memorandum of Law in Support of Summary Judgment ("MetTel Mem.") at 6. That case hardly applies, and then only due to a misunderstanding. The case contains no rulings on the VoIP exemption or the one for intermediate carriers.

---

[4]    Global's traffic terminating to MetTel is traffic received solely from Enhanced Service Providers ("ESPs"), which Global serves exclusively for outbound services, and not from traditional residences and businesses.

[5]    See *id.,* note 92 at 15, citing 47 C.F.R. §69.5(b); Mem. in Support, Pt. IV.A at 7.

Leaving aside whether Judge Vitaliano was correct to deny a motion based on the doctrine of primary jurisdiction in that case, his rationale is not applicable here, and was essentially omitted from MetTel's quotation and paraphrase. In fact, Judge Vitaliano ruled that he need not await the decision of the FCC on the regulatory structure for VoIP, because the case before him went off, in his view, on the contract ("ICA") between the parties. In his view, it was unnecessary to defer to any pending decisions by the FCC as to VoIP because:

> ...even if the FCC had made such a determination [*i.e.*, as to the "very nature" of VoIP], the parties would have been free to opt out of any such regulatory regime by a mutual nondiscriminatory arms length agreement.

463 F.Supp.2d at 342 (inner citations omitted). Thus, MetTel misuses case authority when it fails to point out to this Court that the parties here, unlike those in *Verizon v. Global NAPs*, do not have an ICA, or any contract. And while Judge Vitaliano mentioned the parties' unproductive trip to the FCC, the Verizon affidavit he cites reveals that the issues presented to the FCC then concerned reciprocal compensation, not access charges. *See id.* at 336-37; *see also* Declaration of Sherry A. Ingram, Sept. 20, 2004, filed in *Verizon v. Global NAPs, Inc., supra,* ¶8 at 3 ("As GNAPs described the gravamen of the dispute . . . Verizon owes Global for reciprocal compensation, and . . . Verizon refuses to pay. . .")(copy attached at Exhibit C).

MetTel also misreads the case when it quotes as relevant Judge Vitaliano's statement that "the FCC took a pass and sent them [*i.e.*, the parties to the case before him] packing." MetTel Mem. at 4, quoting 463 F.Supp.2d at 342; MetTel Mem. at 6 ("...the court concluded that it was required to resolve the dispute because the FCC made it clear that it was not going to resolve it"). Contrary to MetTel's clear implication, Judge Vitaliano did not reject Global's primary jurisdiction argument because of his perception that the FCC had declined to deal with a VoIP dispute.

For Judge Vitaliano, rather, the decisive point was that *interpreting and applying the ICA then before him* did not require FCC elaboration of an entire new regulatory regime for VoIP; and, that the FCC presumably knew and accepted that parties would negotiate and operate under ICAs dealing with VoIP *on an interim basis* pending conclusion of the several rulemaking dockets that Judge Vitaliano cited on the preceding page of his opinion. *See*, 463 F.Supp.2d at 341. None of that, of course, bears in the slightest on this case, where MetTel seeks application of its tariffs to an intermediate carrier that is simply not covered by the tariff, and with which it has no ICA or other contractual relationship (nor even direct interconnection).

Similarly, MetTel misstates Judge Pauley's recent decision in *All American Tel. Co. v. A.T.&T.*, 2008 WL 2876424 (S.D.N.Y. July 24, 2008), when it claims that he rejected a defense based on the claim that the traffic the CLECs were terminating there was VoIP. MetTel Mem. at 7. We have searched the report of Judge Pauley's order in vain for any mention of VoIP; in fact, no such contention was before the court, which found only that the traffic transferred there to the CLECs was covered by their filed tariffs. *Id.* at *2-3. The case deals with chat rooms that employ a standard telephony "long distance call", not a VoIP call. *Id.* at *1.

Furthermore, the inapplicability of those tariffs to an "intermediate" carrier" like Global was plainly not in issue in that case, where the defendant AT&T is the paradigmatic "interexchange carrier" within the meaning of the pertinent FCC regulation, 47 CFR §69.5(b): "Carrier's carrier charges shall be computed and assessed upon all interexchange carriers that use local exchange switching facilities for the provision of interstate or foreign telecommunications services." That, of course, is the precise provision cited by the FCC for the proposition that intermediate carriers like Global are exempt from access charges.[6]

---

[6]     *See* notes 2 and 4, *supra*.

Finally, MetTel's reference to the Second Circuit's decision in *Global NAPs, Inc. v. Verizon*, 454 F.3d 91 (2nd Cir. 2006), is as dismaying as it is irrelevant. It is irrelevant because the dispute was with a PUC, concerned FX (foreign exchange), which the court acknowledges was an ISP (dial-up internet) issue, which is not a VoIP issue. ISP goes from the PSTN to the Internet; VoIP goes from the Internet to whomever is called. It is dismaying that MetTel highlights a totally irrelevant case simply because Global fared badly in it for reasons not at all pertinent here. As set out in our initial brief, Global's litigation record in VoIP matters has been good, as has that of all VoIP providers opposing demands to pay the switched access tariff charge applied to traditional long-distance carriers. *See,* Mem. in Support, Pt. IV.A at 7-14.

## IV.    Conclusion

For the foregoing reasons, MetTel's motion for summary judgment should be denied.

Respectfully submitted,

Joel Davidow (JD-4500)
KILE GOEKJIAN REED & McMANUS, PLLC
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

8

# EXHIBIT A

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    MANHATTAN TELECOMMUNICATIONS )
     CORP. d/b/a METROPOLITAN     )
5    TELECOMMUNICATIONS, a/k/a    )
     METTEL                       )
6    44 Wall Street, 6th Floor    )
     New York, New York 10005,    )
7                    Plaintiff, )
                vs.              )    08-Civ-3829
8    GLOBAL NAPS, INC.,          )
                    Defendant.  )
9    --------------------------)

10

11

12                DEPOSITION OF DAVID ARONOW

13                   New York, New York

14                   August 12, 2008

15

16

17

18

19

20

21

22

23

24
     Reported by:
25   Siglinde Carretero

1

2              August 12, 2008

3              11:25 a.m.

4

5              Deposition of DAVID ARONOW, held at the

6      offices of Dreier, LLP, 499 Park Avenue, New

7      York, New York, pursuant to Notice, before

8      Siglinde Carretero, a Notary Public of the

9      State of New York.

10

11                      - oOo -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2   A P P E A R A N C E S:
 3
 4       METROPOLITAN COMMUNICATIONS
 5             44 Wall Street, 6th Floor
 6             New York, New York 10005
 7       BY:   DAVID ARONOW, ESQ.
 8
 9       KILE, GOEKJIAN, REED & McMANUS, PLLC
10       Attorneys for Defendant
11             1200 New Hampshire Avenue, N.W.
12             Suite 570
13             Washington, D.C. 20036
14       BY:   JOEL DAVIDOW, ESQ.
15
16       ALSO PRESENT:
17             JAMES SCHELTEMA
18
19                   - oOo -
20
21
22
23
24
25
```

1

2          IT IS HEREBY STIPULATED AND AGREED by and

3      between the attorneys for the respective

4      parties herein, that filing and sealing be and

5      the same hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED that

7      all objections, except as to the form of the

8      question, shall be reserved to the time of

9      trial.

10         IT IS FURTHER STIPULATED AND AGREED that

11     the within deposition may be sworn to and

12     signed before any officer authorized to

13     administer an oath, with the same force and

14     effect as if signed and sworn to before the

15     Court.

16

17                   - oOo -

18

19

20

21

22

23

24

25

