UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

Manhattan Telecommunications Corp.,
d/b/a Metropolitan Telecommunications,
a/k/a MetTel
44 Wall Street, 6th Floor,
New York, NY 10005

        Plaintiff

    v.

Global Naps, Inc,

        Defendant.
------------------------------------------------------------X

Index No.: 08 Civ 3829
         (JSR)

REPLY
MEMORANDUM OF LAW
IN SUPPORT OF
SUMMARY JUDGMENT

David Aronow, Esq. (DA 2026)
President and Counsel
MetTel
44 Wall Street, 6th Floor
New York, New York 10005
(212) 607-2003

To
Joel Davidow, Esq. (JD-4500)
Kile Goekijan Ree & McManus, PLLC
Attorney for defendant
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

Table of Authorities

AT&T Corp. v. Iowa Util. Bd., 525 U.S. 366 (1999)          Page 5

Advamtel v. AT&T, 118 F.Supp.2d 680 (ED Va. 2000)          Page 3 and 5

The affidavits and "evidence" that Global Naps submits in opposition to MetTel's motion for summary judgment do not raise a *genuine* material issue of fact requiring a trial. The Court should apply the controlling law to this case and upon doing so, should enter judgment in favor of MetTel.

In its answering memorandum, Global Naps combines two issues into one, namely whether *vel non* MetTel can obtain summary judgment based on the constructive ordering doctrine and whether Global Naps raises a genuine issue of material fact regarding its attorney's new claim on double billing.

Global Naps infers that the constructive ordering doctrine must be pleaded and that it is not susceptible to the grant of summary judgment. See Defendant's answering memorandum at page 2. Besides there being no support for this argument, this assertion misperceives what the doctrine is. The constructive ordering doctrine is not a new theory of liability to recover against the defendant (i.e, breach of contract or filed rate doctrine, etc.). It is a legal response to Global Naps' feigned defense that it never ordered the service or that there was no agreement for the service. Under the constructive ordering doctrine, whether there was an agreement or whether Global Naps ordered the service may be inferred as a matter of law in certain circumstances although sometimes there may be a factual dispute about the inference. Either way, it is not an alternate theory of liability and that is why it is not required to be in the complaint. Furthermore, if the facts supporting the doctrine are not in dispute there is no reason to require a trial. I submit that is the case here.

Global Naps cites Advamtel v. AT&T, 118 F.Supp. 2d 680, to support its position that there is automatically a fact issue when a carrier tries to demonstrate the existence of

an agreement or ordering of service inferred by law. In that case, AT&T claimed and pointed to facts demonstrating that it did take steps to avoid receiving the services from Advamtel, which could preclude the court from inferring an agreement in law. That Court held that a trial was required to resolve the factual dispute. However, this case is different. Global Naps provides *no evidence of any kind* regarding what steps it took to prevent it from receiving the services. That is because it took none. Therefore, it is clear that no trial is required on the issue of constructive ordering.

On the contrary, Global Naps is interconnected locally with Verizon. As such, it knows that any calls that are destined for customers carried by local carriers other than Verizon are going to be routed to such carriers. This arrangement is spelled out in detail in the Global Naps-Verizon interconnection agreement at page 68-69, section 12 entitled tandem transit traffic. See Exhibit A. There, the agreement clearly indicates that Verizon will route traffic destined for other CLECs and Global Naps will pay for that service. Accordingly, Global Naps knew that it was indirectly interconnected with MetTel and traffic would be routed to MetTel end users to receive phone calls. Rather than demonstrating that they it tried to prevent receipt of the service, Global Naps' documentary evidence establishes the opposite.

Remarkably, in its dispute letter refusing to pay, Global Naps never disputed retention of the services or that access charges do not apply when a LEC completes the local portion of a long distance call. Rather, it only raised a legal defense based on, essentially, a claim of a change of law, first regarding the FCC's April 2001 ISP Remand Order and now, the VoIP issue. Global Naps' prior course of conduct fails to establish any attempt to avoid retention of the services.

