```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- x
MANHATTAN TELECOMMUNICATIONS CORP.,      :
                                         :
                Plaintiff,               :   08 Civ. 3829 (JSR)
                                         :
           -v-                           :   FINDINGS OF FACT AND
                                         :   CONCLUSIONS OF LAW
GLOBAL NAPS, INC.,                       :
                                         :
                Defendant.               :
---------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

On September 8-10, 2009, the Court conducted a three-day bench trial of this controversy. The parties submitted post-trial memoranda in late September and early October 2009, as well as supplemental letter briefs earlier this month. The following constitutes the Court's findings of fact and conclusions of law resulting from that trial.[1]

This action arises out of the complicated legal tangle resulting from the interconnection between traditional telephone service providers and providers of Voice over Internet Protocol ("VoIP"), exacerbated by the years-long failure of the Federal Communications Commission ("FCC") to act in this area, despite soliciting multiple rounds of comments on proposed rule-making. See, e.g., Proposed Rule, 73 Fed. Reg. 66821 (Nov. 12, 2008). Plaintiff Manhattan Telecommunications Corp. ("MetTel") is duly certificated

---

[1] At the trial, the Court heard testimony from eleven live witnesses and admitted eighteen exhibits into evidence, some of which were voluminous records.

and licensed as a telephone service provider by the FCC and by more than ten states.  Pretrial Consent Order ¶¶ 1-2.  It has effective tariffs for intra- and interstate access on file with, respectively, the relevant state public service commissions and the FCC.  Id.; see also Pl. Exs. 1, 2.[2]  From February 2001 through the present, defendant Global NAPs, Inc. ("Global"), a telecommunications carrier, delivered traffic originated by its customers to the Verizon switch; some of that traffic was ultimately destined for MetTel subscribers' phone numbers, for which MetTel provided access services.  Pretrial Consent Order ¶¶ 3-5.  MetTel invoiced Global for its access services pursuant to its filed tariffs, but Global has not paid any of the charges, claiming that the traffic is VoIP and is not subject to access charges.  Id. ¶¶ 4, 7-8.  Although Global has an Interconnection Agreement ("ICA") with Verizon,[3] MetTel and Global do not have any agreement between themselves and their networks are not directly interconnected.  Id. ¶¶ 3, 9-10; see also Tr. at 103-04.

---

[2] "Pl. Ex." refers to plaintiff's trial exhibits; "Def. Ex." refers to defendant's trial exhibits; and "Tr." refers to the trial transcript.

[3] Defendant contends as a threshold matter that MetTel lacks standing to pursue its claims because MetTel has no rights under Global's ICA with Verizon.  See Def. Post-Trial Br. at 3-5.  However, the argument is without merit.  MetTel brings its claims pursuant to its filed tariffs, or in the alternative, in equity for unjust enrichment; it does not bring its claims pursuant to any contract, including the Global-Verizon ICA.

MetTel has three remaining claims against Global, seeking recovery for breach of federal tariffs and breach of state tariffs, or, in the alternative, unjust enrichment. For the reasons explained below, the Court finds that Global is liable to MetTel on the unjust enrichment claim.

All voice traffic received by MetTel for termination to its subscribers is handled through a format known as time division multiplexing ("TDM"). Tr. at 105-06. Calls that begin in internet protocol are converted to TDM in protocol conversion. See Tr. at 141-42. Calls that begin in TDM may also be switched to internet protocol and back again; as explained by witness Gregory Eccles of Convergent Networks, equipment (that is produced by companies such as his) enables traffic to be switched between traditional voice traffic and internet protocol. Tr. at 263. Thus, from MetTel's perspective, all the traffic it receives is the same, regardless of whether it began in internet protocol. Nor do customers perceive a difference between traditional and VoIP calls. See, e.g., Tr. at 267.

MetTel has billed Global according to its filed federal and state tariffs, using the call detail records provided daily to it by Verizon for calls that cross the leased Verizon network. Calls are classified as intrastate or interstate based on the geographic area corresponding to the originating and terminating telephone numbers. However, it is undisputed that MetTel does not receive origin information on some of the calls that it terminates. See, e.g., Tr.