```
 1
 2             D A V I D   A R O N O W        , called as a
 3             witness, having been duly sworn by the Notary
 4             Public, was examined and testified as follows:
 5     EXAMINATION BY:
 6     MR. DAVIDOW:
 7         Q.   State your full name.
 8         A.   David E. Aronow, A-R-O-N-O-W.
 9         Q.   Your residence?
10         A.   375 South End Avenue, apartment 15T, New
11     York, New York 10280.
12         Q.   By what company are you employed?
13         A.   MetTel.
14         Q.   What is your title at MetTel?
15         A.   President.
16         Q.   Are you also general counsel?
17         A.   You could say that.  There's not a formal
18     general counsel.  I'm an attorney, I do legal work
19     for the company.
20         Q.   You're appearing here, are you not,
21     pursuant to a 30(b)(6) to speak for the company?
22         A.   Correct.
23         Q.   Has MetTel ever signed a contract of any
24     kind with Global NAPS?
25         A.   Not that I'm aware of, no.
```

1                        Aronow

2        Q.    To your knowledge, has Global NAPS ever

3    asked you directly in some form of communication to

4    forward their traffic?

5              Have you ever received a letter or phone

6    call from Global NAPS?

7        A.    No, they did not.

8        Q.    Have you ever had a direct

9    interconnection with Global NAPS?

10       A.    I don't believe so, no.

11       Q.    Could you describe generally what is

12   MetTel's business?

13       A.    MetTel sells local and long distance

14   voice services and also data services.

15       Q.    Do you have what some of us call in the

16   industry dial tone customers?

17       A.    Yeah.

18       Q.    Would those be both individuals and

19   businesses?

20       A.    Yes.

21       Q.    Do you have some customers who are

22   literally a single individual?

23       A.    We do, actually.

24       Q.    You have some customers that are a

25   business?

1                          Aronow

2        A.    Absolutely.

3        Q.    The Acme Meat Company?

4        A.    Exactly.

5        Q.    So these customers, let's say I'm the

6   Acme Meat Company New York, I want telephone

7   service, I come to MetTel, what kind of deal do I do

8   with MetTel, do I sign a monthly contract or what?

9        A.    You could sign a longer term contract, or

10  you could just get regular rates, which would be a

11  month to month rates service.

12       Q.    So, if I'm the Acme Meat Company, I sign

13  a one-year contract with MetTel, then whether I send

14  calls or receive calls, I can continue to pay MetTel

15  some monthly rate for the totality of the service;

16  is that correct?

17       A.    Yes and no.  I mean, the way our rates

18  are structured, it's just like Verizon, there's a

19  fixed like charge, certain elements of service,

20  there's usage sensitive charges for calls to be

21  made.  So, if a customer makes more calls, he will

22  pay more for that usage.

23             But to answer your question, he will not

24  pay more because he's receiving more calls or less

25  calls.  His rate will not be impacted due to the

1                          Aronow

2    amount of calls he received.

3         Q.    Do you separate long distance service

4    from local, that is, does the customer choose, I

5    want just local or local and long distance?

6         A.    Yes, the customer chooses if he wants

7    just local or regional or long distance.

8         Q.    Do you have anything to do with cell

9    phones?

10        A.    We do.

11        Q.    In what sense?

12        A.    We sell Verizon wireless.

13        Q.    So if the customer wanted a cell phone in

14   addition to his land line, he could buy it from you?

15        A.    Absolutely.

16        Q.    If he wanted just a cell phone, he could

17   buy it from you?

18        A.    Yeah.  I mean, he could, although, you

19   know, we're not really going out to do that kind of

20   business.  We do it as part of a service where if

21   we're doing the land line for, let's say a law firm,

22   like this law firm, and they also wanted to service

23   the account by giving them Verizon wireless, because

24   they wanted wireless, we could do that.  We're not

25   actively focusing on wireless as a separate line so

1                           Aronow

2    much.

3         Q.     Would it be fair to state that your two

4    major sources of income would be income from your

5    subscribers, that is customers, and inter-carrier

6    compensation?  Do you have any other sources of

7    income other than subscriber payments and

8    inter-carrier compensation?

9         A.     No.

10        Q.     Those are the two?

11        A.     Those are it.

12        Q.     What percentage of your company's income

13   comes from subscriber revenue as opposed to

14   inter-carrier compensation?

15        A.     Inter-carrier compensation is, you know,

16   less than ten percent -- much less than ten percent

17   of revenue.  Not much less, but it's less.  It's

18   under ten percent approximately.

19        Q.     Your inter-carrier compensation is

20   entirely governed by tariffs, is it not, you have no

21   contract or any other means of carriers paying you,

22   except that you bill them under tariff?

23              Is Verizon an exception to that?

24        A.     There's a couple of exceptions.  I mean,

25   we have an agreement with Verizon that's

1                              Aronow

2      confidential regarding our basic voice service, and

3      in that -- that it deals with -- it deals with

4      inter-carrier compensation, but essentially for

5      purposes of this litigation, it's just very similar

6      to the way it was under the UNEP platform.

7                  Really hasn't changed, even though it's

8      by what they call commercial agreement, it's

9      basically the same structure.  And there's some

10     carriers where we have agreements for just, you

11     know, carrier compensation.

12     Q.    Let's say a person -- I'm sorry.

13                 Were you going to say any other contracts

14     you have besides with Verizon, is anyone else you

15     deal with outside of tariff, any other carrier?

16     A.    The only carrier that comes to mind is

17     AT&T.

18     Q.    There are some cities where they're a

19     major flow through carrier as opposed to Verizon, is

20     your relation with AT&T somewhat geographically

21     defined?

22     A.    Yes and no.  I mean, there's two parts of

23     AT&T.  There's long distance business, original AT&T

24     long distance business we bill access.  In the

25     course of last, you know, eight years we've had

1                              Aronow

2      various agreements with them for essentially billing

3      them access.  There were times in the industry where

4      AT&T was litigating access rates vigorously, and

5      rather than litigate with them, we entered into

6      agreements with them.

7                    There's another part of AT&T's business

8      which is really like a Bell company, SBC, AmerTech,

9      Bell South, areas where we have a -- where the -- so

10     the nature of the relationship is different for

11     those, you know, because we're dealing with them for

12     local service.  So it's a different kind of

13     relationship in those different areas.

14          Q.    Verizon now owns MCI, does it not?

15          A.    That's my understanding.

16          Q.    Does your computer tell you that you

17     receive any MCI traffic?

18          A.    Well --

19          Q.    To your knowledge, do you receive any MCI

20     traffic?

21          A.    I don't -- I don't know.  I don't know.

22     I wouldn't doubt it either way, but I don't know

23     personally.

24          Q.    Does your Verizon contract have rates

25     that are different than your tariff rates?  We'll go

1                              Aronow

2      the other way, that is, assuming that a lady in

3      Washington wants to call the Acme Meat Company,

4      which is your New York subscriber, and that call is

5      on the public switch, regular telephone call, comes

6      up to the New York loop, as I understand it, it then

7      would go to Verizon, and Verizon's computer would

8      note that it's your subscriber, they then sent it to

9      you, it eventually arrives at your subscriber

10     with --

11          A.    That's not how it happens.  I understand

12     what you're saying.

13          Q.    Tell me how it happens.

14          A.    Essentially what happens is this.  It

15     doesn't go from -- most of our traffic is on

16     Verizon's network, we just lease the line from

17     Verizon.  So we're like a reseller but technically

18     we're not.

19               So the way it works, relatively

20     straightforward, let's say -- let's say a SBC local

21     customer in Texas somewhere wants to call a MetTel

22     customer in New York City, let's say an LD carrier,

23     okay, so the SBC bell company routes the local

24     portion of the call, hand it off to their AT&T long

25     distance affiliate, transport the call to New York,

1                              Aronow

2       to a Verizon tandem, then Verizon will terminate the

3       call to the end user.  Because it's on Verizon's

4       network, not on our network, we just lease the line

5       from Verizon.

6              So what happens is Verizon charges us a

7       fee for handling traffic over that line, but we bill

8       the access.  So we'll get call records from Verizon,

9       then we'll bill AT&T for that terminating access

10      portion of the call.

11             Now, to clarify we also have our own

12      facilities, so some of the customers -- some of the

13      calls will get routed actually through our switch at

14      75 Broad, and they'd be terminated to the customer.

15      But the vast majority of customers are actually on

16      Verizon's network.

17             Does that answer your question, Joel?

18      Q.    I'll go on.

19      A.    I mean, partially.

20      Q.    When if we took one example here, the

21      call comes in and goes to Verizon, and again I'm

22      going to call it Acme Meat Company, it's easier for

23      me to keep thinking of that, we can stipulate that's

24      a New York customer of yours paying a yearly fee.

25      It goes to the Acme Meat Company, now then you say