Rather, Global Naps' other papers demonstrate that it purposefully did nothing to prevent receipt of the services. That is because Global Naps claims in this case it is entitled to receive the access services for free because the traffic is VoIP. That is why it knowingly failed to do anything to prevent receipt of the services. Accordingly, its feigned argument that there is some factual dispute surrounding the constructive ordering doctrine is completely without merit. On the contrary there is no factual dispute and the Court should find as a matter of law that Global Naps constructively ordered the service from MetTel because 1) Global Naps was interconnected with MetTel, 2) it took no steps to prevent receipt of the services and 3) it admits it received the services. Advamtel v. AT&T, 118 F.Supp. 2d 680, at 685.

Global Naps' attorney alludes to the fact that *he* thinks that Global Naps might be subject to double billing. See defendant's memorandum at page 3. Although that claim fails to raise a fact issue because the attorney's statement is gratuitous, I nevertheless submit the affidavit of Aizik Leibovitch, the Chief Technology Officer of MetTel which eliminates any such claim. See Exhibit B.

Global Naps tries to raise another doubt about MetTel's ability to collect access charges. Global Naps' attorney points to the fact that MetTel leases lines from Verizon to provide local service. He claims that by failing to allege and prove that we lease network elements we have failed to make out a prima facie case. See defendant's answering memorandum at page 3. However, Global Naps offers no rational explanation or support for this claim. As a matter of federal law, CLECs are entitled to lease available unbundled network elements from the ILEC at cost based rates: that is how CLEC's provide service. See AT&T Corp. v. Iowa Util. Bd., 525 U.S. 366, 371 (1999) (Under the

Act, an ILEC must share its network with its competitors; this includes the right to lease elements of the incumbent's network on an unbundled basis). Thus, it is no surprise to any carrier, that every CLEC or nearly every CLEC must lease some elements from the ILEC to provide service. Indeed Global Naps does so itself and it entered into an interconnection agreement with Verizon which allows it do just that.

Importantly, Global Naps does not dispute that we are the legitimate lessees of the lines. Although Counsel, while deposing me, seems interested to know what we pay for those services, it is unclear how that could affect the outcome of this case. Whether we make or lose money on the service would not change our ability to obtain payment for services rendered. It is unclear why this issue should give Global Naps any basis to avoid payment for services rendered. This is a feigned issue as opposed to a real issue in the case.

Global Naps claims that we are angry at them because they "are exempt from paying the access charges in our tariffs. . . ." See defendant's answering memorandum at page 5. No one here is angry at Global Naps. It is our business to collect the charges for access services that are subject to our tariff. Their statement about MetTel being angry is a gratuitous distraction from the object of this case.

Furthermore, Global Naps has a history of avoiding payment of access charges on various theories. This includes their trip to the Second Circuit Court of Appeals with Verizon. Global Naps tries to distinguish that fact pattern from this case. They note that the disputed traffic there involved Dial Up ISP service and the traffic was going in the other direction. However, the Second Circuit Court of Appeals made one thing very clear, to wit, Global Naps tried to avoid paying access charges by disguising traffic as local

when it was really long distance through the use of virtual NXXs. They were unsuccessful. This Court should not let them succeed here by trying to disguise regular long distance traffic as VoIP and having us terminate it for free. They are simply trying to avoid payment to us while they are being paid for our service.