3

at 72.  For such calls, if the customer does not provide MetTel with a breakdown of its calls' origination, MetTel bills under its percentage-of-interstate-usage ("PIU") default rule, at 50% interstate, 50% intrastate tariff rates.  See Tr. at 48-50.  Global challenges the bills on a number of related grounds.  In essence, Global disputes the application of intrastate rates to its calls, including the application of MetTel's PIU, and the application of any tariff at all to its VoIP calls.

     The evidence reflects that use of telephone numbers to determine the geographic correspondence of calls is seriously flawed in the context of mobile phones and VoIP calls.  For example, VoIP subscribers may select the area code of their phone numbers regardless of where the subscribers are actually located; and VoIP providers such as Broad Voice make no effort to determine the location of their customers vis-a-vis the selected phone numbers' geographic assignments.  Tr. at 238, 249-50.  Some of Global's biggest customers, including Vonage and Broad Voice, are VoIP providers whose calls do not begin in TDM.  See, e.g., Tr. at 241, 343-44; see also, Pl. Exs. 7-10 (Global customer contracts).  However, some of the traffic routed to Global by its customers begins in TDM.  See, e.g., Tr. at 361.  Jeff Noack, Global's Director of Network Operations, testified that he had observed that some calls classified as "local" by MetTel had, in fact, originated from a VoIP provider or were otherwise routed through an enhanced service

provider. Tr. at 224. It is thus clear to the Court that while neither party has been able to identify the protocol source of the calls at issue, a significant number are likely to be VoIP calls that defy the accuracy of the telephone number-based billing system.

The FCC, although failing to resolve the relevant issues that fall within its authority, has made statements that complicate the issues before the Court. The FCC has preempted state regulation of VoIP services as interfering with "important federal objectives," thus effectively declaring VoIP to be jurisdictionally interstate. In re Vonage Holdings Corp., FCC 04-267, 2004 WL 2601194, at *16 (F.C.C. Nov. 12, 2004); see also Vonage Holdings Corp. v. Nebraska Public Service Comm'n, 564 F.3d 900 (8th Cir. 2009) (finding preemption of state regulation of VoIP calls). Moreover, the FCC has clarified that so-called information services, unlike telecommunications services, are not subject to access charges under Title II of the Communications Act of 1934, as amended by the Telecommunications Act of 1996. See, e.g., In re Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges, WC Docket No. 02-361, FCC 04-97, ¶¶ 4-6 (Apr. 21, 2004). The FCC has thus far "not classified interconnected VoIP service as a telecommunications service or information service as those terms are defined in the Act." In re IP-Enabled Services, 24 FCC Reg. 6039, 6043 n.21 (May 13, 2009). Against this backdrop are a host of conflicting court and state

5

regulatory rulings that have held, inter alia, that access charges are not applicable to VoIP calls and that access charges may be assessed for termination of VoIP calls. Compare Paetec v. CommPartners, No. 08-0397, slip op. at 11 (D.D.C. Feb. 18, 2010) (finding that "the access charge regime is inapplicable to VoIP-originated traffic"), with Palmerton Tel. Co. v. Global NAPS S., Inc., No. C-2009-2093336 (Pa. P.U.C. Mar. 16, 2010). Finding that Global has successfully shown that a significant percentage of the (undifferentiated) calls for which it was billed are VoIP, and given the FCC's authority in this area and its limited pronouncements, the Court declines to enter the melee and attempt to apply the filed rate doctrine to the facts of this case.[4]

However, although the Court concludes that the filed tariff rates cannot be applied to the facts of this dispute, the Court concludes that the inability to apply the tariff regime as it stands does not preclude MetTel's entitlement to recover in equity. Global contends, both in its summary judgment papers and again in its post-trial briefing, that this state law claim is preempted by the federal tariff regime. The tension inherent in Global's position is obvious: defendant contends that it is not subject to MetTel's filed tariff

---

[4] Given this determination, the Court need not reach the parties' other subsidiary disputes, including Global's claim that all of its traffic is "enhanced" and not subject to access charges, or the dispute over the significance of the "Feature Group D" designation.