```
 1                          Aronow
 2      you pay Verizon something for doing that, is that a
 3      minutes of use number?
 4           A.    What, for terminating the local portion
 5      of the call?
 6           Q.    Yeah.
 7           A.    We do pay them something.  We owe them
 8      something for that, yes.
 9           Q.    I didn't ask you something, I said when
10      you find out the something, do you know the
11      something by finding out the minutes the call took?
12      Is it a one-minute call, three-minute --
13           A.    Is it a per minute.
14           Q.    Yeah, that's what I'm asking.
15           A.    Yeah, they bill -- calculated per minute
16      I guess.
17           Q.    That's MOU in the industry, minutes of
18      use?
19           A.    Yeah, you can say minutes of use.
20           Q.    And those rates are usually in less than
21      a dime, like .028 or .04, some number of cents per
22      minute?
23           A.    What we're paying for is a switching
24      charge, so it's -- essentially the way it's
25      structured is the -- like for example, New York,
```

1                          Aronow

2    where not all, you know, good chunk of our business

3    is in, New York State Public Service Commission has

4    a rate proceeding, they determined what it costs

5    Verizon to switch a call, it's X, whatever X is, I

6    don't know what it is currently, so we already

7    leased the line, we're already paying Verizon for

8    that line on a monthly basis, you know, for use of

9    that line, so now all they're billing us for is the

10   switching portion for using their switch and maybe

11   some -- some training, some -- maybe some switch

12   fee, maybe a local switch fee and transit fee.

13            We're paying now essentially for what we

14   use, that's how -- that's how the arrangement works

15   for us.

16   RQ   Q.   Will you provide us after the deposition

17   with a document which sets out that rate?

18        A.   I have a problem with that, because I

19   don't -- have to review that with counsel.  See, I'm

20   not sure if I can disclose that document.

21        Q.   Well, we're, of course, happy to have you

22   designate it confidential, that's entirely up to you

23   to --

24        A.   I know if --

25            THE REPORTER:  One at a time, gentlemen.

```
 1                          Aronow
 2        A.    Way the document is structured, I'm not
 3   sure I can disclose it.  So, you know, I need to
 4   review it.  I'm not saying I won't do it, I'm saying
 5   I need to review it.
 6        Q.    What about a copy of the agreement itself
 7   with Verizon?
 8        A.    That's -- that's the issue, if I can
 9   disclose it.
10        Q.    Please let us know.
11        A.    Okay.
12        Q.    When a call from Texas is sent to the
13   Acme Meat Market through New York, is there a
14   difference between a Verizon access tandem and a
15   Verizon local switch, or are they the same?
16        A.    Is there a difference in respect to what?
17        Q.    Well, I'm saying would it go through
18   their access tandem or their local switch or both,
19   theoretically, a call from Texas to the Acme Meat
20   Market?
21        A.    It depends on a couple of things.  It
22   depends on who's handling -- who the IXC is, how
23   they're interconnected with Verizon.
24              For example, if it's AT&T that's the IXC,
25   that's handling the call, and they happen to have
```

1                          Aronow

2    direct office to the serving wire center of that

3    customer, then it's going to go to serving wire,

4    they're going to trunk right out.  Because they pay

5    less money doing that.  On the other hand, if it's

6    small, because AT&T, for example, has a lot of

7    direct end office trunkers, other carriers, smaller,

8    tend not to do end office trunking.  Quest, for

9    example, has lots of end office trunking.  Small.

10   Drop off the tandem and then Verizon terminates the

11   call from there.

12        Q.    Is it more expensive to do it that way?

13        A.    Yeah, but I don't get involved, because

14   that's the IXC's problem, the IXC is -- they -- they

15   save money.  I mean, I shouldn't say it's not my

16   problem.  I bill more depending where it's handed

17   off.  But that's why carriers like AT&T, for

18   example, would bill out a lot of end office

19   trunking, because they save money getting a lower

20   rate if they billed out end office trunking.

21             So it's not as significant as it once

22   was, but it's still a difference, and that's why I

23   guess they keep those facilities in place.

24        Q.    To your knowledge, does TBC have

25   customers in the New York local telephone area, the

1                         Aronow

2    New York LATA?

3         A.    Unless you send me the case -- I never

4    heard of TBC.  I don't know anything about it.  I

5    really don't know anything about it.

6         Q.    Okay.

7               If a carrier is in New York City --

8         A.    Yeah.

9         Q.    -- receives a call, there's a dial in by

10   a New York City customer and that New York City

11   customer wants to call the Acme Meat Company, so

12   that call starts in the New York LATA and it ends up

13   with the Acme Meat Company, you with me up to there?

14        A.    Okay.  Sounds reasonable.

15        Q.    Under your tariff, isn't it true they owe

16   nothing?

17              There's no carrier charge if a carrier in

18   New York with a New York customer sends you through

19   Verizon, for instance, a call that ends up at the

20   Acme Meat Company, so they're calling from three

21   blocks away Acme?

22        A.    It's two different phone companies

23   involved?

24        Q.    I'm assuming there is some phone

25   company --