Moreover, Verizon is currently suing Global Naps for well over 100 million dollars in the Eastern District of New York in front of Judge Vitaliano.[1] Contrary to Global Naps' claim, that case is not limited to only a contract dispute. Verizon is suing Global Naps in its first claim for access charges based on their tariff. Counsel says that I am somehow misusing that case. I disagree. Furthermore, Judge Vitaliano made the following statement which I submit clearly applies to this case:

> Ultimately, Verizon is correct: at its essence the dispute is a billing dispute. There is no reason to wait for Godot or the adoption of a regulatory scheme for VoIP traffic by the FCC. The determination of disputed contractual obligations is well within the conventional experience of the district court.
>
>   This point dovetails well in applying the second and fourth prong of the test. Although the FCC is quite appropriately concerned with creating a uniform scheme to regulate VoIP traffic going forward, when the parties brought to the FCC their contractual dispute arising out of the VoIP traffic that they were actually handing off to each other every day, Cmplt. At ¶ 36, the FCC took a pass and sent them packing. See Ingram Aff. in Opposition to Motion to Dismiss at ¶¶ 4-5, 13. It was a response that is most instructive. Obviously, the FCC had to be well aware of the existence of substantial VoIP traffic in the telecommunications marketplace otherwise it would not be pondering overall regulation. Equally obvious, the FCC had to be aware also that the existing VoIP traffic was moving at someone's expense. The fact that neither on the complaint of Global nor in any other proceeding referred to us by the parties has the FCC deemed it necessary to intervene to upset compensation schemes involving such traffic agreed to by the carriers, see, e.g., In re Vonage Holding Corp., 19 F.C.C.R. at 22,404, leads to the inescapable conclusion that the FCC is in the interim deferring to the existing intercarrier agreements as controlling such

---

[1] Importantly, Verizon alleged there that Global Naps was removing funds from the corporate entities without consideration in violation of the Debtor Creditor Law of New York, inter alia. At his deposition, Mr. Scheltema acknowledged that monies were being taken out of the corporation without consideration.

billing issues and has left for courts or arbitration to resolve any contractual disputes about VoIP traffic arising out of them.

Above, Judge Vitaliano ruled that until the FCC creates a new regulatory framework for VoIP, the FCC's actions demonstrate that it is leaving the parties with their existing compensation schemes intact. Here, Global Naps has been constructively ordering services from us for years and has made no attempt to prevent receipt of the services. It does this because it is being paid to complete calls on the public switched telephone network and it is utilizing MetTel, among others, to do so. Therefore in accordance with Judge Vitaliano's decision Global Naps is liable under our tariffs, even if the traffic was really VoIP because that is the pre-existing compensation scheme between the parties. Just because Global Naps failed to pay access charges in the past to MetTel does not change the fact that it was obligated to pay at such time. Accordingly, I respectfully submit that MetTel has established entitlement to judgment as a matter of law.

Dated: New York, New York
September 4, 2008

Respectfully submitted,

David Aronow, Esq. (DA 2026)
President and Counsel
MetTel
44 Wall Street, 6th Floor
New York, New York 10005
(212) 607-2003

To
Joel Davidow, Esq. (JD-4500)
Kile Goekijan Ree & McManus, PLLC
Attorney for defendant
1200 New Hampshire Avenue NW
Suite 570
Washington, DC 20036
(202) 263-0806

        11.3.1.2    provide an appropriate EMI record to GNAPs to facilitate billing to the IXC; and

        11.3.1.3    bill the IXC the Verizon query charge associated with the call and any other applicable Verizon charges.

    11.3.2    to Verizon or another LEC that is a toll free service access code service provider in the LATA, Verizon shall:

        11.3.2.1    query the call and route the call to the appropriate LEC toll free service access code service provider; and

        11.3.2.2    provide an appropriate EMI record to GNAPs; to facilitate billing to the LEC toll free service access code service provider; and

        11.3.2.3    bill the LEC toll free service access code service provider the query charge associated with the call and any other applicable Verizon charges.