rates, while arguing that the statutory rate system precludes the unjust enrichment claims. The Court rejects Global's contention as legally unsupported. Global relies heavily on the Second Circuit's determination in Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998), that the filed rate doctrine derived from the tariff-filing requirements of the Federal Communications Act of 1934 ("FCA") preempted certain state law claims that implicated the nondiscrimination and nonjusticiability strands of the doctrine. See 138 F.3d at 62. However, the Marcus Court first concluded, in its removal analysis, that the FCA did not create complete preemption of all state law claims related to telecommunications. Id. at 53-54 (citing, inter alia, 47 U.S.C. § 414 ("Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.")). The nondiscrimination strand, which seeks to "prevent[] carriers from engaging in price discrimination as between ratepayers," id. at 58, is clearly not implicated by MetTel's claim, as MetTel seeks to force Global to pay in accordance with its billing practices for all other ratepayers. Nor is the nonjusticiability strand implicated; the Court is not "undermin[ing] agency rate-making authority" -- the FCC, while fully competent to address this issue, has failed to exercise its authority but remains free (and is encouraged) to do so -- but is merely filling the gap left by the FCC's pronouncements. Marcus, 138 F.3d

at 61.  Although Global cites to various cases in which other courts have held that unjust enrichment claims are barred pursuant to the filed rate doctrine, those cases are not binding on this Court and, in any event, given the state of the legal landscape, their analyses as to the implications of the filed rate doctrine are not persuasive to this Court in evaluating the instant facts.

     Having thus determined that the unjust enrichment claim is not preempted, the Court emphasizes that Global does not contend that the facts of this case do not satisfy the requirements of an unjust enrichment claim under New York law that it benefitted at MetTel's expense such "that equity and good conscience require restitution." Leibowitz v. Cornell Univ., 584 F.3d 487, 509 (2d Cir. 2009) (internal quotation mark omitted).  There is no dispute that MetTel terminated Global's traffic, for which MetTel incurred costs, and that Global has not paid anything for these (ongoing) services. According to MetTel's president, David Aronow, MetTel pays approximately $.001 per minute to Verizon for calls that cross the leased part of the Verizon network, in addition to other costs inherent in the provision of its services.  Tr. at 149, 151. Moreover, Global itself profits from its transmission of traffic for its customers.  Global's Vice President of Sales, Brad Masuret, testified that an internal study determined an average gross revenue of $0.002 per minute over the last five years.  Tr. at 273.

The measure of damages on an unjust enrichment claims is the reasonable value of benefit conferred on Global by the performance of MetTel's termination services.  See, e.g., Giordano v. Thomson, 564 F.3d 163, 170 (2d Cir. 2009); see also Pereira v. Farace, 413 F.3d 330, 340 (2d Cir. 2005) ("[R]estitution is measured by a defendant's 'unjust gain, rather than [by a plaintiff's] loss.'" (second alteration in original)).  Global contends that MetTel is entitled to, at most, Global's profits.  MetTel argues that the reasonable value of its services is best captured by its filed tariff rates, and thus contends that Global has been enrichment in the amount of $453,310.00 plus amounts that have accrued since trial –- the same damages MetTel claims under its tariff-based claims.  See, e.g., Pl. Post-Trial Br. at 22.  The Court, sitting in this regard as a court of equity, concludes that limiting recovery to Global's profit would be artificially low, but the invoices as billed by MetTel would be too high in light of the various classification concerns.  The Court therefore concludes that a fairer measure of the recovery to be awarded MetTel is the services provided as measured by the federal rate.

The Court thus finds defendant liable to plaintiff for unjust enrichment.  The parties should submit their separate calculations of that amount, as measured by the federal rate, by April 7, 2010, following which final judgment will be entered.

SO ORDERED.

9

_____<br>
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York  
       March 31, 2010