```
 1                        Aronow
 2        A.    Now we've got to be clear.  If it's -- if
 3    a customer -- if one of my customers is calling
 4    another customer --
 5        Q.    I'm not talking an incoming call.
 6        A.    Incoming or out, doesn't make a
 7    difference.
 8              Look, it's very straightforward analysis,
 9    how it works --
10        Q.    Can we read the question back, would you
11    like here the --
12        A.    No, your question doesn't make sense,
13    that's why I'm trying to -- I'm trying to lay it out
14    for you.  So regardless of your question, I'm trying
15    to explain to you how it works.
16              Whenever a call is made in the same LATA,
17    the local access transport area, they have these
18    arrangements called reciprocal compensation, okay,
19    and so if a MetTel customer calls a Verizon
20    customer, there is a charge charged to me.  I got to
21    pay.  Verizon terminated that call, and vice-versa.
22    So when Verizon sends a call from one of its
23    customers to mine, they pay the reciprocal
24    compensation.  So whenever the call stays within the
25    LATA, if it involves two companies, okay, there is
```

1                           Aronow

2       -- there is an inter-carrier compensation.  That's

3       the way it is.

4              If it's MetTel and it's on Verizon's

5       facilities, we may have access leasing networks, we

6       got to pay on top of that.  We got to pay the

7       facility charges for using and whatever the rates

8       are for those charges.

9              So whenever there's a call made to or

10      from our customers, we're always paying.  All the

11      time.  In almost every scenario we pay.

12      Q.     Is that reciprocal rate 007?

13      A.     No.  No, our tariff right now's over a

14      penny a minute.  Our reciprocal compensation is over

15      a penny a minute.  It's not capped by anything.

16      That federal rate that you're talking about, the

17      007, has no bearing on the reciprocal compensation

18      rate in New York state.  It just doesn't apply.

19      Q.     Let me come back.

20             Question then is, for the moment, in

21      regard to the tariffs that you have sent us in this

22      case as being the relevant tariffs, do those tariffs

23      apply, those tariffs to call from New York City to

24      New York City?

25      A.     I sent you a whole bunch of tariffs.  I

1                        Aronow

2      sent federal access, the intra-state access, and --

3      and I hopefully sent you interconnection too for

4      local.  I don't know if you got it, though, so I got

5      to double check that.

6              But do they apply the local?  If there's

7      no agreement, it's a local call, it stays in the

8      LATA, we have no arrangement with anybody, no

9      agreement, then our local interconnection tariff

10     applies.

11         Q.   When you sued, did you sue under the

12     local interconnection agreement?  Isn't it true you

13     sued under inter-state and the tariff between LATAs?

14             I'm talking about your complaints in this

15     case.

16         A.   Well, I understand.

17             I don't really recall, sitting here

18     today, exactly what we said.

19             Read back the question.

20             (Record read.)

21         Q.   You did sue --

22         A.   Well, the question is -- depends on --

23     I'm not sure.  I believe we only -- I don't know if

24     we mentioned the local tariffs, we may not have, but

25     to the extent that you're claiming from your dispute

1                        Aronow

2    letter that traffic is ISP bound or whatever, then,

3    you know, you're claiming it.  If you're claiming

4    that -- you're claiming traffic is inherently

5    inter-state, if that's what you're claiming, then

6    the federal tariff allows inter-state access, tariff

7    applies.  That's my position.

8            If it's not, if you're saying a different

9    position, then I'm going to say the local tariff,

10   whichever tariff applies, depending on the nature of

11   the call, is what I'm going to say applies.

12           I don't know -- I don't know as we sit

13   here today.  I'm sure there's different kinds of

14   traffic that you send us, some of the traffic is

15   inter-state, intra-state, okay, some might be local.

16   I don't know until I look through the data.  I don't

17   know for sure.

18           To the extent there's all that traffic,

19   usually there is, always a little bit of everything

20   in all the traffic, then those apply.  Those tariffs

21   apply, the appropriate tariff.

22       Q.    When you calculated the money you claim,

23   that money was based on an application of two types

24   of tariff, the inter-state and the intra-LATA?

25       A.    I didn't calculate anything.

1                              Aronow

2        Q.    When you came to 264,000, your people,

3    your computer, arrived at that by using two types of

4    tariffs, did they not?

5        A.    I don't -- I don't know.  We out-source

6    access, and they -- what they do is they have the

7    the tariff rates for inter-state and intra-state

8    access, and I believe they apply those rates to the

9    -- depending on what they perceive the call to be.

10   If they say that the call appears to be inter-state,

11   they apply that rate; if it's intra-state, they --

12   they apply the appropriate rate, depending on how

13   they rate the traffic, but that's my understanding

14   of what they do, that's the business.

15       Q.    Is it fair to state the method that's

16   used in determining these rates that you used in

17   this lawsuit is based on the reading of area codes?

18       A.    I don't know exactly what CDG does,

19   that's who we use CDG.

20       Q.    Well, my point is this, this computer

21   that does it for you, if you terminate a call, and

22   it looks at something, and let's say it looks at

23   that the call begins with the 312 area code, which

24   is Chicago, and if it sees 312, then the rate that

25   it automatically applies is your inter-state rate;

1                          Aronow

2    is that correct?

3          A.    I think that's generally how it works.

4          Q.    If it says the Buffalo LATA, the three

5    digit number, then it applies a rate for a call

6    between two areas of New York state?

7          A.    There's only one fatal flaw in your

8    assumption, and that is in these numbers, in the

9    signalling stuff, they have -- they have a thing

10   called local routing number, and the local routing

11   number is something that was created when the

12   government compelled local portability, for just

13   this problem.

14          So when -- let's say my number, my home

15   phone number is 212-677-5002, I move to LA, Los

16   Angeles, I can take my phone number with me.

17          How does a local carrier figure out where

18   I'm calling from?  Well, they assign a local routing

19   number, NPANXX, it's a term of art in the trade, so

20   they align the local routing number with that, will

21   identify it as being from Los Angeles, for example.

22   So when the -- when the billing company bills, they

23   don't look at the phone number, they look at the

24   local routing number, that's how they bill, not off

25   the NPANXX of the actual phone number.

1                              Aronow

2          Q.     If I sign up for Vonage, Vonage gives me

3     a number, does Vonage sign up for a local routing

4     number?

5          A.     Every time an NPANXX is issued, it's a

6     question of whether the carrier who's handling

7     traffic wants to give that information.  If the

8     carrier withholds that information, then -- then it

9     withholds that information, it's not following the

10    -- you know, the TelCom Act.  They're supposed to

11    give local routing numbers.

12               There's a routing number assigned to each

13    NPANXX, where the number is sitting.

14         Q.     Is Vonage a carrier?

15         A.     Yes, Vonage is a carrier.

16         Q.     What facility does it to use to carry

17    things?

18         A.     I think it uses various telecom

19    equipment.

20         Q.     You're sure?

21         A.     Yes.

22         Q.     Does Vonage sell software?

23         A.     Not that I know of.

24         Q.     You mean Vonage wouldn't send me a disk

25    to put in my computer?