  11.4    Verizon will not direct untranslated toll free service access code call to GNAPs.

## 12. Tandem Transit Traffic

  12.1    As used in this Section 12, Tandem Transit Traffic is Telephone Exchange Service traffic that originates on GNAPs's network, and is transported through a Verizon Tandem to the Central Office of a CLEC, ILEC other than Verizon, Commercial Mobile Radio Service (CMRS) carrier, or other LEC, that subtends the relevant Verizon Tandem to which GNAPs delivers such traffic. Neither the originating nor terminating customer is a Customer of Verizon. Subtending Central Offices shall be determined in accordance with and as identified in the Local Exchange Routing Guide (LERG). Switched Exchange Access Service traffic is not Tandem Transit Traffic.

  12.2    Tandem Transit Traffic Service provides GNAPs with the transport of Tandem Transit Traffic as provided below.

  12.3    Tandem Transit Traffic may be routed over the Interconnection Trunks described in Sections 2 through 6. GNAPs shall deliver each Tandem Transit Traffic call to Verizon with CCS and the appropriate Transactional Capabilities Application Part ("TCAP") message to facilitate full interoperability of CLASS Features and billing functions.

  12.4    GNAPs shall exercise its best efforts to enter into a reciprocal Telephone Exchange Service traffic arrangement (either via written agreement or mutual Tariffs) with any CLEC, ILEC, CMRS carrier, or other LEC, to which it delivers Telephone Exchange Service traffic that transits Verizon's Tandem Office. If GNAPs does not enter into and provide notice to Verizon of the above referenced arrangement within 180 days of the initial traffic exchange with relevant third party carriers, then Verizon may, at its sole discretion, terminate Tandem Transit Service at anytime upon thirty (30) days written notice to GNAPs.

  12.5    GNAPs shall pay Verizon for Transit Service that GNAPs originates at the rate specified in the Pricing Attachment, plus any additional charges or costs the receiving CLEC, ILEC , CMRS carrier, or other LEC, imposes or levies on Verizon for the delivery or termination of such traffic, including any Switched Exchange Access Service charges.

VZ-GNAPS-NY-ICA (Contract)

12.6   Verizon will not provide Tandem Transit Traffic Service for Tandem Transit Traffic to be delivered to a CLEC, ILEC, CMRS carrier, or other LEC, if the volume of Tandem Transit Traffic to be delivered to that carrier exceeds one (1) DS1 level volume of calls.

12.7   If or when a third party carrier's Central Office subtends a GNAPs Central Office, then GNAPs shall offer to Verizon a service arrangement equivalent to or the same as Tandem Transit Service provided by Verizon to GNAPs as defined in this Section 12 such that Verizon may terminate calls to a Central Office of a CLEC, ILEC, CMRS carrier, or other LEC, that subtends a GNAPs Central Office ("Reciprocal Tandem Transit Service"). GNAPs shall offer such Reciprocal Transit Service arrangements under terms and conditions no less favorable than those provided in this Section 12.

12.8   Neither Party shall take any actions to prevent the other Party from entering into a direct and reciprocal traffic exchange agreement with any carrier to which it originates, or from which it terminates, traffic.

12.9   When GNAPs originates traffic in the same local calling area to an ITC or such traffic is terminated to GNAPs by ITC, the terms and conditions set forth in Verizon's NYPSC No.8 Tariff, as amended from time to time, will apply.

## 13. Number Resources, Rate Center Areas and Routing Points

13.1   Nothing in this Agreement shall be construed to limit or otherwise adversely affect in any manner either Party's right to employ or to request and be assigned any Central Office Codes ("NXX") pursuant to the Central Office Code Assignment Guidelines and any relevant FCC or Commission orders, as may be amended from time to time, or to establish, by Tariff or otherwise, Rate Center Areas and Routing Points corresponding to such NXX codes.

13.2   It shall be the responsibility of each Party to program and update its own switches and network systems pursuant to information provided on ASRs as well as the LERG in order to recognize and route traffic to the other Party's assigned NXX codes. Except as expressly set forth in this Agreement, neither Party shall impose any fees or charges whatsoever on the other Party for such activities.