```
 1                          Aronow
 2       A.    I have no idea what they'd send you.
 3       Q.    All right, then, you have no idea.
 4             MR. DAVIDOW:  We'll mark this as
 5       Defendant's Exhibit 1,
 6             (Defendant's Exhibit 1, document,
 7       marked for identification, as of this date.)
 8       Q.    Would you look at Defendant's Exhibit 1.
 9             (Witness reviews document.)
10       A.    Okay.
11       Q.    We requested the tariffs that were
12  relevant to this case, is this one of the ones that
13  you sent us?
14       A.    Looks like it, yeah.
15       Q.    Some definitions in it, correct?
16       A.    Yes.
17       Q.    Would you look at the definition of
18  customer.
19             (Witness reviews document.)
20       A.    Yes, I'm looking at it.
21       Q.    Would you read it for a moment?
22       A.    Out loud or --
23       Q.    Yeah, read it out loud.
24       A.    "Any individual, partnership,
25  association, corporation or other entity which
```

1                           Aronow
2      subscribes to the services offered under this tariff
3      includes both inter exchange carries and users."
4           Q.    What does subscriber mean in that
5      sentence?
6           A.    I don't know.
7           Q.    Can you tell me where and when Global
8      subscribed to your service?
9           A.    Yeah, I can.
10          Q.    Yeah?
11          A.    Do you want me to tell you?
12          Q.    Yes.
13          A.    Well, there's a -- it's not on -- not on
14     -- local concept called constructive ordering, which
15     I allude to in my papers, motion for summary
16     judgment, but in addition, you may have missed it,
17     but it exists, it's tariff.  It's not -- it may not
18     be in the -- in the federal tariff, but it's in a
19     lot of state -- inter-state access tariffs.
20               So the concept is when you send traffic
21     to us and you have the ability to not, you know, you
22     can take reasonable steps to stop it, you owe us
23     money.  You ordered it.
24          Q.    If I understood your last answer, you're
25     saying that in a tariff, which we don't have in

1                          Aronow

2       front of us, you say that the customer definition is

3       somewhat more precise, it includes people who

4       actually subscribe and people who you view as

5       constructively -- what you told me is there is a

6       different tariff which focuses on this directly?

7            A.     Some of our tariffs include the -- the

8       concept or definition of constructive ordering.

9       Some include it; some don't.

10           Q.     One of the ones you sent us, you can't

11      find it in that tariff?

12           A.     Regardless of whether it's in the tariff,

13      we're taking the position that in -- in the Second

14      Circuit, it's the law when you do that.  There's

15      enough cases in this circuit that say when you --

16      what Global NAPS did, you're constructively ordering

17      services.  It's a legal issue.  So, going through

18      the facts about it, you know, I don't know, what

19      point that is.

20           Q.     Well, I'll make my own decisions on that.

21           A.     Okay.

22           Q.     Now, do you contend that when we forward

23      traffic -- first of all, do you accept, do you

24      accept the fact that Global has no end user

25      customers, that is, the person who made the phone

1                          Aronow

2    call?

3         A.    It doesn't matter to me.

4         Q.    I didn't ask you if it mattered --

5         A.    Accept it or not is not an issue in this

6    case.

7         Q.    I'm sorry, for purposes of our

8    discussion, are you prepared to accept that Global

9    has no personal telephone dial tone customers?

10              To the best you know, Global has none

11   relevant to this case?

12        A.    I believe that the contracts that you

13   submitted are really that the other carriers not

14   handing off traffic to you, that you're terminating

15   that -- that traffic into the public switch

16   telephone network for a fee.   That's my

17   understanding.

18              Whether, you know, whether, you know,

19   you don't have a direct relationship with end users,

20   I don't -- I don't really dispute that.

21        Q.    Is it possible that when Global receives

22   -- Global opens the switch, in a sense, and

23   electronic signals come in and they go out, and is

24   it -- is it possible that Global doesn't know

25   itself, if you asked it today, what were the

1                           Aronow

2      telephone numbers that went in and what are the

3      telephone numbers that went out?

4           A.    Well, what I know is this, Global's

5      getting paid a lot of money to terminate calls into

6      the PSTN.  Rather than discriminate against anybody,

7      all the traffic coming across its network, it's like

8      you said, it's opening space, it's letting it go

9      right through.  It's making money off it, it's

10     paying me nothing for that.  So from our standpoint,

11     what we're trying to do, we're simply trying to pay

12     for terminating traffic.  Just like if you charge

13     for origination or local termination.  That's all

14     we're trying to do, the same exact thing, that's

15     what this says, what this is about.  It has nothing

16     to do with anything else.

17          Q.    Well, I was asking a factual question.

18                I'm saying you don't have any knowledge,

19     do you, about what Global actually knows about the

20     originating telephone call or the ending telephone

21     call?

22          A.    I have no knowledge.

23          Q.    All right.  Assuming that Vonage began

24     the phone call in question, there's some phone call

25     that ended up at the Acme Meat Market, you with me

```
  1                          Aronow

  2    up to there?

  3         A.    Guess so, yeah.

  4         Q.    Began at Vonage and then it went to

  5    TransCom or Global, Verizon, your customer.

  6               Is it your position that you have the

  7    same claim against Vonage to pay you or TransCom or

  8    only Global?

  9         A.    Is it my position -- you're asking my

 10    legal position?

 11               Well, I don't think -- I object to that

 12    question.  I don't think that's a proper question at

 13    deposition.

 14               I'm not going to answer a legal question

 15    at deposition.

 16         Q.    Have you ever asked Vonage to pay you

 17    anything?

 18         A.    No.

 19         Q.    Do you recall any letters, telephone

 20    calls --

 21         A.    I don't recall that, no.

 22         Q.    Have you ever asked any of the four

 23    people who supplied Global to pay you anything,

 24    Intero or TransCom or Tom Partners?

 25               MR. SCHELTEMA:  That's confidential.
```

1                          Aronow

2        Q.    I'm sorry, that's confidential.

3        A.    That's why I didn't ask that, because I

4   didn't know who they were.

5        Q.    Will you be billing future --

6        A.    No -- well, I'm going to sue them

7   shortly.  I'll serve them a summons and complaint.

8   Because I didn't know that they existed, and I

9   didn't know that Global NAPS was taking the position

10  that because they're an intermediate carrier, I

11  can't collect against them.  So in light of that

12  position, I will sue them, and they will be a party

13  to this case, and the way I view it, I think

14  someone, maybe you -- maybe Global NAPS will be

15  successful under the theory it's an intermediate

16  carrier, and I should go, according to you, I should

17  go to TransCom and all the other guys.  It's

18  possible that's right, and if that's the case, I

19  will file suit against them shortly, if you're right

20  on that legal position, then hopefully I will win

21  against the customers.  And if you're wrong about

22  that, then judgment's against you.  So it's -- I

23  don't know how -- how the law will work this out.

24       Q.    Prior to filing this lawsuit, had you

25  ever read TBC's decision of New York --

1                              Aronow

2        A.    No.

3        Q.    Did you then receive the TBC decision

4   because we sent it to you in a letter from Global

5   asking you to give up the lawsuit?

6        A.    I believe those were the circumstances

7   and facts.

8        Q.    The TBC opinion states, does it not, that

9   TBC was precluded from applying inter-state tariffs

10  to Global because the FCC has not yet decided

11  whether the traffic is subject to such access rates,

12  do you remember that?

13       A.    What I remember TBC saying is that they

14  -- they believed -- I forgot the precise reasons of

15  why they believe it, it didn't have jurisdiction to

16  impose a particular rate or allow TBC to charge its

17  rate.  What he did say was that they -- that TBC had

18  a right to turn off Global NAPS if they couldn't

19  enter into an agreement.

20       Q.    Well --

21       A.    That to me was what was necessary to

22  their decision.  That was the key decision that said

23  if you do not agree, you, Global NAPS, do not agree

24  to pay the amount that TBC agrees to, that TBC can

25  shut you off.