13.3   Unless otherwise required by Commission order, the Rate Center Areas will be the same for each Party. During the term of this Agreement, GNAPs shall adopt the Rate Center Area and Rate Center Points that the Commission has approved for Verizon within the LATA and Tandem serving area.

13.4   GNAPs will also designate a Routing Point for each assigned NXX code. GNAPs shall designate one location for each Rate Center Area in which the GNAPs has established NXX code(s) as the Routing Point for the NPA-NXXs associated with that Rate Center Area, and such Routing Point shall be within the same LATA as the Rate Center Area but not necessarily within the Rate Center Area itself. Unless specified otherwise, calls to subsequent NXXs of GNAPs will be routed in the same manner as calls to GNAPs's initial NXXs.

13.5   Notwithstanding anything to the contrary contained herein, nothing in this Agreement is intended, and nothing in this Agreement shall be construed, to in any way constrain GNAPs's choices regarding the size of the local calling area(s) that GNAPs may establish for its Customers, which local calling areas may be larger than, smaller than, or identical to Verizon's local calling areas.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

Manhattan Telecommunications Corp.,            Index No.: 08 civ 3829
d/b/a Metropolitan Telecommunications,                  (JSR)
a/k/a MetTel
44 Wall Street, 6th Floor,
New York, NY 10005,                               AFFIDAVIT

           Plaintiff

     v.

Global Naps, Inc.

           Defendant.
-------------------------------------------------------------X

COUNTY OF NEW YORK
                         ss:
STATE OF NEW YORK

AIZIK LEIBOVITCH, being duly sworn, deposes and says:

        1.      I am the Chief Technology Officer for MetTel. I have been so for over 10 years. I am fully familiar with MetTel's billing. I am also familiar with the industry standard call record layout used by the industry players including all of the Incumbent Local Exchange Carriers such as Verizon, Bell South, Southwestern Bell, etc. I am also familiar with ordering and supporting the customer ("OSS").

        2.      MetTel's primary business is providing local telephone service. An important part of such service, if not the most important part, is billing our end users and carrier customers. In the ordinary course, we bill all carriers that we provide local access for their long distance calls.

3. When MetTel makes a sale to switch a local customer to MetTel, it sends an electronic message to the incumbent local exchange carrier ("ILEC") to convert the customer to MetTel. In response the ILEC automatically in its switch records the carrier change. Later when that customer makes or receives phone calls the ILEC telephone switch records all of the pertinent call information. As part of the record keeping function, the ILEC prepares call records for all Competitive Local Exchange Carriers ("CLEC") including MetTel in the industry standard format. The ILEC forwards the call records relevant to a particular CLEC's end users in the ordinary course of its business. In the ordinary course of MetTel's business, MetTel takes the information from the call records and prepares bills. I have witnessed and experienced this business practice for over a decade. It is standard in the trade.

4. In the industry standard call records delivered, the ILEC populates data fields which, among other things, identify the originating and terminating carriers by operating company number ("OCN"). I have reviewed some random call records involving calls coming from Global Naps and terminating to MetTel customers. In each instance the terminating carrier OCN was identified by MetTel's OCN and not Verizon's OCN. Therefore, there is no factual basis to conclude that both Verizon and MetTel have billed for the same call.

5. The allegation by the attorney for Global Naps claiming that there is some doubt as to whether Global Naps is being "double billed" is pure unsubstantiated speculation. That type of problem is avoided by the information retained in the industry standard call records by Verizon and other ILECs with identifying information such as the terminating OCN. Indeed, if the terminating OCN was populated with Verizon's

OCN, Verizon would not send it to us. I know this because, I have reviewed many call records over the years and Verizon and other ILECs do not send us such call records.

_____
AIZIK LEIBOVITCH

Sworn before me this
3rd day of September, 2008

_____
Notary Public

Winnie Lee
Notary Public, State of New York
No. 01LE6152185
Qualified in Queens County
Commission Expires August 28, 2010