```
 1                          Aronow
 2         Q.     Let's take it one step at a time.
 3                Talking about count one of your
 4     complaint, count one is a count for inter-state
 5     tariffs, isn't it?
 6         A.     I believe so.
 7         Q.     And I asked you the question whether
 8     after you read the TBC, you understood them to say
 9     that the PFC said the BCW, whatever they do
10     collecting full inter-state tariffs at this time,
11     was not one of the things that was on --
12         A.     I think you're wrong.  I think they said
13     -- they said that TBC couldn't bill them, or at
14     least they believe TBC couldn't, you know, bill them
15     for intra-state access, because the traffic was
16     inherently inter-state.
17                So, under that theory, if PFC is right,
18     then I can bill you under my tariffs.
19                So, that's my deal.
20         Q.     That's how you read what the case says?
21         A.     Well, I know from what I read, it did not
22     involve inter-state tariffs, it involved intra-state
23     tariffs which are different.
24         Q.     Well, that is what you think you
25     understood?
```

1                           Aronow

2          A.     I may be wrong, but that's my

3    understanding.

4          Q.     I understand.

5                 Did you, in deciding to go forward with

6    the case, you decided to go forward with a count

7    one and two, which were counts for tariff rates,

8    that your count three is unjust enrichment, leave

9    that for a moment, but having read TBC, you did

10   decide to keep counts one and two in the case,

11   correct?

12         A.     I object to the question.

13                You know, I filed a motion for summary

14   judgment, and I cited the case from the Southern

15   District of New York which involved a traffic, and

16   the federal judge ruled that the access tariffs

17   apply because of the nature of the service that was

18   covered by the tariffs, as described in the tariffs.

19                That's exactly what I'm suing you for.

20                So that's my basis for summary judgment.

21                Now, my legal position is that my

22   position is not frivolous.  Further, my legal

23   position is that your motion for sanctions, the

24   motion for sanctions, not your position, but the

25   motion for sanctions is frivolous.

```
 1                          Aronow
 2         Q.    I haven't made a motion for sanctions.
 3         A.    You put in a request if I don't withdraw
 4    the complaint --
 5         Q.    That's not a motion.
 6         A.    When you make your motion.
 7         Q.    If I make it.
 8         A.    Well, it's predicated -- that document is
 9    a predicate to a motion.
10         A.    When --
11         Q.    When --
12         A.    When you make your motion for sanctions,
13    when there's a motion, I'll move for sanctions, let
14    me know that right now.
15         Q.    Thank you.
16               THE REPORTER:  One at a time, gentlemen.
17         Q.    In regard to count two, which was the one
18    for intra-state tariffs, you did say a moment ago
19    that you understood the New York PFC to say the
20    inter-state tariffs would not lie because the VoIP
21    is inherently inter-state, is that it?
22         A.    I believe that's what they said, yeah.
23         Q.    All right.  But then you continue with
24    count two, did you do it on the basis of any
25    contrary authority?
```

1                        Aronow

2           A.    Yes, I just told you, I based it on the

3    All American case.

4           Q.    The All American case you believe is

5    contrary to the TBC case?

6           A.    Yeah, that's right.  I think it is.  I

7    think All American stood for that if you have a

8    tariff and it's between your case, which Judge

9    Vitali said in the Eastern District and what Judge

10   Pauley said in the Southern District, it's very

11   clear that they recognize that the issue you raised,

12   your defense to payment, is up in the air.  That

13   they're going to proceed like Verizon.  So, judgment

14   one way or the other, win, loss or draw, and that

15   under All American, the carrier, such as MetTel, has

16   a right to charge under their tariffs, because the

17   service provider under the tariff is as described in

18   the tariff.

19           Now, you may win now, I may win

20   ultimately, or you may win ultimately, but I think

21   that the issue is not a clear-cut way such that you

22   can make a motion for sanctions.  What I do think is

23   the issue is clear-cut way enough that since you may

24   -- you may not win, that -- that my argument is not

25   frivolous, that your motion for sanctions is

```
 1                         Aronow

 2   frivolous.

 3        Q.    Do you find any words in the All American

 4   decision whether VoIP is inter-state?

 5        A.    I don't recall.  I don't recall off the

 6   top of my head.

 7        Q.    But that's important to your theory,

 8   isn't it, that All American goes against the TBC

 9   conclusion that VoIP is inter-state?

10        A.    Whether -- whether the traffic is voice

11   over IP or some other information access, I don't

12   think changes the nature of the decision.  Because

13   their defense is essentially the same defense as

14   yours, AT&T's, and they lost.  So, I think that

15   you're in a similar position, because your traffic

16   is -- there's no material difference between the

17   traffic in All American and your traffic, and since

18   AT&T was forced to pay access charges, I think you

19   will too.

20        Q.    When you decided to file this case, did

21   you vet the case with any other outside lawyer, a

22   lawyer who is not in your company?

23        A.    I don't recall.

24        Q.    You don't recall doing it?

25        A.    I don't recall not doing it.
```

```
 1                          Aronow
 2         Q.    Do you possess an opinion from another
 3    law firm stating that your causes of action are
 4    viable?
 5         A.    I never asked anyone for a formal opinion
 6    letter.
 7         Q.    Do you have any record of any other law
 8    firm billing you for advice about whether this case
 9    was viable?
10         A.    I didn't speak to lawyers mentioning that
11    I was going to go sue Global NAPS.  I did speak to
12    lawyers asking about this issue.  I did.  I just
13    don't recall exactly when, but I did ask several
14    different lawyers on several different occasions.
15    Exactly when it was, I don't recall, but I
16    definitely spoke to other attorneys.
17         Q.    Do you have responses, written
18    responses  --
19         A.    No, it was informal, I just called them.
20         Q.    After Global NAPS wrote you a letter
21    stating that they believed your case was untenable,
22    did you then ask for the advice of a lawyer outside?
23         A.    As I said, I spoke to lawyers, several of
24    them.
25         Q.    After you received --
```

1                              Aronow

2          A.     I don't recall whether it was before or

3     after.   But it was definitely during this time

4     frame.   And I did mention Global NAPS per se, or I

5     may have, but I asked them about the issues involved

6     in this case, the issues you raise.   And actually

7     that's when I -- that's when I found out about the

8     All American case, by speaking to our counsel.   And

9     they told me, not that I have to disclose this, they

10    said this is the All American case, very similar to

11    your case, you know, you should take look at it, so

12    I did.

13               MR. DAVIDOW:   I'd like to take a break

14         for five minutes.

15               (Recess taken.)

16    BY MR. DAVIDOW:

17         Q.     What's an inter-exchange carrier?

18         A.     It's a carrier that transports traffic

19    from one LATA to another.   From one exchange to

20    another, usually it's one LATA to another.

21         Q.     Is Global an inter-exchange carrier, in

22    your view?

23         A.     I would think so.

24         Q.     Why is that?

25         A.     Because just from the nature of what it

1                           Aronow

2    does, traffic predominantly is being transported

3    across LATA boundaries.

4         Q.    Isn't an inter-exchange carrier a carrier

5    that takes the traffic from the customer's LATA to

6    the recipient's LATA?

7         A.    You know, that's my understanding, is

8    inter-exchange carrier is a carrier that transports

9    traffic from one LATA another.

10              You know, there might have been some

11   decision 15 years ago that required what you said, I

12   don't know.  But that's my understanding.

13        Q.    Do inter-exchange carriers charge tolls?

14        A.    What do you mean by toll?  What's a toll?

15        Q.    Minutes of use that they charge by either

16   the number of phone calls or the number of minutes

17   in the phone call, that they measure, tolling means

18   measuring, that they measure how many calls are

19   going, how many --

20        A.    Some do, sure.

21        Q.    Do you know any that don't?

22        A.    Global NAPS doesn't.

23        Q.    So, if being a toll carrier is part of

24   being an inter-exchange carrier, Global isn't it

25   one?

1                            Aronow

2          A.    I never said that.  There's no foundation

3     to your question.  Objection.

4          Q.    Your count three is for unjust

5     enrichment, do you remember that count three of your

6     complaint?

7          A.    Right.

8          Q.    You may recall that we sent you certain

9     cases, such as in our summary judgment motion, that

10    say that unjust enrichment doesn't work in regard to

11    a tariff case, telecommunication tariff case, do you

12    remember reading that case, the one from South

13    Dakota?

14         A.    I don't recall the case from South

15    Dakota.

16         Q.    All right.  At the time you sued us on

17    unjust enrichment, do you know of a case in which a

18    telecommunications carrier who had tariffs was able

19    to get an unjust enrichment victory?

20         A.    All I know is this, from my practice in

21    law, all I know is that unjust enrichment implies in

22    the absence of any contractual arrangement.  So

23    usually it's pled in the alternative.  So that if

24    for whatever reason the contract fails or it was

25    deemed there was never any kind of relationship,

1                          Aronow

2    that you're entitled to reimbursement.

3              There may be some cases that you cited

4    that concern circumstances that say that unjust

5    enrichment doesn't apply when there's a tariff and

6    that makes sense because tariff is a contract, and

7    when there's a contract, there's no possibility of

8    unjust enrichment.

9              So it's unjust enrichment as the

10   alternative theory in the absence of an agreement or

11   contract.

12        Q.   In regard to your fourth claim for

13   account stated, do you recall that?

14        A.   I do.

15        Q.   There is an issue in this case about

16   whether account stated can be liable if there was

17   some form of protest by the customer saying I don't

18   owe you money, remember that issue?

19        A.   I do recall that.

20        Q.   It's an issue?

21        A.   Yes.

22        Q.   I read perhaps that your position is that

23   account stated is okay if the protest is of a legal

24   nature as opposed to a factual nature, that is you

25   indicated that you feel you can go ahead with the

1                           Aronow

2    account stated because although we protested, Global

3    protested, they protested on legal rather than

4    factual grounds, do you remember that being your

5    position?

6         A.    Yes.

7         Q.    Did you have any cases that say that,

8    that say it is account stated, even with protest if

9    the protest is legal rather than factual?  Did you

10   find any cases that defend your theory?

11        A.    I don't recall.  I don't know.

12             MR. DAVIDOW:  I have no further

13        questions.

14             MR. SCHELTEMA:  Reiterate counsel's

15        request for Verizon agreement.

16        Q.    We're going to formally request that

17   form.

18        A.    I got to look it over.

19

20             (Time noted:  12:30 p.m.)

21

22

23

24

25

```
 1
 2                    A C K N O W L E D G M E N T
 3
 4    STATE OF NEW YORK )
 5                      ) ss. :
 6    COUNTY OF         )
 7
 8              I,          DAVID ARONOW         , hereby
 9         certify that I have read the transcript of my
10         testimony taken under oath in my deposition of
11         August 12, 2008; that the transcript is a
12         true, complete and correct record of my
13         testimony, and that the answers on the record
14         as given by me are true and correct.
15
16                                     DAVID ARONOW
17
18    Subscribed and sworn
19    to before me on this the
20         Day of          , 2008.
21
22    Notary Public, State of New York
23
24
25
```

```
1
2                    C E R T I F I C A T E
3
4    STATE OF NEW YORK )
5                     ) ss. :
6    COUNTY OF QUEENS )
7
8            I, Siglinde Carretero, a Notary Public
9        within and for the State of New York, do
10       hereby certify:
11           That     DAVID ARONOW     , the witness
12       whose deposition is hereinbefore set forth, was
13       duly sworn by me and that such deposition is a
14       true record of the testimony given by the
15       witness.
16           I further certify that I am not related
17       to any of the parties to this action by blood
18       or marriage, and that I am in no way interested
19       in the outcome of this matter.
20           IN WITNESS WHEREOF, I have hereunto set
21       my hand      14th day of August       , 2008.
22
23                                      Siglinde Carretero
24
25
```

# EXHIBIT B

Manhattan Telecommunications Corporation
d/b/a Metropolitan Telecommunications Corporation a/k/a MetTel

Tariff F.C.C. No. 1 – Access
Preface
Original Page No. 1

## MANHATTAN TELECOMMUNICATIONS CORPORATION
### d/b/a Metropolitan Telecommunications Corporation a/k/a MetTel

### ACCESS SERVICES

REGULATIONS, RATES AND SCHEDULE OF INTERSTATE CHARGES

Applying To The Provision of Access Services Outside a
Local Access and Transport Area ( LATA )
for Connection to Interstate Communications Facilities
For Customers Within the Operating Territory of
Manhattan Telecommunications Corporation
d/b/a Metropolitan Telecommunications Corporation a/k/a MetTel

Issued: June 16, 2006
Issued by:        Andoni Economou, Vice President
                  44 Wall Street, 6th Floor
                  New York, New York  10005

Effective:  June 17, 2006

**Manhattan Telecommunications Corporation**
**d/b/a Metropolitan Telecommunications Corporation a/k/a MetTel**

Tariff F.C.C. No. 1 – Access
Section 1
Original Page No. 1

## CONTENTS

## SECTION 1 - GENERAL REGULATIONS

PAGE

1.1    APPLICATION OF TARIFF...................................................................................... 2

1.2    DEFINITIONS....................................................................................................... 3

1.3    UNDERTAKING OF THE COMPANY...................................................................... 6

Issued:  June 16, 2006
Issued by:        Andoni Economou, Vice President
                  44 Wall Street, 6th Floor
                  New York, New York  10005

Effective:  June 17, 2006

**Manhattan Telecommunications Corporation**
**d/b/a Metropolitan Telecommunications Corporation a/k/a MetTel**

Tariff F.C.C. No. 1 – Access
Section 1
Original Page No. 2

## SECTION 1 - GENERAL REGULATIONS

### 1.1    APPLICATION OF TARIFF

This tariff contains regulations, rates and charges applicable to the provision of access services by Manhattan Telecommunications Corporation to Customers.

The provision of service by the Company as set forth in this tariff does not constitute a joint undertaking with the Customer for the furnishing of any service.

Issued:  June 16, 2006
Issued by:        Andoni Economou, Vice President
                  44 Wall Street, 6th Floor
                  New York, New York  10005

Effective:  June 17, 2006

Manhattan Telecommunications Corporation
d/b/a Metropolitan Telecommunications Corporation a/k/a MetTel

Tariff F.C.C. No. 1 – Access
Section 1
Original Page No. 3

## SECTION 1 - GENERAL REGULATIONS (CONT'D)

1.2    DEFINITIONS

ACCESS CODE - Denotes a uniform code assigned by the Company to an individual Customer. The code has the form 10XXX, 10XXXXX, 950-0XXX, or 950-1XXX.

ACCESS MINUTES - Denotes that usage of exchange facilities in Interstate service for the purpose of calculating chargeable usage.

ACCESS TANDEM - A switching system that provides a traffic concentration and distribution function for originating or terminating traffic between end offices and a Customer's premises.

ANSWER SUPERVISION - The transmission of the switch trunk equipment supervisory signal (off-hook or on-hook) to the Customer's point of termination as an indication that the called party has answered or disconnected.

CALL - A Customer attempt for which the complete address code is provided to the service end office.

CARRIER OR COMMON CARRIER - Any individual, partnership, association, corporation or other entity engaged in Interstate communication for hire by wire or radio between two or more exchanges.

CENTRAL OFFICE - A local Company switching system where exchange service customer station loops are terminated for purposes of interconnection to each other and to trunks.

CHANNEL - A communications path between two or more points of termination.

COMMUNICATIONS SYSTEM - Denotes channels and other facilities which are capable of communications between terminal equipment provided by other than the Company.

COMPANY – Manhattan Telecommunications Corporation d/b/a Metropolitan Telecommunications Corporation a/k/a MetTel.

CUSTOMER - Any individual, partnership, association, corporation or other entity which subscribes to the services offered under this tariff, including both Interexchange Carriers and End Users.

CUSTOMER DESIGNATED PREMISES - The premises specified by the Customer for termination of Access Services.

DUAL TONE MULTIFREQUENCY (DTMF) - Tone signaling, also known as touch tone signaling.

END OFFICE SWITCH - A Company switching system where exchange service customer station loops are terminated for purposes of interconnection to each other and to trunks.

Issued: June 16, 2006
Issued by:    Andoni Economou, Vice President
              44 Wall Street, 6th Floor
              New York, New York 10005

Effective: June 17, 2006

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VERIZON NEW YORK INC., VERIZON NEW ENGLAND INC., VERIZON NEW JERSEY INC., VERIZON PENNSYLVANIA INC., VERIZON MARYLAND INC., VERIZON WASHINGTON, DC INC., and VERIZON VIRGINIA INC.,<br><br>          *Plaintiffs*<br><br>-against-<br><br>GLOBAL NAPS, INC., GLOBAL NAPs VIRGINIA, INC. and GLOBAL NAPS SOUTH, INC.<br><br>          *Defendants.* | 03 CV 5073 (FB)(RML)<br><br>DECLARATION OF<br>SHERRY A. INGRAM |

Pursuant to 28 U.S.C. § 1746, SHERRY A. INGRAM, ESQ., under penalty of perjury, hereby declares:

1.    I am Assistant General Counsel, Federal Regulatory, for Verizon. I provide this declaration in opposition to defendants' motion to dismiss this proceeding. In particular, I wish to address GNAPs' contention that the subject matter of this action is under consideration by the Federal Communications Commission ("FCC") in a proceeding GNAPs alleges it commenced against plaintiffs there. The issue of the validity of the tariffed charges Verizon seeks to collect through this action is not before the FCC in the alleged "proceeding" or in any other form. Indeed, contrary to GNAPs' representations to the Court, there is no binding or formal "proceeding" before the FCC at all that would resolve this dispute. As such, this Court can and should exercise its jurisdiction over this action.

2.    My job responsibilities include management and oversight of

enforcement proceedings brought by competitive local exchange carriers before the Federal Communications Commission. In this capacity, I have been personally involved with and had oversight of the mediation between Verizon and GNAPs that GNAPs claims gives the FCC primary jurisdiction of this case.

3.    GNAPs has complained that Verizon's withholding of monies for intercarrier compensation for ISP-bound traffic as a set-off for other charges GNAPs owes Verizon, including charges for reciprocal compensation GNAPs owed Verizon in different jurisdictions, was improper.

4.    On July 28, 2003, GNAPs attempted to file with the FCC pursuant to 47 CFR 51.720 et. seq. a formal complaint against Verizon concerning Verizon's practice of withholding payments for intercarrier compensation for ISP-bound traffic as set-offs against GNAPs' debts that were not for intercarrier compensation for ISP-bound trafffic. GNAPs' purported "complaint" was rejected by the FCC because it did not comply with the FCC's rules for filing formal complaints. A true and complete copy of the purported "complaint" is attached hereto as Exhibit 1.

5.    After a meeting with the staff, GNAPs agreed to mediate instead of pursuing its formal complaint.

6.    To facilitate mediation before the FCC, the FCC allowed GNAPs to use its defectively filed formal complaint as a mediation statement and required Verizon to respond with its own mediation statement.  Verizon filed its non-binding mediation statement in response on September 10, 2003. A true and complete copy of Verizon's mediation statement (without its exhibits) is annexed

2

hereto as Exhibit 2.

7.    As in any mediation, the competing mediation statements frame the

issues in dispute.   The parties' mediations statements here demonstrate that,

contrary to GNAPs' representation to the Court, the mediation and settlement

negotiations facilitated by the FCC concerned not the validity of any tariffed

charges, but whether or not Verizon had the right to set-off revenues for

Intercarrier compensation for ISP-bound traffic against any other debts owed to it

by GNAPs.

8.    As GNAPs described the gravamen of the dispute:

[W]e have made repeatedly clear . . . our position is that Verizon
has made use of self-help without regard to its contractual
obligation to deny Global just and due compensation. Negotiations
between the companies have revolved around two main themes:
(1) Verizon owes Global for reciprocal compensation, and, (2)
Verizon refuses to pay because it asserts there is a common law
right of set-off irrespective of its contract which it believes apply.
There seems to be no dispute that Verizon owed Global reciprocal
compensation. **What is at issue is whether Verizon may
unilaterally set off dispute sums from the entire Verizon
footprint without regard to the dispute resolution mechanisms
in the applicable interconnection agreements, against the
intercarrier compensation payments due to Global . . . .**

Exh. 1, p.2 (emphasis added).

9.    Verizon joined issue on exactly this point, as demonstrated by the

opening of the argument section of its own mediation statement:

GNAPs' complaint is based on the proposition that, no matter how
much GNAPs' may owe Verizon for facilities charges under
Verizon's tariff and the parties' interconnection agreement, Verizon
is obligated to continue to pay GNAPs intercarrier compensation for
ISP-bound traffic originated on Verizon's network.  GNAPs is
wrong. Whether this issue is governed by federal common law or
by state rules of decision, Verizon has a right to withhold payments
due to GNAPs on the basis that GNAPs has failed to pay Verizon

3

amounts due to Verizon. [fn omitted]  The doctrines of recoupment and set-off recognize the fundamental inequity of forcing a first party to pay money to a second party when the second party in turn owes money to the first.  In such circumstances, the first party is not required to pay the money, but may withhold it; all claims can then be litigated in a single action and the parties' respective debts settled.

Exh. 2, p. 3.

10.    On or about September 18, 2003, the first and only meeting in the voluntary, non-binding mediation took place. At that meeting, Verizon raised, *inter alia*, questions as to the FCC's jurisdiction to hear and resolve the set-off issue in any capacity, whether official or unofficial.  Verizon's point was, given that the issues were outside the FCC's purview altogether, it might be improper for the FCC to be involved even in the settlement discussions.

11.    In response to these concerns, the FCC staff required  the parties to file written submissions on the jurisdictional issue. The parties submitted their responses on jurisdiction on October 27, 2003. True and complete copies of the Verizon and GNAPs jurisdictional submissions are annexed hereto as Exhibits 3 and 4, respectively.

12.    As the parties' submissions again demonstrate, at no time was the FCC asked, in any capacity, to pass on the validity of the tariffed charges at issue here.

13.    The parties have had no further mediation sessions with the FCC on this issue.  Indeed, there have been no meetings, talks, sessions or writings in the settlement process in almost a year.  In sum, each of GNAPs' central characterizations of the dispute resolution is incorrect:  There is and never was

4

an FCC proceeding; rather there was a voluntary, non-binding mediation. This unofficial mediation concerned Verizon's right of set off, not the validity of the tariffed charges, which is the gravamen of Verizon's complaint before this Court. Furthermore, because the proceeding before the FCC is mediation and not a formal complaint, any "decision" the FCC might reach is non-binding. Even if GNAPs had raised the validity of the charges during the mediation, there would still have been no FCC "proceeding" concerning that issue. Indeed, in order for GNAPs to have had the validity of the charges decided by the FCC, GNAPs would have been required to file a new complaint and begin a separate proceeding, which it never did.

14.    I swear under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

Dated:  September 20, 2004
        Arlington, Virginia

Sherry A. Ingram, Esq.

6